# EXHIBIT "A"



Deposition of:
# Thomas  Burns

*August 5, 2021*

In the Matter of:

# RBR-Technologies, Inc. v. SPG Institute, Inc. et al

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com  |

Page 1

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE EASTERN DISTRICT OF VIRGINIA

2                  (Alexandria Division)

3    - - - - - - - - - - - - - - - - x

4    RBR-TECHNOLOGIES, INC.,              :

5                      Plaintiff,      :

6          vs.                     :    CIVIL CASE NO.

7    SPG INSTITUTE, INC., and        :    1:21-cv-00213

8    SP GLOBAL, INC., and            :

9    DR. DAN TOLLEY,                 :

10                  Defendants.    :

11   - - - - - - - - - - - - - - - - x

12                           Thursday, August 5, 2021

13

14   Virtual Deposition of:

15                  THOMAS BURNS

16   called for oral examination by counsel for

17   Plaintiffs, pursuant to notice, via Zoom video

18   conference, before Christy McGee, CSR, of Veritext

19   Legal Solutions, a Notary Public in and for the

20   Commonwealth of Virginia, beginning at 12:35 p.m.,

21   when were present on behalf of the respective

22   parties:

Page 2

```
 1              A P P E A R A N C E S
 2   On behalf of Plaintiff:
 3         JUSTINE A. BAAKMAN, ESQUIRE
           Offit Kurman, P.C.
 4         1801 Market Street, Suite 2300
           Philadelphia, Pennsylvania 19103
 5         (267) 338-1300
           Justine.Baakman@offitkurman.com
 6
 7   On behalf of Defendants, SPG Institute, Inc., and SP
     Global, Inc.:
 8
 9         KYUNG (KATHRYN) DICKERSON, ESQUIRE
           Smolen Plevy
10         8045 Leesburg Pike, Suite 540
           Vienna, Virginia 22182
11         (703) 552-4113
           kndickerson@smolenplevy.com
12
13   On behalf of Defendant, Dr. Dan Tolley:
14         CHRISTIE A. LEARY, ESQUIRE
           Leary Law, P.C.
15         10505 Judicial Drive, Suite 203
           Fairfax, Virginia 22030
16         (703) 359-7111
           christie.leary@leary-law.com
17
18   ALSO PRESENT:
19         Bryan Harte
20
21                      * * * * *
22
```

1                    C O N T E N T S

2

3    EXAMINATION BY:                              PAGE

4         Counsel for Plaintiffs              4/138

5         Counsel for Defendant                137

6

7

8    BURNS DEPOSITION EXHIBITS:         *        PAGE

9    1   Email with Invoices                    111

10   2   Email with January 5, 2021, Draft Letter   115

11   3   Email with Summary of AR                122

12   4   Outstanding Invoices Email Chain         128

13

14   CONFIDENTIAL EXCERPTS (Under Separate Cover):

15   Pages 18-21

16   Pages 46-51

17

18

19

20

21

22        (* Exhibits attached to transcript.)

Page 4

```
 1                  P R O C E E D I N G S
 2    WHEREUPON,
 3                       THOMAS BURNS
 4    called as a witness, and having been first duly
 5    sworn, was examined and testified as follows:
 6          EXAMINATION BY COUNSEL FOR PLAINTIFFS
 7    BY MS. BAAKMAN:
 8       Q    Good afternoon, Mr. Burns.  My name is
 9    Justine Baakman.  I represent RBR-Technologies,
10    Incorporated, in litigation it has initiated against
11    SPI, SPG, and Dr. Dan Tolley that brings us to this
12    deposition today.
13             It is my understanding that you are here
14    to testify on behalf of both SPGI and SPG.  And so
15    the record is clear, when I refer to SPGI, I am
16    referencing SPG Institute, Incorporated, with an
17    office in Chantilly, Virginia; and SPG refers to SP
18    Global, Incorporated, also in the office in
19    Chantilly, Virginia.  Is that your understanding as
20    to your deposition today, that you are here as a
21    designee on behalf of both SPGI and SPG?
22       A    That's correct.
```

1    Q    Great.  Before we begin kind of the

2  substance of your deposition, I am going to go over

3  some brief instructions just so that way you and I

4  can be on the same page.

5          Before I kind of go into that, have you

6  ever had a deposition taken before?

7    A    I may have years ago.  I don't remember

8  when, though.

9    Q    Okay.  I presume that that deposition was

10  likely not taken via Zoom, so this particular

11  instruction I'm about to give is probably the first

12  time you'll hear it.  Even though we are set up

13  probably either in our respective homes or offices,

14  you are not permitted to communicate with your

15  counsel or with anyone else while the

16  question-and-answer session is going on.  If you

17  need to speak to Ms. Dickerson or Ms. Leary at any

18  point, please let me know, and I'll be more than

19  happy to accommodate you speaking to either of them

20  off the record.  I'd just ask that if there is a

21  question pending that you answer it, and then we can

22  go off the record for as long as you need to consult

1    with either Ms. Dickerson or Ms. Leary.  Is that

2    understood?

3         A    It's understood.

4         Q    Okay.  Great.  Even though we are in an

5    informal setting today, you are still under oath

6    just the same as if you were in the court testifying

7    in front of a judge.  Do you understand that?

8         A    I do.

9         Q    Okay.  And you're doing a great job of

10   this so far, but I do need all of your responses to

11   be verbal because Christy is taking down everything

12   you and I are saying today and ultimately will

13   produce a written transcript of everything you and I

14   are saying.  And although today I might understand a

15   shake of the head means yes or no or an uh-huh or

16   huh-uh means yes or no or something else, later on

17   when I'm reading the transcript and when the other

18   attorneys are reading the transcript, we won't

19   understand what that meant.  So I need all your

20   responses to be verbal so that way we have a clear

21   record.  If you give me a nonverbal response, I will

22   just ask you to clarify that.  You might shake your

Page 7

1    head and I'm going to ask you, is that a yes, is

2    that a no.  Again, that's not because I'm being

3    rude.  I just want to make sure that the record is

4    clear as to what you're actually responding to.  Do

5    you understand that?

6         A    I understand that.

7         Q    Great.  Another thing, because we are

8    conducting this deposition via Zoom, there sometimes

9    can be a lag in time where I might not hear a

10   response that you give or Christy may not hear a

11   response you give or Ms. Dickerson or Ms. Leary may

12   not hear a response that you give.  If that's the

13   case, I may ask you to repeat your answer.  I'm

14   going to ask that you repeat your answer, to the

15   best of your ability, exactly as you provided it

16   rather than giving a different answer if I ask you

17   to repeat it.

18        I'm going to also ask that you let me

19   finish my question before you answer it.  In

20   everyday conversation, you might start to kind of

21   anticipate the question I'm going to ask and give me

22   your answer before I fully ask the question.  I'm

Page 8

```
 1    just going to ask that you not do that for two
 2    reasons:  One, again, so we can kind of have a clear
 3    record.  Christy can't take down you and I speaking
 4    over one another.  And, also, because I want to make
 5    sure that you are actually answering the question
 6    that I ask.  You might anticipate a different
 7    question than the one that I'm actually trying to
 8    ask you.
 9            I am also going to ask that you let me
10    know if you don't understand any of my questions.
11    It's my job to ask questions you can understand, so
12    please let me know if you don't and I will be happy
13    to rephrase it until you do understand what it is
14    that I'm asking you.  With that same concept in
15    mind, if you answer a question, I'm going to assume
16    that you understood what it was that I was asking.
17    I don't want you to guess or approximate -- or I'm
18    sorry.  I don't want you to guess at any of your
19    answers.  If you need to approximate or estimate,
20    please do that.  Let me know if you're doing it, but
21    I just don't want you to guess.  With that in mind
22    "I don't know" or "I don't remember" are perfectly
```

Page 9

1   acceptable answers if they're accurate.

2           And kind of to my comment earlier, I'm

3   happy to accommodate any break that you might want

4   or need.  Just let me know that you would like one.

5   Again, I'm going to ask that you answer any question

6   that is pending before we take a break, but, you

7   know, other than that, I am happy to accommodate

8   breaks as needed.

9       A    Thank you.

10          MS. BAAKMAN:  All right.  Ms. Dickerson

11  and Ms. Leary, do you have any other instructions

12  you'd like to give the witness before I begin?

13          MS. DICKERSON:  No.

14          MS. LEARY:  I don't either.

15  BY MS. BAAKMAN:

16      Q    Okay.  Great.  Mr. Burns, what is the

17  office location for SPGI?

18      A    We're in Chantilly, Virginia, on

19  Conference Center Drive, 14700 (sic) Conference

20  Center Drive, Suite 300.

21      Q    Does SPGI have any other physical office

22  locations?

Page 10

1      A     Not at this time, no.

2      Q     How about back in and around August of

3  2020?  Did SPGI have any other physical office

4  locations?

5      A     Yes, we did in Dayton, Ohio.  I'm sorry.

6  I don't remember the address.

7      Q     When did the Dayton, Ohio, office cease to

8  exist?

9      A     About four months ago approximately.

10      Q     What was the reason that that office was

11  either closed or that a lease was not renewed?

12      A     We were behind in rent.  We were able to

13  catch that up, but they were going to raise the rent

14  significantly and we decided that that was the time

15  to go ahead and move to other facilities while we

16  could.

17      Q     Are there any plans to open another office

18  in Dayton, Ohio, or anywhere else at this point?

19      A     Upon our funding, we would reopen an

20  office in Dayton, Ohio.

21      Q     Is there any physical office location that

22  SPGI is currently intending to move into when and if

Page 11

1   funding is received?

2       A    The folks in Dayton, I think, have looked

3   at some other space.  They've not provided me a

4   preferred area to move to.

5       Q    How many individuals does SPGI currently

6   employ?

7       A    Currently, I believe it's in the range of

8   23 to 24.  That is an estimate.

9       Q    And I am just going to repeat this only

10  because I just want to make sure that we are clear.

11  Those are employees specifically and only that are

12  employed by SPGI.  I am not asking for any

13  individuals employed by SPG.

14      A    Thank you for clarifying that.  At this

15  point there are zero employees in SPGI.

16      Q    When was SPGI first --

17      A    I'll ask you a question, if I could.

18  There are still board members.  Okay?  I am not

19  counting those people as employees.  They don't get

20  paid, but there are still our board members.  But

21  other than that, there are zero employees at SPGI.

22      Q    Okay.  Thank you for clarifying that.  And

Page 12

1    this was an instruction I didn't give, but, you

2    know, as we're talking today, if at any point you

3    want to clarify or give additional detail about

4    something you testified to earlier, you think about

5    something that maybe you hadn't thought about

6    before, just let me know and I'm happy to go back to

7    any particular area of discussion that we may have

8    had.

9              So I just kind of want to go back to the

10   testimony you gave about the fact that SPGI does not

11   employ anyone currently, setting aside any members

12   of a board of directors, that you do not consider

13   employees.  In and around August of 2020, did SPGI

14   have any employees?

15        A    No.

16        Q    Has SPGI ever had any employees?

17        A    No.

18        Q    When was SPGI first formed?

19        A    I don't know that exact date.

20        Q    Can you give me an estimate?  For example,

21   in 2015?

22        A    You know, I really -- SPGI was opened as a

Page 13

1   nonprofit, and I believe that was in '16.  It was

2   for a research situation.  It was never -- we never

3   entered into any research with it, and the first

4   thing that we actually did with SPGI is enter into

5   the contract with the Air Force.  But the date that

6   you're asking for is, I don't know the exact date

7   that that was.  It would have been, I believe, '16,

8   possibly '17.

9        Q    And you made reference to a contract with

10  the Air Force.  Is that the contract with the Air

11  Force that's at issue in this litigation or

12  something else?

13       A    Yes, it is.

14       Q    And I believe you touched on this a little

15  bit in your prior response, but what is the business

16  purpose of SPGI?

17       A    The business purpose, it really has a

18  nonprofit research element to help in some of the

19  projects that we do at SPG.  Once again, we took

20  nothing under that premise during that period of

21  time, and then I was -- I was approached about using

22  the SPGI as a conduit for this Air Force contract

Page 14

```
 1    that we had referred to, and we did.
 2         Q    How many individuals currently serve on
 3    the board of directors for SPGI?
 4         A    I believe just two.
 5         Q    Who are those individuals?
 6         A    That would be Dr. Tolley.
 7         Q    Dr. Tolley and anyone else?
 8         A    I don't believe so.  I don't know that for
 9    certain, but I don't believe so.
10         Q    Okay.  So I thought your response was that
11    there were two individuals who served on the board
12    of directors.
13         A    That would be myself and Dr. Tolley.
14              THE COURT REPORTER:  I'm sorry.  Say that
15    again.
16              THE WITNESS:  That would be myself and
17    Dr. Tolley.
18              You probably have fast fingers.  You're
19    going to have to slow them down.  I don't talk very
20    fast.  I apologize.
21              MS. BAAKMAN:  Not talking very fast is
22    good for Christy.  That makes her happy.
```

1          THE WITNESS:  Well, I only use speed in

2     flash, so I don't know.  I don't know what fast is.

3     BY MS. BAAKMAN:

4          Q    Other than Dr. Tolley and yourself, have

5     any other individuals ever served on the board of

6     directors for SPGI?

7          A    Yes, a -- yes.

8          Q    What are the name -- what is the name or

9     are the names of those individuals?

10         A    John Chiochetti and Roger Mann.

11         Q    When was Mr. Chiochetti on the board of

12    directors for SPGI?

13         A    Early stages.  Early stages, and then we

14    asked him to step down.  And I don't know that date.

15    I'm sorry.  I'm answering a question you didn't ask.

16    I apologize.

17         Q    That's okay.  What was the reason that you

18    ask Mr. Chiochetti to step down?

19         A    Some of the original things that we

20    originally had considered doing would have involved

21    areas of expertise of Mr. Chiochetti, and we

22    abandoned those interests.  Subsequently, we asked

Page 16

 1    him to resign, which he was pleased to do.

 2         Q    When was Mr. Mann on the board of

 3    directors for SPGI?

 4         A    Same thing, early stages.

 5         Q    And was he also asked to step down for a

 6    similar reason as Mr. Chiochetti?

 7         A    Yes, his workload was too heavy to

 8    continue on, and so we asked him to step down.

 9         Q    What is the purpose for the board of

10    directors for SPGI?

11         A    Basically, you know, to administer the

12    company and decide what projects we would or would

13    not take on as an entity.

14         Q    Is SPGI currently working on any projects?

15         A    Just the Air Force contract.

16         Q    How about in and around August of 2020?

17         A    Yes.

18         Q    Any other projects?

19              I'm sorry.  I didn't hear your response.

20    I saw your --

21         A    Not that I'm aware of, no.

22         Q    Has the board of directors -- have you and

Page 17

1    Dr. Tolley consistently served as members on the

2    board of directors since the inception of SPGI?

3         A    No.  I came on the board of directors -- I

4    believe it was about the time that Mr. Mann and

5    Mr. Chiochetti.  There was not -- those were not

6    simultaneous, but in that time frame I joined the

7    board of directors.

8         Q    Was Dr. Tolley always on the board of

9    directors since the inception of SPGI?

10        A    I believe he was, yes.

11        Q    When was SPG formed?

12        A    I believe November of 2015.

13        Q    What is the corporate structure of SPG?

14        A    It's a C Corp.

15             (Whereupon, pages 18 through 21 were

16             marked confidential and proprietary and

17             attached under separate cover.)

18                      *   *   *   *   *

19

20

21

22

Page 22

1   BY MS. BAAKMAN:

2        Q    How many individuals does SPG currently

3   employ?

4        A    As I said, currently, we have had some

5   people asked to be laid off and I believe now

6   we're -- an estimate is about 23.

7        Q    In and around August of 2020, did SPG have

8   more, less, or the same number of individuals it was

9   employing?

10        A    We had more.

11        Q    Can you tell me how many individuals SPG

12   was employing at that time?

13        A    Somewhere between 50 and 54.

14        Q    And what's the reason for the difference

15   in the number of individuals being employed by SPG?

16        A    Basically we've been waiting on an

17   investment package to come in and it has not come in

18   and basically people just couldn't wait much longer

19   before they had to take another job.

20        Q    Is SPG currently paying its employees?

21        A    We are not.

22        Q    At what point -- well, at what point did

Page 23

1    SPG stop paying its employees?

2        A    Sometime around September 1st, the end of

3    August, first part of September in 2020, some of our

4    employees stopped getting paid.  We tried to keep

5    the younger employees on payroll as long as we

6    could, and I think that -- I don't know the exact

7    date of that, but that could have been somewhere

8    mid-October, the end of October, something like

9    that.  But there was -- it was a graduated number of

10   key people that had been with us from the beginning,

11   you know, forego payment, you know, forego salary

12   for the promise of payment in the future.

13       Q    Does SPG have a physical office location?

14       A    Yes, we do.

15       Q    Where is that?

16       A    Chantilly, Virginia.  I don't know why I

17   can't remember my address.  14800 Conference Center

18   Drive.  The same location as SPGI in Chantilly.

19   Would you like the rest of that address?

20       Q    Please.

21       A    14800 Conference Center Drive, Suite 300,

22   Chantilly, Virginia 20151.

Page 24

1      Q     Does SPG have any other physical office

2  locations?

3      A     Not at this time.

4      Q     In and around August of 2020, did SPG have

5  any other physical office locations?

6      A     We had a lab in Manassas, and I believe

7  that's the only other office.  Well, obviously we

8  had the office in Dayton, Ohio.

9      Q     That's the same office we spoke about when

10  discussing SPGI earlier?

11      A     It is, yes.

12      Q     Of the current approximately 23 employees

13  of SPG, do they all work out of the Chantilly,

14  Virginia, office location?

15      A     That is their home base, yes.  The

16  majority of them at this point are working remotely

17  and have been due to the COVID situation.

18      Q     What position, if any, do you hold at SPG?

19      A     At SPG, I'm the chairman of the board and

20  CEO.

21      Q     Does SPG also have a president and other

22  executives?

Page 25

1       A    Yes, we do.  Dan is the -- Dr. Tolley is

2    the president and chief technology officer, and I

3    don't think we have any other corporate people at

4    this point, corporate executives.  Well, Tony Demasi

5    would be, you know, kind of the -- he's our office

6    manager.  At that point -- you know, I'm not sure

7    that we're talking at this point C-level people, and

8    that would be a CTO and a CEO and president.

9       Q    Does SPG also have a board of directors?

10      A    Okay.  Were we talking previously about

11   SPGI or were we talking about SPG?

12      Q    Okay.  So with regards to my questions

13   that I just asked you about your title and whether

14   there were executives, those questions were with

15   regards to SPG.  So I'm asking, does SPG also have a

16   board of directors?

17      A    Yes, it does.

18      Q    Who are the current members of SPG's board

19   of directors?

20      A    Myself as the chairman of the board and

21   Dr. Tolley as a board member.

22      Q    What are the responsibilities of the

1    chairman of the board of directors for SPG?

2        A    Primarily to, you know, set direction,

3    along with Dr. Tolley, of the corporation of what

4    companies we would take under, what investments we

5    would consider bringing in, what type of overall

6    funding the organization and subcompanies need to

7    have in order to get to the point of our VP and

8    initial offer, this while looking at the costs and,

9    you know, profitability of SPG.

10       Q    Did SPG have shareholders?

11       A    Yes, we have Dr. Tolley and myself.  We do

12   get to have a friends-and-family round, which there

13   are some stockholders at that level.  And at this

14   point, that's the extent of that.  We have -- we

15   have provided some incentive stock that's nonvoting

16   stock to certain employees.

17       Q    What percentage of the stock does

18   Dr. Tolley own?

19       A    You know, it's somewhere in the range

20   currently of like 35 percent.  I don't have those

21   numbers in front of me, but Dr. Tolley's family, my

22   family, and then the other shareholders, I think

Page 27

1    ours falls in at the range of around 35 to 38

2    percent each, somewhere in that range.

3        Q    What assets, if any, does SPG currently

4    have?

5        A    At this point we have the stock in our

6    company.  We have ownership positions in all of our

7    subcompanies, GlobalFlyte, S.A. Wyze, CoreSyte,

8    Vyrtx, and Branch Botanicals.

9        Q    The subcompanies that you mentioned, are

10   they all for-profit?

11       A    They are all for-profit.  You could

12   conceivably put SPGI in that position as well, but

13   it -- as being a nonprofit, we don't consider it to

14   be one of our for-profit companies.

15       Q    Does SPG own any property?

16       A    We own office furniture, you know, normal

17   situations that you deal with there.  I think we

18   have a vehicle.  I'm trying to think beyond that.  I

19   don't think we have any other physical properties.

20       Q    Okay.  So no, for example, commercial

21   office buildings?  Anything like that?

22       A    No.

Page 28

1    Q    What is the current value of the stock

2  that you hold of SPG?

3    A    Well, it's right now we are -- according

4  to our investment that we're in the middle of, it

5  could be roughly $5 a share.  It would be roughly $5

6  a share.  The problem is is that without the funding

7  in, it does not demonstrate the value, so without

8  the -- you know, without the funding round

9  completed, we're probably -- with IP that we hold

10 and so forth, you know, it's probably somewhere in

11 the, you know, a dollar per share, you know, 15,

12 20 million, something like that.  You know, once

13 again, I'm not taking into consideration the value

14 of the subcompanies, so I don't have a firm number

15 on that to give you right now.

16   Q    And the subcompanies that you mentioned

17 were GlobalFlyte, CoreSyte, Vyrtx, Branch

18 Botanicals.  Anything else?

19   A    S.A. Wyze.

20   Q    Does SPG provide its employees with

21 laptops?

22   A    Yes, we do.

Page 29

1       Q     When did SPG first start providing its

2    employees with laptops?

3       A     I believe that was from the beginning of

4    the corporation.

5       Q     Does SPG provide its employees with work

6    cellphones?

7       A     Some of the employees.

8       Q     Which employees are those?

9       A     That I don't know.

10      Q     Do you know which employees those are

11   based on their titles or roles, rather than name?

12      A     You know, there were some that had phones

13   and existing numbers and did not want to have

14   phones.  To be honest with you, that's out of my

15   area of expertise in the company.

16      Q     Can you explain to me kind of an

17   originate -- origination -- oh, my goodness.  I'm

18   trying to ask for an organization chart for SPG.  So

19   I understand that you and Dr. Tolley are likely at

20   the very top.  Can you explain to me kind of how the

21   leadership may kind of go from there in terms of

22   kind of downstream.

Page 30

```
 1        A    I can tell you what it was when we were
 2   fully operational.
 3        Q    Okay.
 4        A    Right now, some of those people are not
 5   with us any longer.  In general -- and, once again,
 6   I'm not going directly from our org chart.  I'm
 7   going from the top of my head.  Dr. Tolley -- of SPG
 8   we're speaking of, I'm the CEO.  Dan is president
 9   and CTO.  We had Roger Mann was one of our executive
10   vice presidents.  Tony Demasi was a vice president
11   of basic operations and so forth.  We had Dan
12   Ehlert, who was our comptroller, and then beyond
13   there, administrative people in general.
14             Generally, what we would look at is our
15   core people would provide advice and oversight
16   decisions on whether or not we were going to take on
17   a particular piece of IP and develop it into a
18   company, but part of our TCF process --
19             Kathryn, we want to make certain -- I
20   think this is part of our disclosure as well.
21             But we offered a combined management team
22   and provided management of the subcompanies.  So
```

1   primarily our management team here operated as what

2   we called our TCF Management Group.  Okay?  And then

3   we would have one of our employees designated as the

4   CEO and one designated as president of what we call

5   a TO of the subcompanies, transformative

6   organization, TO.  We would then meet with them and

7   act as their C-suite so that we weren't having to

8   pay out additional monies or train other people to

9   come in.  So that's why we had stayed at the range

10  of five, six, seven projects at a time so that we

11  could work with the individuals in the formation of

12  that company and still provide a level of expertise

13  that they would not be able to gain as a new co. on

14  their own.  I hope I -- I hope that made that as

15  clear as mud for you, but that's what we do.

16          And I do apologize.  I'm getting closer

17  and closer to the screen.  I don't hear very well.

18  And I don't mean to be pushing my face up so close,

19  but I do want to hear the questions you ask

20  completely.

21      Q    Thank you.  I appreciate that.  And if you

22  don't hear one of my questions, please let me know,

Page 32

```
 1   and I'll repeat it or ask Christy to repeat it for
 2   you.
 3        A    Thank you.
 4        Q    Is Mr. Mann still an employee of SPG?
 5        A    Yes.
 6        Q    Is Mr. Demasi still an employee of SPG?
 7        A    Yes.
 8        Q    Is Mr. Ehlert still an employee of SPG?
 9        A    No, he's not.
10        Q    When did Mr. Ehlert cease his employment
11   with SPG?
12        A    Recently.  Less than a month, I believe.
13        Q    What was the reason that Mr. Ehlert --
14        A    Could not go any longer without payment.
15        Q    Is Mr. Ehlert one of the individuals that
16   SPG provided a work cellphone to?
17        A    I don't know the answer to that.
18        Q    When employees leave the service of SPG,
19   decide to end their employment, are they responsible
20   for turning over any equipment or items that maybe
21   they've been using that were SPG property before
22   their employment ends?
```

Page 33

```
 1     A    That is -- that is our requirement.  That
 2  has not necessarily been held.  Some of the people
 3  that have left I believe are -- I'm not sure they're
 4  fully compliant with that requirement.
 5     Q    So what steps, if any, did SPG take to
 6  make sure that its employees either shortly before
 7  their employment ends or right as their employment
 8  is ending turn over any SPG equipment or cellphones,
 9  laptops that that employee may have been using?
10     A    You know, there's little that we can do
11  with most of the folks, other than when they ask to
12  be laid off, we provide them a layoff letter, and
13  part of the requirement of getting that termination
14  letter is that they return company properties.  And
15  the only value, I guess, to the layoff letter is
16  that they need that to file for unemployment.  So
17  there's limited anything that you can do to do that.
18          And I think some of them feel that
19  potentially any of the -- you know, anything that
20  they keep would offset the money that we would owe
21  them from back salaries.  Once again, I don't know
22  the status of equipment from all of the people.  I
```

Page 34

1   should have said that to begin with, I guess.

2        Q    Is SPG currently in possession of the

3   laptop that Mr. Ehlert was using in his role as

4   comptroller of SPG?

5        A    I do not know that we are.  We were told

6   that we would have it.  I'm not sure that we have

7   received it.

8        Q    Who would know whether it's been received?

9        A    Dr. Tolley would, you know, I believe know

10  that information.

11       Q    And why do you believe he would know it

12  rather or, you know, in place of you knowing it, for

13  example?

14       A    Anything -- generally, I don't get

15  involved in that part of our business.  And the

16  personnel and HR thing, that part of it is not the

17  level I'm involved in.

18       Q    Other than Mr. Ehlert, is there anyone

19  either currently employed at SPG or formerly

20  employed at SPG that was -- that played any role in

21  SPG's accounting?

22       A    No.

Page 35

```
1        Q    Does SPG have up-to-date contact
2   information for Mr. Ehlert?
3        A    I'm sure we do.  I'm sure we do.
4        Q    Do you have that information as we sit
5   here today?
6        A    I do not.
7        Q    Did SPG ever employ an individual by the
8   name of Jim Merkle?
9        A    Yes.
10       Q    Is Mr. Merkle still employed by SPG?
11       A    No, he's not.
12       Q    When Mr. Merkle was employed by SPG, what
13  was his title?
14       A    Contracts manager, I think.  At that -- I
15  believe that's it.  I could be wrong.  So maybe I
16  should say, I don't know.
17       Q    What were Mr. Ehlert's responsibilities as
18  comptroller of SPG?
19       A    He basically handled receivables and
20  payables and interfaced with the accounting service
21  that we employed or we subscribed to.
22       Q    What is the name of that accounting
```

Page 36

1   service?

2       A    The product is called CorePro.  I think

3   that is the name of the company as well.  I don't

4   know that for certain.

5       Q    What was or is your understanding of the

6   services that CorePro was providing SPG?

7       A    Dan would provide them with invoices and

8   payables, bank records, credit card accounts, all of

9   the elements that would prescribe to a business'

10  receivables and payables.  All of the elements that

11  would move to a balance sheet.

12      Q    Was CorePro maintaining a spreadsheet of

13  some sort with this information that you just

14  described?

15      A    They provided the books and the chart of

16  accounts, those types of things, yes.

17      Q    Is SPG still employing the services of

18  CorePro?

19      A    No.  Once again, they terminated us as of

20  a couple of months ago.  I don't know the exact

21  dates, but they terminated service for nonpayment.

22      Q    Is there currently any employee of SPG

1   who's taken on the responsibilities and kind of

2   tasks that CorePro was providing since CorePro

3   terminated its services with SPG?

4       A    As best we can, Dan has tried to pull

5   information that Mr. Ehlert had and at this point

6   either tried to get a -- what I asked CorePro for is

7   to provide us a summary of what they had when they

8   had ended services so that we could move that into a

9   parochial accounting system and try to keep track of

10   those things ourselves either through QuickBooks or

11   just other standard accounting procedures.  But that

12   has not -- we are doing our best to try to get those

13   items together so we can get a clearer look at that.

14       Q    When was the last time that SPG was using

15   the services of CorePro?

16       A    They started to slow down a number of the

17   services, I would say, last September, October.

18   They had a grading scale of services that they would

19   provide.  We were able to get them to do some work

20   through that period, but they stopped all services a

21   couple of months ago.  So full services they would

22   have stopped, I would say, the end of last year in

Page 38

1   general.  I have not gotten a P&L from them or been

2   able to, you know, do any summary of the books since

3   the first of the year.

4        Q    Okay.  So that was going to be kind of the

5   follow-up question.  Does SPG have any access to any

6   of the information or documents that it either

7   submitted to CorePro or that CorePro -- that CorePro

8   was kind of keeping for it or providing for SPG when

9   services were still in tact?

10       A    Ms. Baakman, I'm sorry.  I couldn't

11  understand that question.  Could you repeat it?

12       Q    Yeah, absolutely.  Does SPG still have

13  access to any of the documentation that was

14  submitted to CorePro?

15       A    We have copies, I believe, but the

16  majority of things that were sent to them had been

17  sent back to us.  I don't know if Dan kept copies of

18  everything that he sent away.  I would hope that he

19  did, but I don't know that.

20       Q    Does SPG have any formal document

21  retention policy?

22       A    No.

Page 39

```
 1      Q    How about an informal document retention
 2   policy?
 3      A    Just other than good practice, I don't
 4   think we have a formal -- any type of a formal
 5   policy on that at all.  I don't know that I've ever
 6   in any of the companies I've been involved with had
 7   a document retention policy being small companies.
 8   Once again, the answer should have been no.
 9      Q    Does SPG have a document management system
10   of any kind?
11      A    No.
12      Q    So are documents that SPG keeps in the
13   course of its business in paper form, in electronic
14   form, in some other form?
15      A    In that area, yes.  I think that, you
16   know, generally, contracts, those types of things,
17   would be one of the things that Mr. Demasi and his
18   people that he had working for him would keep, make
19   certain that those documents were kept somewhere.  I
20   think, you know, that possibly Mr. Merkle --
21   Mr. Merkle would have anything that had to do with a
22   government contract or whatever.  He would have
```

Page 40

1    maintained those.  In that regard, I'm sure that

2    they had a methodology of maintaining those

3    documents.  Obviously, whenever I would ask for

4    something from someone, they would come up with it,

5    so, you know, they must.  I don't know that, once

6    again, that was a formal policy as much as an

7    executive's policy of how they maintain records to

8    be able to provide them when management needed them.

9        Q    Is there some type of shared folder or

10   drive that all SPG employees have access to, for

11   example, share/store electronic documents?

12       A    Yes.

13       Q    And can you describe that to me, where

14   that is, if all SPG employees have access to it.

15       A    I believe, once again, since whenever I

16   need anything I have to ask somebody to get it for

17   me, they go to the shared drive and I believe there

18   are permissions inside that site for certain people

19   having access to specific levels of documents.  As I

20   said, you know, people provide that documentation

21   and retrieve it as I need it.  So I guess there is a

22   formal document retrieval.  I don't know.  That's

Page 41

```
 1    not my strong suit.  I'm sorry.

 2         Q    Does SPG have internal IT personnel?

 3         A    We do or did.

 4         Q    So currently does SPG have any internal IT

 5    personnel?

 6         A    It was my understanding that he was

 7    planning to leave.  I don't know if that has

 8    actually happened.

 9         Q    What is that person's name?

10         A    That would be John Elliott.

11         Q    When did Mr. Elliott's employment with SPG

12    begin?

13         A    Oh, probably two years ago, maybe three

14    years ago.

15         Q    Any other individuals that SPG employed at

16    any point that were internal IT personnel?

17         A    No.

18         Q    Does SPG use any external vendors for IT

19    support or anything related to IT?

20         A    No.

21         Q    Is SPG in possession of Mr. Merkle's

22    laptop?
```

1      A    I don't know the answer to that.

2      Q    Was Mr. Merkle an individual that was

3   provided an SPG cellphone?

4      A    I'm sorry.  I don't know the answer to

5   that.

6      Q    Who would be the person who would know the

7   answer to those questions?

8      A    Dr. Tolley.

9      Q    Is Mr. Demasi still an employee of SPG?

10     A    You know, I don't know.  He was going

11  to -- once again, he tried to stay as long as he has

12  been able to.  I don't know if he has asked to have

13  a layoff letter or not.  I know he was close to

14  doing that.  We are still in contact with him.  He

15  has moved out of state, and, you know, certainly

16  with most of the stuff that he could do, he would be

17  able to work remotely for us.  He's a valued

18  individual of the company.

19     Q    What were or are, depending on

20  Mr. Demasi's status, his role, his responsibilities?

21     A    Well, Tony was with us since the formation

22  of the company and he likes -- let me use his term

 1   is that he's chief gopher.  As the vice president in

 2   the organization, he's certainly much more valuable

 3   than a gopher.  But he basically would take on

 4   responsibilities that the company had or take on

 5   whatever needs we had for him at the time.  He

 6   primarily made certain that our insurances were up

 7   to date, you know, kind of would -- he would

 8   interface with our HR people and basically be a

 9   sounding board for employees.  Wonderful man.

10        Q    What are Mr. Mann's responsibilities as

11   executive VP?

12        A    As we work with our subcompanies, he

13   provides input from his experiences and areas when

14   we need that.  But primarily he operates as the CEO

15   of GlobalFlyte organization and he's done a -- he's

16   very busy in that particular project.

17        Q    What is the business purpose of

18   GlobalFlyte?

19        A    GlobalFlyte is an applicative service.  I

20   forget what you call it.  SAS, I think, and it is --

21   the product that they have is AWARE.  AWARE works

22   with primarily emergency management organizations to

Page 44

1    coordinate responses and communications more

2    efficiently.  And he's actively engaged and seen at

3    that project.

4         Q    Is that project at a point where it is

5    profitable?

6         A    It is not profitable at this point.  It is

7    at the point where it is looking for investment.

8    You know, there's -- they have had a certain amount,

9    very minimal amount, of grant money to work with.

10   We have been able -- once again, there's a good deal

11   of software.  Software as a service was the term I

12   was looking for.  But that software has been largely

13   developed and isn't profitable at this point, and

14   they're endeavoring to pull revenue.  But they are

15   not profitable at this point.

16        Q    What is the business purpose of CoreSyte?

17        A    CoreSyte is a sweat-monitoring system and

18   hydration-monitoring product.  It basically has

19   receptors that goes -- it goes on a person's skin.

20   There's noninvasive receptors to be able to measure

21   the amount of hydration that an individual is

22   dealing with.  Its primary role right now is in the

Page 45

1  health market, exercise, athletic teams, race car

2  drivers, that type of thing, and it provides them

3  status as to their hydration.

4      Q    Is CoreSyte at a point of development that

5  it is profitable?

6      A    It is not profitable yet.  It's still in

7  development.

8      Q    What is the business purpose of Vyrtx?

9      A    Vyrtx is a process management system for

10  the movement, tracking, and conditioning of

11  transplant organs and tissue.

12      Q    And is Vyrtx at a point in development

13  where it is profitable?

14      A    It is not.

15          (Whereupon, pages 46 through 51 were

16          marked confidential and proprietary and

17          attached under separate cover.)

18              *   *   *   *   *

19

20

21

22

Page 52

1   BY MS. BAAKMAN:

2       Q    Then with regards to SAYS, was that one of

3   the subcompanies?

4       A    S.A. Wyze, yes.

5       Q    S.A. Wyze.  What is the business purpose

6   of S.A. Wyze?

7       A    S.A. Wyze is similar to CoreSyte, other

8   than its major business focus is in the healthcare

9   industry dealing with issues of depression,

10  postpartum depression, other areas that there seems

11  to be a lot of women's health type of things and

12  developing a -- you know, the same type of a

13  monitoring system so that medications can be, you

14  know, tailored to certain areas, as well as just the

15  feedback of, you know, certain circumstances in a

16  particular time.  Similar -- dealing through sweat

17  sensing, so similar to CoreSyte other than a

18  different application.

19      Q    Is that at a point in development that it

20  is profitable?

21      A    No.

22      Q    Any other subcompanies that I missed that

Page 53

1   are for-profit that you had mentioned earlier?

2       A    I don't believe so.  CoreSyte, S.A. Wyze,

3   Branch Botanicals, Vyrtx, and AWARE of GlobalFlyte.

4       Q    Did SPG at some point employ an individual

5   by the name of Timothy Shaw?

6       A    Yes.

7       Q    Okay.  Is Mr. Shaw still an employee of

8   SPG?

9       A    Yes, he is, I believe.

10      Q    Okay.  What is Mr. Shaw's title?

11      A    He is operating as president of

12  GlobalFlyte, and he was the manager of the Dayton

13  office.

14      Q    Do you anticipate that Mr. Shaw will

15  resume his role of manager of an Ohio office once

16  one is opened again?

17      A    I would hope that he would, yeah.

18      Q    Did SPG ever employ an individual by the

19  name of Mark Poehl?

20      A    Yes.

21      Q    Is Mr. Poehl still an employee of SPG?

22      A    As far as I know, yes.

Page 54

1      Q     What is Mr. Poehl's title?

2      A     I don't know, quite frankly.

3      Q     Do you know his responsibilities?

4      A     He was working on the Air Force contract

5   with Mr. Shaw and Mr. Wall at SPGI.

6      Q     Mr. Wall, are you referring to Ken Wall?

7      A     I am.

8      Q     Is Mr. Wall a current employee of SPG?

9      A     I believe so, yes.

10     Q     What is his title?

11     A     I can't tell you.  I don't know.

12     Q     What is -- what responsibilities does

13   Mr. Wall currently have?

14     A     Continuing to, you know, work through the

15   process with SPGI and the Air Force contract.

16     Q     Does Mr. Wall also work in some capacity

17   on behalf of GlobalFlyte?

18     A     Not that I'm aware of.  You know, once

19   again, with the company as a whole, when things need

20   to be done, people will perform whatever functions

21   that they need to.  So I'm not aware that he's -- he

22   could be.  He could be.  It wouldn't be out of the

Page 55

1    realm of possibility.

2         Q    Does SPG currently employ an individual by

3    the name of Marcia Gross?

4         A    I believe so.  I can't tell you whether

5    she is still an employee or not.

6         Q    Assuming Ms. Gross is still an employee of

7    SPG, what are her responsibilities?

8         A    You know, I don't know what that is.  I

9    believe she was -- I believe she was in accounting

10   for Mr. Wall.  I have not had the pleasure to ever

11   meet Ms. Gross.

12        Q    Did you play any role in gathering

13   documents and information for the purpose of making

14   a document production in connection with this

15   litigation?

16        A    I'm not certain of what the terms are.

17   The interrogatories, is that a correct term?  You

18   asked for information, is that correct?

19        Q    So interrogatories are written questions

20   or they can written statements that kind of seek

21   information through the discovery process.  Request

22   for production of documents are exactly what they

Page 56

1   sound like, written requests for various documents

2   and things to be produced.  My office provided both

3   interrogatories and request for production of

4   documents directed to SPGI, SPG, and Dr. Tolley.

5   What I am seeking is information on what role you

6   played, if any, in preparing responses to that

7   written discovery?

8        A    I played a minor role.  When -- basically

9   Dan took those, looked at them.  He was more

10  familiar with the operation of SPGI than I.  He

11  would ask me a question as to my recollection of

12  anything.  I would provide that.  Dan is a very

13  meticulous person and had most of the information.

14  You know, as far as answering the questions are

15  concerned, asking for documents and so forth, Dan

16  and whoever he has working with him on that have

17  been able to provide most of the other information

18  to you.  I know that he had asked to have -- I think

19  they got emails and so forth that were relevant.

20  The one thing that I know that they did ask for that

21  we're in the process of having done now is there

22  were text messages from my phone relative to

Page 57

1    Mr. Trip, and we're in the process of compiling

2    those at this point.

3        Q    Are you aware of what was done to gather

4    the documents responsive to RBR's request for

5    production?  For example, do you know what search

6    terms, if any, were used to search emails that may

7    have been responsive to RBR's request for production

8    of documents?

9        A    No.

10       Q    If you don't know, who would know?

11       A    Dr. Tolley would know.

12       Q    What was done, if anything, to search the

13   shared drive that we discussed earlier for documents

14   that may be responsive to RBR's request for

15   production?

16       A    I don't know the answer to that.

17       Q    Who would know, if you don't?

18       A    Dr. Tolley or someone that he had tasked

19   to do that.  Once again, I guess I've been saying

20   Dr. Tolley.  You know, obviously he's had to do most

21   of this with our lack of, you know, assistance, and

22   he's worked his tail off to provide as much

Page 58

1    information as he could in a timely fashion.

2        Q    Are you aware of anything that was done to

3    search cellphones of either current or former

4    employees for any text messages that may be

5    responsive to RBR's request for production of

6    documents?

7        A    The only thing that I would know of that

8    is the request that I've had to have text messages

9    from my phone, you know, made available to you.

10       Q    The text messages that you were asked to

11   either provide or to be made available, were those

12   text messages solely between you and Scott Trip?

13       A    Yes.

14       Q    Okay.  Who provided that directive to you?

15       A    I guess I'm assuming I was told that that

16   needed to be done, and, frankly, I'm not certain if

17   it was Dan that told me that or possibly someone

18   else.  But, you know, frankly, I don't know.

19       Q    Are you aware of anyone besides Dr. Tolley

20   who is working on gathering the information and

21   documents responsive to RBR's request for production

22   of documents?

Page 59

1        A      He has been -- I think he's had several of

2     our people, you know, that have been able to come in

3     and help gather some of that information.  I don't

4     know if possibly Mr. Ehlert was trying to gather

5     information that he'd had, his messages.  He took

6     another job, but I know at one point he said, Look,

7     I'm too tied up to help do that.  But I think then

8     he did provide some information, and there's --

9     beyond that, I don't know.  I know Dan's children

10    have come to help, you know, try to pull documents

11    and sort documents and so forth.  So there's been

12    any number of people that have been working on that,

13    but I don't know the extent of who they are.

14       Q      Do you know if Mr. Elliott is assisting

15    Dr. Tolley with gathering the documents?

16       A      I think that's yes.  Put it this way, I'm

17    assuming that that's yes.  I haven't seen him here

18    doing that.

19       Q      And you're assuming that because of

20    Mr. Elliott's role as an IT person or for some other

21    reason?

22       A      His role as an IT person.

Page 60

1      Q    Okay.  Are you aware of any search of

2  paper documents that is being done or was done in

3  anticipation of making a document production in

4  connection with this litigation?

5      A    I'm not aware of it.

6      Q    Are there -- does SPG keep paper files in

7  the course of its business?

8      A    As a company, I believe that accounting

9  kept some paper files.  Individuals, as it pertained

10  to their jobs, maintained some paper files.  As far

11  as everything coming to a central repository that

12  the company had direct control of that everybody had

13  to, you know, move into, I'm not aware that that has

14  occurred at all.  It wasn't something that I would

15  know whether we have or not.  I don't think that we

16  do.

17      Q    Does SPG use a service for the purpose of

18  keeping track of employees' arrival time, departure

19  time, work that may be done during the workday?

20      A    Yes.  It is a -- that was part of our

21  CorePro system.  Once again, there wasn't a time

22  clock to punch in when you came in and when you went

Page 61

```
 1    out, but it electronically kept track of all of the

 2    time cards.

 3         Q    In light of SPG no longer using the

 4    services of CorePro, how is that information

 5    currently being either stored or collected?

 6         A    I think that is simply being stored by

 7    Excel at this point.

 8         Q    Did SPG provide employees of its own for

 9    the purpose of performing work on behalf of SPGI?

10            MS. DICKERSON:  I'm sorry.  I didn't

11    understand that question.

12    BY MS. BAAKMAN:

13         Q    Okay.  No problem.  Did SPG employees ever

14    conduct any business on behalf of SPGI?

15         A    SPG employees staffed SPGI and conducted

16    regular business that needed to be done on SPGI's

17    behalf.

18         Q    How would SPG keep track of the time its

19    employees were performing services on behalf of

20    SPGI?

21         A    It was part of their job description, and

22    as they put their hours into their supervisors,
```

Page 62

1   their supervisors then would be, you know, under

2   SPGI and it would go into CorePro as, you know, they

3   would put the project they were working on and what

4   time they were dedicating to that.

5        Q    So CorePro was the system that was being

6   used ultimately to house that type of information?

7        A    That's correct.

8        Q    Do you and Dr. Tolley keep track of the

9   time that you work on the various subprojects of

10  SPG?

11       A    You know, I don't believe we segment our

12  time, as I think we consider that to be overhead.

13  The answer should be no, I guess.

14       Q    Do you receive a salary from SPG?

15       A    Technically.

16       Q    And when you say "technically," is that

17  because you currently are not receiving a salary?

18       A    I forgot what a salary looked like.  Yes,

19  I do not receive salary currently.

20       Q    At some point were you receiving a salary

21  from SPG?

22       A    Yes, I was.

Page 63

1      Q    And what was that salary, whether it's

2  annually or monthly, whatever is easier for you to

3  tell me?

4      A    Around 360,000.

5          MS. DICKERSON:  And just for clarity, I

6  believe the witness intends that to mean 360,000

7  annually as opposed to monthly.

8  BY MS. BAAKMAN:

9      Q    That was my assumption.  Thank you for

10 clarifying that.

11         Are you aware of either Dr. Tolley or

12 anyone on behalf of SPG collecting bank statements

13 for the purposes of producing them in connection

14 with this litigation?

15     A    I'm not aware of that.

16     Q    Does SPG use a banking institution of any

17 kind?

18     A    Certainly.

19     Q    I'm sorry?  I didn't hear you.

20     A    Yes.

21     Q    What is the name of that institution or

22 institutions?

Page 64

1        A     United Bank.

2        Q     Does SPGI currently use any banking

3   institution?

4        A     Yes.

5        Q     What is the name or names of that

6   institution?

7        A     United Bank.

8        Q     How many banking accounts does SPG have at

9   United Bank?

10        A     SPG or SPGI, I don't know if there are

11   sub-accounts or how they're separated out.  I

12   thought there were just two accounts.  I was told

13   that SPG has one account and then SPGI has three

14   accounts.  And that's --

15        Q     Who told you that information?

16        A     Dan Ehlert had told Dr. Tolley and

17   Dr. Tolley told me.

18        Q      In what context did that information get

19   shared with you?

20        A      Just on the extent that it was -- you

21   know, that I had made the comment to Dr. Tolley, you

22   know, that we had the two United Bank accounts and

Page 65

1    so forth, and he said, well, actually, we have more

2    than that, you know, for a procedural process.

3         Q    Does SPG receive bank statements from

4    United Bank?

5         A    Electronically we have them available.  We

6    do not receive paper.  Well, I don't know.  We may.

7    I shouldn't say that.  I don't know.  I would assume

8    paper or electronic, obviously, they would.  I don't

9    know if we receive one, the other, or both.

10        Q    Who has access to SPG's account at United

11   Bank?

12        A    I do and Dr. Tolley does and Dan Ehlert

13   did.

14        Q    Who has access to SPGI's three accounts at

15   United Bank?

16        A    Dr. Tolley, myself, and Mr. Ehlert.

17        Q    Is that -- are those the same individuals

18   who had access to those accounts in and around

19   August of 2020?

20        A    Yes.

21        Q    Are there any other people who had access

22   to SPGI's account and -- SPGI's three accounts at

Page 66

1    United Bank in and around August of 2020?

2         A    That I don't know.

3         Q    Who would know that?

4         A    United Bank, but possibly Dr. Tolley.  I

5    don't think there was anyone else that had access to

6    it, but for whatever reason I don't know that for

7    certain.

8         Q    Was anyone responsible for reviewing

9    monthly statements, whether they were received

10   electronically or in paper form, for the purpose of

11   verifying the accuracy of those statements?

12        A    That would be the comptroller, Mr. Ehlert.

13        Q    Do you know if Mr. Ehlert did, in fact, do

14   that in and around 2020 to 2021 prior to his

15   employment ending?

16        A    You know, in his role as comptroller, he

17   would review those past -- the other person that

18   would have -- and I don't know how they would have

19   that.  It would have been CorePro because they would

20   have had those statements, once again, to do

21   reconciliation with.

22        Q    Are those monthly statements that we've

Page 67

 1    been discussing stored electronically somewhere

 2    within SPG's shared drive?

 3         A    I don't know.

 4         Q    Does SPG or SPGI have an online user

 5    account for their respective banking accounts at

 6    United Bank?

 7         A    Yes.

 8         Q    Are the individuals that have access to

 9    that yourself, Dr. Tolley, and formerly Mr. Ehlert?

10         A    That's correct.

11         Q    Anyone else?

12         A    Not that I know of.

13              Ms. Baakman?

14         Q    Yes.

15         A    I'm sorry, but I need to take a shot.

16    Okay?

17         Q    I was going to suggest we take a break

18    shortly.  So 10, 15 minutes?  What do you need,

19    Mr. Burns?

20         A    No more than ten minutes.

21              MS. BAAKMAN:  Okay.  So why don't we take

22    a break for about ten minutes.

Page 68

1          THE WITNESS:  Okay.

2          MS. DICKERSON:  All right.

3          (Brief pause.)

4    BY MS. BAAKMAN:

5          Q    Mr. Burns, I want to start to talk about

6    the contract with the Air Force that we've been kind

7    of referring to earlier in the deposition testimony.

8    Did you play any role in securing SPGI's contract

9    with the Air Force?

10         A    No.

11         Q    Who was responsible for securing the

12   contract?

13         A    It was a -- they responded to a, I don't

14   know, offering.  I believe it was -- the team that

15   was involved was Mr. Shaw and possibly Mr. Mann.

16         Q    Did Dr. Tolley play any role in securing

17   the contract?

18         A    Possibly on a consultive situation on

19   technical components.  You know, obviously, their

20   part of it would be some financial things that we

21   would have had to agree to, and in that regard, I

22   would have been consulted on that.  But I don't

Page 69

 1    recall specifically what that was about.

 2         Q    Who was SPGI's point of contact at the Air

 3    Force for this contract?

 4         A    Early on it was Mr. Shaw, and I think that

 5    transitioned to Mr. Wall.

 6         Q    Who were those individuals communicating

 7    with at the government?

 8         A    You know, I've never met any of the people

 9    representing the government.  I've seen names.

10    Mr. Schumacher possibly, Shoemaker, Schumacher,

11    something such as that, I think, was a point of

12    contact.  Beyond that, I don't know.

13         Q    Is the individual you're referring to,

14    Mr. Schumacher, is that Corey Schumacher?

15         A    That sounds correct, yes.

16         Q    How about an individual by the name of

17    Marina Schemmel?

18         A    I'm not familiar with that name.

19         Q    Can you explain to me the process by which

20    SPGI was to receive funds from the government under

21    this contract?

22         A    I am not at all familiar with the entire

Page 70

1    internal process of the contract at all.

2         Q    Okay.  So I want to understand your answer

3    to that question a little bit better.  Do you have

4    no knowledge whatsoever or do you just have a

5    limited knowledge?

6         A    I know that we submit invoices that come

7    in and we submit, and then we're -- we pay those.

8    We receive funds from the Air Force to pay those

9    with and then we go from there.  But I -- yeah, so I

10   guess it would be limited knowledge possibly.

11        Q    Okay.  So I --

12        A    On a day-to-day basis, I do nothing with

13   that and have done nothing with it.

14        Q    Okay.  And I understand that.  Part of --

15   part of the reason I'm asking it to you is,

16   Mr. Burns, you are here testifying on behalf of the

17   corporate entities today, not just your personal

18   knowledge.  So, you know, I want to understand

19   before I kind go into the substance of my questions

20   about this, what exactly did you do today to prepare

21   for the deposition?  Or not just today.  I should

22   say, what did you do at all to prepare for the

Page 71

1   deposition that we're having today?

2        A    In general, looked at the questions

3   that -- briefly looked at the questions that were

4   proposed and how they've been answered and take a

5   look through it.  Unfortunately, it was very

6   briefly.

7        Q    And when you say the answers that -- or,

8   I'm sorry, the questions that were posed, are you

9   referring to the written discovery requests or

10  something else?

11       A    Yes, it would be the written discovery

12  requests.

13       Q    Did you review the Complaint?

14       A    I had reviewed the Complaint previously,

15  yes.

16       Q    How about the answers filed by SPGI and

17  SPG to the Complaint?

18       A    I had.  We discussed when we were -- when

19  we were providing those, we discussed those at the

20  time, and they were filed after that.

21       Q    Did you review them specifically for the

22  deposition today or had you reviewed them, you know,

Page 72

1    a while ago when they were first filed?

2        A    We had reviewed -- I'm sorry for talking

3    over you.  I had reviewed those previously.

4        Q    Did you review any of the documents that

5    were produced by either SPGI or SPG in connection

6    with this litigation?

7        A    To a limited extent, yes.

8        Q    So which documents did you review?

9        A    Generally, just the things that were going

10   to be provided, you know, based on the questions

11   that you had.

12       Q    So, again, just so I understand, those

13   documents you reviewed were done prior to their

14   production and not in preparation for today?

15       A    I would not say that it was prior to their

16   production.  You had produced -- you had asked the

17   questions, submitted them to us.  Dan and his group

18   answered those or tried to answer those as clearly

19   as they could.  I briefly looked over it to make

20   certain that there was not anything that was

21   glaringly that I had or that was glaringly being

22   omitted and they looked reasonable to me and we went

Page 73

1    ahead then and submitted them.

2         Q    Did you review any invoices that RBR-

3    Technology submitted to SPGI in preparation for your

4    deposition today?

5         A    Yes.

6         Q    Did you review any bank statements in

7    preparation for your deposition today?

8         A    No, I did not.

9         Q    Did you review the subaward with RBR in

10   preparation for today?

11        A    I had reviewed that previously.

12        Q    And did you review SPGI's contract with

13   the Air Force in preparation for today?

14        A    I had reviewed that a long time ago.

15        Q    Did you review any email correspondence

16   sent by SPGI employees that explain a process by

17   which money was to be received by SPGI from the

18   government under its contract with the Air Force?

19        A    I'm familiar somewhat with the process,

20   yes.

21        Q    Okay.  And what is that knowledge based

22   off of?

Page 74

1    A    It was just based off of briefings that I

2  had had on a tangential basis just requesting how

3  are things going, where are we at, and then, you

4  know, at that point getting feedback from the folks.

5    Q    Who at SPGI was responsible for knowing

6  the process by which SPGI was to receive money from

7  the government under this contract?

8    A    I think that would have been Mr. Ehlert

9  and probably Mr. Shaw.

10    Q    Did you speak with either Mr. Ehlert or

11  Mr. Shaw to get a better understanding of that

12  process in preparation for today?

13    A    No.

14    Q    I'm sorry.  What was the answer?

15    A    No.

16    Q    It's my understanding that documentation

17  and communication with the Air Force under SPGI's

18  contract was conducted/submitted through Wide Area

19  Workflow.  Are you familiar with that?

20    A    I am familiar with Wide Area Workflow,

21  yes.

22    Q    What is your understanding of -- well, is

Page 75

1    it your understanding that SPGI was using Wide Area

2    Workflow in connection with its contract with the

3    Air Force?

4           A    I believe that's yes.

5           Q    What is your understanding of what Wide

6    Area Workflow is?

7           A    That generally it is the normal workflow

8    which invoices are submitted, reviewed, approved,

9    and paid through.

10          Q    Did you review any of the documentation

11   that SPGI submitted through Wide Area Workflow in

12   connection with this contract in preparation for

13   today?

14          A    No.

15          Q    Do you have access to Wide Area Workflow?

16          A    I do not.

17          Q    Who at SPGI or SPG has access to Wide Area

18   Workflow?

19          A    I believe that was Mr. Ehlert and possibly

20   Mr. Merkle.  But I think Mr. Ehlert.

21          Q    So there are no current employees at SPGI

22   or SPG that have access to Wide Area Workflow at

1   this time?

2       A     That is my understanding.  I think that

3   there is a process with the government to go in and

4   change, you know, who that contact person is, and I

5   don't know if that has been done yet or not.

6   Mr. Shaw may have taken care of that for us.  But,

7   actually, it wouldn't have been Mr. Shaw.  It

8   probably would have been Mr. Wall, if it was done.

9   You know, Mr. Shaw would have been out of that part

10  by then with his duties with GlobalFlyte.  So

11  Mr. Wall may have had support people with him that

12  could handle that, and I can't say whether they had

13  access to Wide Area Workflow or not.  I think that

14  it was Mr. Ehlert.

15      Q     What was done, if anything, to gather and

16  collect documents that were responsive to RBR's

17  request for production that were stored on the Wide

18  Area Workflow?

19      A     That I don't know.

20      Q     Who would know that?

21      A     Well, since Dr. Tolley was gathering

22  information, if there is information that's been

                                                      Page 77

1   gathered from that, it would have been probably from

2   him.

3        Q    Are you aware of whether Mr. Ehlert prior

4   to ceasing employment with SPG did anything to

5   retrieve the documents from Wide Area Workflow that

6   may have been responsive to RBR's request for

7   production?

8        A    I would have no knowledge of that.

9        Q    Would there be somewhere for Mr. Ehlert to

10  have electronically stored those documents should he

11  have gathered them prior to the end of his

12  employment with SPG?

13       A    I would think that he would have.  Once

14  again, I am not that familiar with Wide Area

15  Workflow.  My guess is there is -- when you are in

16  that that there are records that they allow you to

17  keep.  I don't know that, but just from other

18  systems, that would be my assumption.  And if that

19  had happened, my guess is that Mr. Ehlert would have

20  stored those on his computer or possibly on Wide

21  Area Workflow or possibly on our accounting system.

22       Q    And the accounting system that you just

Page 78

1   made reference to, is that CorePro or something

2   else?

3        A    That's CorePro.

4        Q    Did you review any communications from

5   SPGI or SPG individuals to anyone at RBR in

6   preparation for the deposition today?

7        A    No.

8        Q    Did you speak to anyone to either gather

9   additional information or just in general to prepare

10  for the deposition today?

11       A    No.  Well, you know, I guess we wanted to

12  look at the information that had been submitted

13  before, but, in general, I took a light look of what

14  was provided and it looked reasonable to me.

15       Q    And when you say "we," are you referring

16  to another individual that you may have met with?

17       A    I'm sorry.  I was interrupting you.  I

18  apologize.  Could you repeat that, please.

19       Q    So you said that "we" wanted to look at

20  the information.  Was there someone else that you

21  were doing this with, whether that was Dr. Tolley or

22  another individual?

Page 79

1      A      No, I just -- as far as the company was
2   concerned, I thought I should take a brief look at
3   it.  And when I said "we," I'm referring to we as
4   the company.
5      Q      I'm not asking for any of the substance of
6   any conversations that you may have had with
7   counsel, but did you meet with counsel to prepare
8   for the deposition today?
9      A      Yes.
10     Q      When was that meeting?
11     A      Oh, yesterday.  Possibly the day before
12  yesterday.
13     Q      Did you review any communications you may
14  have had with any investors or potential investors
15  in preparation for the deposition today?
16     A      I wasn't very -- I have reviewed and been
17  working with daily our investment portfolio and
18  process.
19     Q      So I want to go back to some questions
20  about the Wide Area Workflow.  You indicated that
21  there were some documentation that had to get --
22  that you believe were submitted there.  I believe

Page 80

1    you said "invoices."  Are you aware of any other

2    documentation that was exchanged via the Wide Area

3    Workflow other than invoices?

4         A    No, I'm not.  To be honest with you, my

5    familiarization for Wide Area Workflow was from a

6    previous time and really had nothing to do with this

7    contract at all.  When I was told that, once again,

8    we would be working through that process as far as

9    the contract was concerned, I said, okay, well,

10   we've done that before.  And I understand that the

11   way we had done that before was to submit invoices,

12   the Air Force would review them, they'd check them

13   off, and then they would send payment.  So that's

14   the only knowledge I have on the Wide Area Workflow.

15        Q    The invoices that were being submitted

16   through Wide Area Workflow, was that for work that

17   had already been performed or work that was to be

18   performed in the future?

19        A    That I don't know.

20        Q    Was there any documentation other than

21   invoices that were required to be submitted with the

22   invoices in order for SPGI to receive money from the

Page 81

1    government?

2         A    I just really don't know that answer.  I

3    have some guesses, but I don't -- I don't know that

4    they're correct.

5         Q    Okay.  So I don't want you to guess.  You

6    indicated that you have used -- that you're familiar

7    with Wide Area Workflow from prior experiences with

8    it, not necessarily on this particular project.  So

9    I'm going to ask you, based off of your prior

10   experiences with Wide Area Workflow, were there

11   other documentation that generally was submitted

12   with the invoices prior to kind of funds being

13   dispersed?

14        A    In what we had done previously, it was

15   for -- we would submit for work that was done in

16   relation to research that we were doing, and there

17   were benchmarks that, you know, we would move to.

18   Then we would submit an invoice as to completion of

19   that benchmark, which the project manager and then

20   the contract manager and it seems like eight other

21   managers would sign off on, and then we would be

22   paid.  That is probably not a direct correlation

Page 82

1   with the billing and payment process in SP -- under

2   the contract under SPGI.

3       Q    In your prior experience using Wide Area

4   Workflow, was there any type of certification that

5   had to be submitted with the invoices that required

6   that the funds that were being dispersed be used

7   solely in connection with whatever contract was at

8   issue?

9       A    No.

10      Q    You're not aware if a certification to

11  that effect was required under SPGI's contract with

12  the Air Force that we're talking about today?

13      A    That I don't know.

14      Q    And who would know the answer to that?

15      A    Possibly Mr. Ehlert.

16      Q    Was Mr. Ehlert the individual that was

17  responsible for submitting whatever documentation

18  was required to the government in order for SPGI to

19  receive payment?

20      A    I don't know.  I'm sorry I'm not being

21  very helpful, but I don't know the flow of that

22  paperwork or process.

Page 83

1    Q    What current SPG employee would know that?

2    A    I presume Dr. Tolley would know that.  He

3  was working on that part of the project since we

4  don't have anybody else to do it.

5    Q    Was Dr. Tolley involved in that process

6  prior to Mr. Ehlert's resignation from -- or I

7  shouldn't say resignation.  Prior to Mr. Ehlert

8  ceasing his employment with SPG?

9    A    He would be tangentially involved in that,

10  I assume, prior to that.  As far as the process is

11  concerned, yes.

12    Q    What was the manner in which the

13  government actually dispersed funds to SPGI?

14    A    I believe we received them by a wire.

15    Q    What bank account would that money be

16  wired into?

17    A    That would have been wired into the United

18  Bank ARCNet account.

19    Q    So earlier we talked about the fact that

20  SPG had one bank account at United Bank and that

21  SPGI had three different accounts.  You made

22  reference to an ARCNet account.  Is that something

Page 84

1   separate from the accounts we've already discussed

2   or one of the accounts?

3       A     That is one of the accounts.

4       Q     Okay.  Which account is that?

5       A     It's the United Bank ARCNet account.

6       Q     And does that -- is that one of the three

7   accounts that SPGI had at or has at United Bank?

8       A     Yes.

9       Q     What are the names of the other two

10  accounts that SPGI has at United Bank?

11      A     The -- I don't know the names specifically

12  of them.  One was an overhead account that money

13  would go into to pay various SPGI administrative

14  bills, and beyond that, I don't know.

15      Q     So the overhead account was separate from

16  the ARCNet account that you referred to earlier?

17      A     Yes.

18      Q     Okay.  And then you're not aware of what

19  the other third account was being used for?

20      A     I don't know what -- I don't know just

21  what the breakdown of that is, no.

22      Q     So once the money was received into the

Page 85

1    ARCNet SPGI account, what would happen with the

2    money?

3        A    That was a -- the one account was what was

4    called a SWIFT account.  Okay?  So that, you know,

5    it was a large sum of money and it would go into the

6    SWIFT account so that it would have bank guarantees

7    or whatever to it.  And as bills came to be paid,

8    they would be paid from that ARCNet account, and

9    those are bills to contractors or vendors underneath

10   the contract award.

11       Q    Would the money just sit in that account,

12   in the ARCNet account, until invoices for various

13   other recipients were received and ultimately paid?

14       A    I presume, yes.

15       Q    And the ARCNet account that we're

16   referring to, is that the account that RBR would

17   have been paid from?

18       A    I don't know if it would be paid directly

19   from that account or one of the other two accounts,

20   but that is funding that would have went towards the

21   payment to RBR.

22       Q    Is there funding from other sources that

Page 86

1   would have been used to pay RBR?

2       A    Just that I believe the funding was to

3   come from the contract from that account, yes.  So

4   no.

5       Q    What was the process by which RBR would

6   submit invoices to SPGI to then ultimately receive

7   payment?

8       A    That I don't know.  I don't know what the,

9   you know, procedure or process in that regard was.

10  I -- once again, I could guess, but I don't know

11  specifically.

12      Q    I don't want you to guess.  Who at SPG

13  would know that information?

14      A    At this point I think Dan would be the one

15  that would be aware of that.

16      Q    Other individuals that I've deposed

17  have made reference to a point in time when an

18  approximately $3,000 check bounced in connection

19  with this contract.  Do you have any knowledge of

20  that?

21      A    I have no knowledge of that.

22      Q    Are you aware of any checks bouncing in

Page 87

1    connection with this contract?

2         A    I have no -- no, I have no awareness of

3    any checks bouncing in the contract.

4         Q    When did you first become aware of the

5    fact that subrecipients were not receiving payment

6    under SPGI's contract with the Air Force?

7         A    Well, that would have been at least

8    September, August/September time frame.

9         Q    And that is of 2020 or some other year?

10        A    2020, yes.

11        Q    How did you become aware of the fact that

12   subrecipients were not getting paid?

13        A    At that point it was the ARCNet account.

14   At that point we did not have money left in that

15   ARCNet account to be able to transfer over to have

16   the payments that were due being paid.

17        Q    And why was there not money in the ARCNet

18   account for payments to be made?

19        A    Well, I guess to begin with, the ARCNet

20   account and the three accounts that were over there

21   are ones that I'm aware of now and had not been

22   aware of specifically that we did that Dr. -- or

Page 88

1   Mr. Ehlert was the one that decided that there

2   should be three different accounts.  Okay?

3   According to our practice is that we pool all of our

4   company's monies together and then we pay from -- we

5   pay invoices and so forth from that.  By our

6   investment not coming in, there was not enough money

7   left in that pool to be able to continue payments.

8       Q    So when you say that your practice was to

9   pool money for your different projects, are you

10  saying your practice was to, you know, pool money

11  from SPG, SPGI, GlobalFlyte, Branch Botanicals, the

12  various other projects we discussed and kind of use

13  the funds interchangeably for the various different

14  projects that SPGI was working on at that time?

15      A    You know, that's not exactly correct, but

16  the reality is is that, once again, money that came

17  in to SPG from any of the companies would come to --

18  eventually come to SPG, and then we would pay --

19  we'd pay expenses from that.

20      Q    So I want to make sure I understand it,

21  and you said that my recitation of what you said

22  wasn't correct.  So explain to me how it is that the

Page 89

1    ARCNet account did not have the money in it that was

2    to be used for payment of the subrecipients?

3        A    I had directed that some of that money be

4    moved to SPG to be able to move that forward.

5        Q    And when you say "to be able to move that

6    forward," what do you mean by that?

7        A    To be able to continue process with SPG,

8    SPGI, and the carry-on functions of the whole

9    organization.

10       Q    So you had direct -- you had authorized

11   money from the ARCNet account to be withdrawn to be

12   used for other SPG business?

13       A    That's correct.

14       Q    Did you have any concern about withdrawing

15   that money with regards to SPGI's ability to pay the

16   subrecipients?

17       A    My concern generally had been, do we have

18   resources to be able to pay those in a timely

19   fashion, am I certain that those payments are going

20   to continue; and at that point I believe that we did

21   have that.  And that once again, it was more of an

22   accounting procedure than, you know, something is in

Page 90

1    the right drawer or the left drawer.

2        Q    And what was your belief that you would

3    have the sufficient funds for that based off of?

4        A    Commitments that we had in our investment

5    as to when dollars would flow, the amount of dollars

6    that would flow, and so forth.

7        Q    And those are commitments to investment

8    that SPG had?

9        A    That is correct.

10       Q    And when was the first point -- at what

11   point did you direct that the funds from the ARCNet

12   account be moved out of there for purposes of

13   covering other SPG expenses?

14       A    I don't know that exact date, but it would

15   be in the bank account records showing transfer.

16       Q    Do you recall the amount of the transfer

17   or was it multiple transfers?

18       A    It was several transfers.

19       Q    Do you recall the time frame in and around

20   those transfers occurred?  You know, for example,

21   spring of 2020?

22       A    I don't remember.  I don't recall that.

Page 91

1      Q    Okay.  What was the total amount of money

2  that you had authorized or directed be moved from

3  that ARCNet account to other SPG accounts or to

4  cover other SPG expenses?

5      A    I don't have that figure.

6      Q    Can you estimate for me how much it is?

7      A    I know that at this point we owe around

8  $11 million outstanding, so my guess is that it's

9  somewhere in that range.

10     Q    And that roughly $11 million that we're

11  talking about, what was that money used for by SPG?

12     A    Once again, you know, continued operations

13  of the organization.

14     Q    So, for example, rent payments, payments

15  to cover people's salaries, things of that nature?

16     A    Rent, salaries, insurance, you know, yes.

17     Q    At what point did you first realize that

18  the investments that you had been kind of relying on

19  may not actually come to fruition or at least come

20  to fruition based on the timeline that you had

21  expected?

22     A    To be fairly specific, we have had -- we

1    had several commitments for funding of different

2    amounts.  Okay?  As of February of 2020, the

3    investment to SPG was committed to for $90 million:

4    $25 million directly to SPG, $25 million to our TCF

5    commercial fund, and $25 million into our TCF

6    medical fund.  An additional $15 million of what's

7    called a sidecar investment into -- would follow on

8    into SPG and thrift down into the subcompanies.  So

9    that was committed on February 11th.

10            Part of the conditions of receiving those

11   funds was that the advisory board from Pritt

12   Investments Partners would come in, inspect, visit,

13   look through the books, do that type of thing.  And

14   once that then was done -- and they were coming in

15   from Malaysia.  And once they came in to get that

16   done, then the funds would be wired within I think

17   it was five days, something like that.  So we were

18   working on the visas to bring people in, and by the

19   time the paperwork got back and forth, the COVID

20   shutdown had started in March and they were denied

21   entry into the country.

22            The process with our investors -- Pritt

1    operates as an accumulator and placement office for

2    large-family office based out of Singapore,

3    Malaysia, that area.  They're out of Dubai, but

4    their banking curve is there.  Their primary -- they

5    are primarily real estate investors, and the costs

6    that they would have for real estate investment is

7    the individual inspection, inspecting physically the

8    project.  And that's just been always part of their

9    process.  Part of the money that Pritt was bringing

10   in for these investments were real estate, as well

11   as our non -- what they would call their

12   nontraditional funding or venture capital area, but

13   they carried the same process as they continue to do

14   today.  That was interrupted because of COVID.  We

15   continued down the line, you know, with that.  It's

16   going to be April 15th, it's going to be March, you

17   know, May 1st.  It's going to be whatever, and it

18   never did get opened.  Okay?

19          I'm assuming that you want to know what

20   this process is of what we were going through.  So

21   through this, Mr. Trip was able to negotiate with

22   the people that we don't know when this is going to

Page 94

1  go up; can we do, you know, either a life-size or

2  some type of an electronic process to be able to,

3  you know, connect the people together.  You know,

4  they were receptive to that, you know, because they

5  weren't placing money.  They don't make money unless

6  they place money.  So, anyway, he was able to get

7  them to agree to that, and we entered in then to a

8  securities agreement, a security offering agreement,

9  on September 4th where they committed to -- where

10 they committed to the funding and did sign the

11 individual securities agreement subject to the funds

12 being brought in.  Part of the process is that they

13 receive partial ownership of the investment funds

14 and also would receive partial ownership of SPG.

15 Okay?  Different transactions in the way they're

16 done, but all involving the SPG situation.  So that

17 was done on September 4th of 2000.  Okay?

18      Q    I just want to interrupt you for one

19 moment.  2000 or 2020?

20      A    Well, when you're old, it's 2000.  I can't

21 believe it's not in the 1900s.  Yes, 2020.  Thank

22 you.

Page 95

```
 1       Q     Thank you.

 2       A     Okay.  And since that time, we have had

 3  continued delays of how that was to come in.  And

 4  part of that has to do with, you know, the COVID

 5  restrictions and trying to get anti-money laundering

 6  and, you know, know your client regulations.  So

 7  there's government regulations, foreign government.

 8  There's American government regulations and then

 9  foreign banking and domestic banking relations.

10  It's been a nightmare and which had continuous

11  delays over and over and over again.

12       Q     All right.  And I appreciate the length of

13  your response.  I am probably going to go back to

14  some of the things that you said just so I make sure

15  I can understand it.

16             The money that was first committed that

17  you made reference to in February, was that February

18  2020?

19       A     Yes.  It was February 2nd, I think, of

20  2020.

21       Q     Okay.  And the commitment of funds, is

22  that a formal contract?
```

```
1        A     The commitment of funds in February of
2   2020 was an agreement to enter into the contract.
3   Okay?  And at that point we had scheduled the remote
4   investors, their panel, to come and visit us.  At
5   that point, you know, they sign off and then the
6   money is wired.  Okay?  These are all subscription
7   agreements.  Well, I shouldn't say that.  That's not
8   true.  The fund, the TCF fund and the TCF medical
9   fund, are individual subscription agreements that
10  were being handled by a placement broker for us.
11  Okay?  So those went through all the FINRA
12  requirements, the SCC requirements, all of the bad
13  actor checking, and all of those type of things.
14  The one that's coming -- the two that were coming
15  directly to SPG, they're a Title I private
16  placement, you know, per year basically.  And having
17  the other two -- so we decided the private placement
18  without having to have, you know, outside -- they
19  would come directly to SPG, and the other two would
20  go through placement brokers.  So official, those
21  were -- basically that was finally done in September
22  4th of 2020.  You know, all those were officially
```

Page 97

1    signed at that point subject to -- you know, subject

2    to their benefits, upon our receiving the wire from

3    their bank.

4         Q    The money that was committed back in

5    February 2nd, the roughly 95 million, I believe

6    you testified that 15 million of that was to be used

7    for SPG's various subcompanies?

8         A    Yes.

9         Q    Okay.  Did that money, the 15 million that

10   was to be used for subcompanies, was that money you

11   anticipated using to pay subrecipients under SPGI's

12   contract with the Air Force?

13        A    I understand your implication with that,

14   but, no, it was part of the full package that would

15   go to SPG.  That $15 million involved $3 million

16   private sidecar investment into GlobalFlyte, those

17   five companies, for which the investor in that would

18   receive a 10-percent valuation -- 12 percent.  You

19   got me doing that now.  A 12-percent stake in the

20   equity tables of those five companies, and that was

21   $3 million each in that.  The 25 million was

22   directly to SPG, and that's a direct investment in

Page 98

1   here for a percentage of SPG.  And of that money,

2   once again, then we pay all of our bills, so, you

3   know, go from there.

4       Q    Were you the individual that was handling

5   the communications with Mr. Trip on behalf of Pritt

6   Investment?

7       A    We all were.  You know, Dan, myself, and

8   Mr. Soucie were communicating with him.  I was the

9   primary point of contact and I handled all

10  negotiations as far as the investment was concerned.

11  I did have individual emails with him, numerous

12  texts back and forth.  The reality is is that he was

13  in our office virtually every day meeting with

14  myself, Dan, and Chris.

15      Q    And that was true in February 2020 or at

16  some point later than that?

17      A    That was probably from -- as soon as we

18  started to have the issue with COVID and not knowing

19  how we were going to work around that whole issue,

20  from that point on.  And I can't say that was

21  February 2nd or March whatever.  Certainly from --

22  we were anticipating being able to be released from

Page 99

1    oversea travel by the end of April.  And after that,

2    it was a matter of, look, they're not going to get

3    here, we don't know when it's going to be, so what

4    else can be done to satisfy the requirements.  From

5    that point on we've had -- you know, there's been

6    some weeks where it hasn't been every day but never

7    less than three times a week, and, you know, on an

8    ongoing basis, we are in contact daily.

9         Q    The security offer agreement that was

10   signed on September 4, 2020, was that -- is that a

11   contract?

12        A    It is a subscription agreement.  Okay?  I

13   am not an attorney, so it is my understanding that

14   it is a contract as long as I give up the percentage

15   of stock that he is purchasing and that he provides

16   the money to purchase it.

17        Q    And the "he" that you're referring to, is

18   that Mr. Trip or someone else?

19        A    That would be Mr. Trip.

20        Q    The security offer agreement, did that

21   include a specific date by which SPG was to receive

22   the funds that were being committed?

1      A    It didn't because we did not have -- we,

2  once again, still didn't know when things would be

3  transferred and so forth.  But even beyond that,

4  what we did receive from Mr. Trip is regular updates

5  as far as what he knew the process was or what he's

6  being told by either regulators, banks, whatever,

7  governments, and his time frame that he was being

8  told that they would be executed, and recommitted

9  his interest to move forward with the SPG

10  investment.

11      Q    Have you ever received a proof of funds

12  from Mr. Trip with regards to the $95 million that's

13  been committed?

14      A    Well, you know, in the investment world,

15  you don't ask an investor for proof of funds unless

16  he's somebody that stumbles in off the street.  When

17  you're dealing with an accredited investor that has

18  the -- you know, that's went through the FINRA and

19  SCC requirements that he has went through with us,

20  you really want him to stay as an investor and not

21  somebody that you're, once again, going to require

22  proof of -- the only thing that I was concerned of

Page 101

1   as far as proof is concerned is his willingness and

2   commitment to continue to participate in the

3   project.

4        Q    Is it fair to say you didn't have any

5   concerns about Mr. Trip's ability to kind of produce

6   the 95 million that he had committed through Pritt

7   Investments?

8        A    I had none and continue to have none.

9        Q    Had you ever worked with either Mr. Trip

10  or Pritt Investment prior to February of 2020?

11       A    We have.  We had worked -- be working with

12  him since 2018 for him to understand what we're

13  doing, for us to be able to continue the flow of our

14  TCF process and development of RIPs and so forth,

15  yes.

16       Q    Has he invested in any -- has he, through

17  Pritt Investment, invested in any prior projects of

18  yours?

19       A    Of mine, no.

20       Q    Okay.  How about of either SPG's or any of

21  the related subcompanies?

22       A    No.

Page 102

1      Q     To date, has SPG received the 95 million

2   that was committed to it?

3      A     We have not received it to date.

4      Q     Okay.  Is it your intention should and

5   when you receive that 95 million --

6      A     It's actually -- may I?  It's 90 million.

7      Q     Oh, okay.

8      A     It was 25, 25, 25, and 15, so it's

9   90 million.

10      Q     Okay.  I apologize if that's what you said

11   and I've just been referring to it incorrectly.

12      A     It's okay.  I'm sorry.

13      Q     Is it your intention once you receive the

14   90 million that's been committed to SPG to pay the

15   outstanding roughly 11 million that you referenced

16   earlier to the various subrecipients for bills that

17   are outstanding?

18      A     That's correct.  That is our intention.

19      Q     And those include bills that are

20   outstanding from RBR?

21      A     That's correct.

22      Q     Other than Mr. Trip and Pritt Investment,

                                          Page 103

1    are there any other investors or potential investors

2    that SPG has been exploring in an effort to secure

3    funds to pay the outstanding bills from the

4    subrecipients?

5         A    Right now this investment is the only

6    thing that we're spending our time on.

7         Q    Is that true since August 2020?

8         A    I have continued to, you know -- I've

9    continued to discuss and talk about our process to

10   investors, investment portals, and so forth.  Right

11   now the full amount of my time is focused and needs

12   to be focused on closing this opportunity.  We have

13   a very committed middleman, a very committed

14   endgame, and God knows I'd like to have the money.

15   So there -- that's an interesting process, and there

16   are obstacles in the way that we're trying to

17   overcome.  We still have people, Mr. Frasier,

18   working with other investors on different projects

19   that we have.  Mr. Mann is looking, you know, for

20   money for GlobalFlyte and so forth.  So, yes, we

21   had -- we're -- the investment appetite today given

22   the economy and the uncertainty of the things that

Page 104

1    are going on for early-stage investments is limited

2    at best.  So you have so much time and an awful lot

3    of issues to try to overcome with the project that

4    we have, and so I have dedicated virtually all of my

5    time at this point to bringing this investment to

6    fruition and funding in and clearing all of the debt

7    that we have.

8         Q    Do you have -- what is your understanding

9    of, as we sit here today on August 5, 2021, what is

10   delaying SPG's receipt of the funds from Pritt

11   Investments?

12        A    Right now what we believe -- let's talk

13   about just the investment.  Just the investment, we

14   believe it's being held in India while the Indian

15   government -- or excuse me.  The bank provides

16   certification to the Indian government that none of

17   the funds that are going to be wired and used are

18   going to contribute or are going to go in any way to

19   Pakistan, Afghanistan, or any of their neighboring

20   countries where they have issues.  Right now, you

21   know, India is dealing with what, 1.6 million

22   deaths?  They don't have the vaccine, and their

Page 105

1    capacity on a government level and on a banking

2    level, I am told, is severely impacted.  You know, I

3    have verified that through a number of sources, and

4    that's what I believe the hold-up is on that

5    investment as of today.

6         Q    Do you have an anticipated or expected

7    date that you will receive the funds as we sit here

8    today?

9         A    Do I have?  Yes, I do.

10        Q    Okay.  Can you tell me what that date is?

11        A    We received a notarized statement from

12   Mr. Trip, you know, a couple of weeks ago, ten days

13   ago, whatever, that they had told him, that's the

14   bank, that they felt that they would have that wound

15   up by the end of July.  They did not.  The letter

16   went on to say that if we did not have that by the

17   end of July that he had spoken with his partners and

18   that in order to be able to bring this to fruition

19   that they had agreed to lend him the money

20   against -- of this portion of the money or a portion

21   of this money against their commitment, which

22   eventually will come through, and then provide that

Page 106

1   no later than the end of August.  Now, that is the

2   certified letter that he provided or the sworn

3   letter that he provided to me a couple weeks ago.

4        Q    Okay.  And so going back to that notarized

5   statement, you referenced a bank.  Is that the bank

6   in India that you --

7        A    That would be the bank in India, yes.

8   Now, once again, please understand that this is

9   my -- what I am getting.  Okay?  Now, I don't know

10  if that was the bank in India that told him or his

11  partners that's working with the bank in India that

12  have been told and they reiterated to him.  But he

13  was told and told me that that was the response from

14  the bank at this point.

15       Q    The money that you made reference to that

16  Mr. Trip would be lent should the money not be

17  received by the end of July, do you anticipate

18  receiving that by the end of August 2021?

19       A    The money that we would receive by the end

20  of August would be money that would be lent instead

21  of a loan and which he was preapproved for, and he

22  is in Dubai today and has been the last couple of

1    days in order to effect that loan.  Now, once again,

2    he gets that loan and then that money has to be

3    transferred to us.  There will be some times in

4    there, and that's why he had said that we should

5    have that wound up by the end of August.

6        Q    The money that Mr. Trip is attempting to

7    secure that would be a loan, is that for the full

8    90 million or something less than that?

9        A    That would not be a loan to me.  Okay?

10   That would be a loan to him with the security being

11   the investment monies that they are placing with his

12   company.  The money that would be coming to me would

13   be the direct investment.

14       Q    Okay.

15       A    Now, I'm not certain -- okay.  I'm not

16   certain that we will look at the full 90 million.

17   Okay?  I know that we will receive -- he had said

18   minimum it would come in -- an initial amount would

19   come in, you know, try to go below the transfer

20   rates to where, you know, once again, all of a

21   sudden you send $90 million to someone that's coming

22   from someone that the bank doesn't know that well to

1   someone they don't know at all.  You know, it may be

2   20 million or 10 million or 5 million and then the

3   balance of it after that.

4        Q    If you receive that money or when you

5   receive that money, is it your intention to use that

6   to pay the bills that remain outstanding from the

7   subrecipients?

8        A    It is our intention to pay that.  As a

9   matter of fact, it is a requirement of our agreement

10  that we pay all outstanding debts that the company

11  would have, and that would include RBR and others.

12       Q    And just to be clear, I was asking with

13  regards to the money that you were anticipating

14  receiving by the end of this month, not the total

15  90 million.

16       A    It's our intention that whatever we'd

17  receive by the end of the month that RBR would be

18  immediately paid.

19       Q    What is your understanding of the amount

20  of outstanding money due and owing to RBR?

21       A    I've looked at the invoices that there are

22  out there, and, you know, I -- you know, I saw --

Page 109

1    I'm not sure just what the number is.

2         Q    Okay.  Do you contest that -- well, strike

3    that.

4              The notarized statement that we were

5    referring to earlier that Mr. Trip sent to you, is

6    that something that's been provided to your counsel?

7         A    I think so.

8         Q    Your communications with Mr. Trip, did

9    those tend to be via text, via email, verbal

10   conversations?  How exactly did the two of you tend

11   to communicate?

12        A    Well, it was all three, but by far the

13   most communication that we had was in person.  As I

14   said, he was in the office virtually all week, and,

15   you know, this is -- this is not -- this is a matter

16   of, you know, what have you heard, has anyone

17   called, walked in, I just talked to this, that type

18   of thing.  So the vast majority of this was verbal

19   as, you know -- and, once again, what I tried to do

20   in that period of time -- this had been a very tense

21   situation for everyone, and we tried to do that as a

22   situation where it was with myself, Dan, and

 1   Mr. Soucie.  And, you know, it just is never good

 2   to, okay, well, I just had a conversation, so let me

 3   try to pass on what I heard.  So he was -- one of

 4   the reasons that he was in the office that much is

 5   so that he could stay in communication with all of

 6   us directly as to what was going on.

 7        Q    I apologize if I asked this question

 8   already and you answered it.  When was the first

 9   time you realized that there may be an issue paying

10   subrecipients?

11        A    Well, it became obvious that, you know, it

12   was going to be difficult when we -- you know, when

13   the holdups on our investment dollars, you know,

14   were moving in.  You know, and that was probably in

15   the late March time, April time.

16        Q    At some point were the concerns about lack

17   of -- was the concern about lack of ability to pay

18   subrecipients communicated to the subrecipients?

19        A    To who now?

20        Q    To various subrecipients.

21        A    I think that we -- you know, that we did

22   communicate that things were going to be delayed,

Page 111

1    you know, and how come, whatever, that type of

2    thing, but, yes, we were communicating that things

3    were being delayed.  And I just didn't notice when

4    that time frame was.

5         Q    I'm sorry.  I didn't hear that last little

6    part of your answer.

7         A    I didn't notice what that time frame was.

8    My guess is -- I shouldn't guess.  My educated guess

9    to that would be that that would have started

10   probably in the September, late September time

11   frame, somewhere in there.

12        Q    What was the reason for the delay in

13   communicating that to the subrecipients if you first

14   kind of had a concern about that in and around

15   February or March of 2020?

16        A    I don't think there was delay in payments

17   to anyone during that time frame.  I don't think

18   that started until the September time frame.

19        Q    Okay.  So nothing was communicated in that

20   regard until at least there was payment that had

21   been missed by SPGI?

22        A    I would say that it was when payments

Page 112

1    started to be delayed that, you know, obviously

2    people call; and as they call, you know, we'd inform

3    them that there was going to be a delay.

4         Q    And when you say we informed them, were

5    you the person who was actually communicating this

6    to the subrecipients?

7         A    No, I was not.  That would have been

8    through the Dayton office.

9         Q    And would that have been through Mr. Wall

10   or someone else at the Dayton office?

11        A    You know, honestly, I don't know what

12   their hierarchy was there, so I don't know if it was

13   Mr. Wall or an assistant.  I assume that given the

14   people that we still have that it would potentially

15   be -- and, once again, I am assuming that the touch

16   point probably went from -- is it -- I don't know.

17   Gross, Ms. Gross, you know, I think would probably

18   have been an initial point of contact.  I imagine

19   that Ken Wall would have probably been after that,

20   and, you know, then it probably would have went to

21   Mr. Ehlert.

22        Q    Are you aware of whether Dr. Tolley was

Page 113

1    having any direct communications with the

2    subrecipients in and around September of 2020?

3        A    I don't know about that time frame, but

4    eventually Dr. Tolley and I both had conversations

5    with subrecipients.

6        Q    In and around August or September of 2020

7    when payments -- when subrecipients began not

8    receiving timely payment, what was the reason that

9    the subrecipients were being given about why payment

10   was being missed?

11       A    At that point it was an accounting issue

12   with getting the money in from our investment.  I

13   think it was basically just that we're having an

14   accounting issue that we assume is going to be dealt

15   with shortly.  We were receiving notices daily from,

16   you know, the -- from Mr. Trip that money should be

17   freed up and to us any day and that those accounts

18   would be sufficient to bring everybody up to date.

19       Q    And those communications from Mr. Trip,

20   were they verbal communications?

21       A    There was verbal communication, there was

22   written communication, and there was text

Page 114

1   communication.

2        Q    Okay.  At some point was it communicated

3   to the subrecipients that the issue was larger than

4   an accounting issue?

5        A    I don't believe so.

6        Q    And was there a particular reason why that

7   wasn't done?

8        A    I think that -- frankly, my opinion is

9   that it is an accounting issue.  You know, it's a

10  matter of, you know, money transferring back in to

11  the company and moving back out to payments.

12       Q    At some point was it communicated to the

13  subrecipients that payment was going to be

14  significantly delayed?

15       A    I don't believe so.  We have -- we have

16  never been at a point that I believe that it was

17  being told by significant individuals in the process

18  that it was going to be anywhere near what we're

19  dealing with now.  It was always, it should be next

20  week, it should be this week, and repeatedly there

21  were reasons why that didn't happen.  And I spent a

22  great deal of time trying to verify were those

Page 115

1  things true, and all of the things that I could

2  verify in that process, they were.

3      Q    So what types of things did you do to

4  verify that?

5      A    Well, you know, it's pretty simple that

6  when money is supposed to come from Malaysia, for an

7  example, that when Malaysia's country is shut down,

8  the government buildings are shut down, the banking

9  is shut done, and people aren't allowed to leave

10  their home.  They're probably not going to send the

11  money that day.

12      Q    You weren't communicating with anyone in

13  Malaysia about, you know, kind of what the status

14  was at that point?

15      A    Well, it -- you know, once again, you

16  could go online and see that Malaysia commerce had

17  shut down, so, you know.

18      Q    All right.  Understood.  Did you ever

19  communicate directly with anyone at RBR?

20      A    I spoke to several people.  I was asked

21  if I had talked to anybody from RBR, and I don't

22  remember ever speaking to anybody at RBR.  It's

Page 116

1    possible that I did, but I don't recall.

2        Q    Do you recall sending any emails or text

3    messages to anyone at RBR?

4        A    No, I don't remember.

5        Q    Other than the commitment of funds that

6    was dated February 2, 2020, and the security offer

7    agreement that was dated September 4, 2020, have you

8    received any other commitment of funds in writing?

9        A    Yes.

10       Q    On what dates were those commitment of

11   funds received?

12       A    Generally, since that time we have

13   received -- as I said, as things have changed and I

14   have asked that we get a status update from Pritt

15   and with, you know, the one that they are continuing

16   with the, you know, commitment to the program, and

17   here's the status of what's going on at this point.

18   So I can't tell you if it's four or eight, but there

19   is -- there are numerous signed commitments from

20   them indicating what the current status was as they

21   knew it.

22       Q    Have those all been turned over to your

Page 117

1    counsel?

2         A     I presume that they have.

3         Q     When you say you presume, is that because

4    you haven't personally done it but you're assuming

5    somebody else has?

6         A     That's certainly something that I would

7    want her to have.  I did not specifically provide

8    them, and Dr. Tolley is a very competent man.

9         Q     So presumably Dr. Tolley has either

10   already given them to counsel or is getting ready to

11   give them to counsel?

12        A     That would be my assumption, yes.

13        Q     Are those saved on the shared drive?

14        A     I would doubt that.

15        Q     So where are they stored right now?

16        A     I have copies of them.  You know, they

17   would have come by email or they would have been

18   just sent to us by email or signed and handed to us

19   and we would have scanned.  But yeah.  But, once

20   again, all of that stuff, he's here in person.  We

21   worked through that and we asked them for an update

22   and continued commitment.

Page 118

1     Q    Have you had any communications with

2  anyone at the government with regards to the issues

3  that bring us here today?

4     A    I have not had any direct conversations

5  with anyone at the government.

6     Q    At what point was the government made

7  aware of the issues with payment to the

8  subrecipients?

9     A    I don't know what date that was, but

10  Mr. Wall had been -- as things were not being paid,

11  Mr. Wall has been giving them updates that we

12  provide him from our investor.

13     Q    Mr. Burns, have you ever reviewed the

14  subaward between SPGI and RBR?

15     A    I'm sorry.  I moved away from the

16  computer.  Let me come back.  I didn't hear you.

17     Q    Have you ever reviewed the subaward

18  between RBR and SPGI?

19     A    What is it that you're asking between SPGI

20  and --

21     Q    Have you looked at the contract between

22  SPGI --

Page 119

1        A    I see.  No, I've never looked at that.

2        Q    You haven't looked at that.  Okay.  Do you

3   know -- do you know if anyone on behalf of SPGI

4   signed that contract?

5        A    Yeah.  You know, it's possible I signed

6   it, but if I did, it was something that was, here's

7   a subaward.  I don't know.  I can't say that I did

8   not sign it.  Someone must have signed it.

9             MS. BAAKMAN:  Christy, could you allow me

10   to share my screen, please.

11             (Off the record.)

12             MS. BAAKMAN:  Mr. Burns, I am showing you

13   documents that were produced to me by -- Mr. Burns,

14   are you still there?  Your video just cut out.

15             (Off the record.)

16             MS. BAAKMAN:  Mr. Burns, I am showing you

17   documents that were produced to me by Dr. Tolley.

18   They are Bates labeled Tolley 855 through Tolley

19   857.  I'm going to mark these Burns 1.

20             (Burns Deposition Exhibit Number 1

21             was marked for identification.)

22   BY MS. BAAKMAN:

Page 120

1      Q    I'm going to ask you some questions about

2   the documents here, Mr. Burns.  I'll scroll up and

3   scroll down so you can review them.

4      A    Is it possible you could increase the

5   size?

6      Q    Yes, absolutely.  Is this large enough or

7   would you like me to --

8      A    That should be fine.

9      Q    Okay.  There are additional pages, so just

10  let me know when you're done looking at this one and

11  I'll scroll down.

12     A    Okay.  Go ahead.

13     Q    Okay.

14     A    Okay.  Okay.  Okay.

15     Q    Do you have an understanding of what these

16  documents are?

17     A    They appear to be invoices.

18     Q    So I want to focus on the document that's

19  Bates stamped Tolley 856.  Do you recognize the

20  subcontractor name there?

21     A    RBR, yes.

22     Q    At the bottom of this, it is signed by an

Page 121

1    individual by the name of Ken Wall.  Is that the Ken

2    Wall that we've been talking about that worked out

3    of the Dayton, Ohio, office?

4         A    Yes.

5         Q    Do you have an understanding of whether

6    Mr. Wall was responsible for approving the various

7    subrecipient invoices for payment?

8         A    I assume that, yes, he's responsible for

9    authorizing it.  Yes, yeah.

10        Q    Well, I don't want you to guess.  Are you

11   assuming because his name is on it?

12        A    I've not seen this before.  I really don't

13   know what it is.  I see that it's a subaward.  I see

14   that it's for work that they're doing, a total

15   amount.  I assume a total amount of that invoice and

16   then a total amount of what had been paid.  So, yes,

17   I see what that is.  It is not something that I've

18   seen before.

19        Q    Okay.  So earlier today we were talking

20   about documents you may have reviewed in advance of

21   the deposition, and I was under the impression that

22   you may have reviewed the RBR invoices.  Did you

Page 122

1    ever review a document -- are these the invoices now

2    that I'm showing you on Tolley 857 that you were

3    making reference to when you said you reviewed the

4    RBR invoices?

5         A    No, they're not.

6         Q    Okay.

7         A    When I referred -- that was a spreadsheet

8    of invoices that they had submitted that I saw, not

9    individual invoices.

10        Q    Okay.  Understood.  So I do want to still

11   go back to this document that's Bates labeled Tolley

12   856 and just ask a couple other follow-up questions.

13   Right above Mr. Wall's name here, I'm going to read

14   a portion of this document.  It says, "Signature

15   below certifies that an authorized representative of

16   SPGI has reviewed the invoice and authorizes SP

17   Global to issue payment."  Do you see where I read

18   that from?

19        A    I can, yes.

20        Q    Okay.  Why is SPGI authorizing SP Global

21   to issue payment?

22        A    Okay.  SP Global -- once again, SPGI has

Page 123

1    no staff and SP Global provided individuals to act

2    on behalf of management processes inside SPGI, of

3    which Mr. Wall was one.

4         Q    So this authorization is not -- does not

5    make -- is not indicating that money from an SPG

6    bank account is going to cover the costs that's

7    reflected here?

8         A    Yes, I guess that that's -- yeah, that

9    would be correct.

10             MS. BAAKMAN:  Mr. Burns, I am showing you

11   documents that were previously produced to me by

12   Dr. Tolley.  They are Bates labeled Tolley 4087

13   through Tolley 4088.  I'm going to mark this as

14   Burns 2.

15             (Burns Deposition Exhibit Number 2

16             was marked for identification.)

17   BY MS. BAAKMAN:

18        Q    Mr. Burns, let me know when you are ready

19   for me to scroll down to the second page for you to

20   review that and then I'll ask you some questions.

21        A    Please feel free.

22        Q    Okay.

```
                                          Page 124

 1      A    Okay.  You can scroll.

 2           Okay.

 3           Okay.

 4      Q    So looking at the document that's Bates

 5  labeled Tolley 4088, is this a draft letter that you

 6  composed to Mr. Burns?

 7      A    It's a draft letter that we as a company

 8  composed, yes.

 9      Q    Is this your signature down at the bottom?

10      A    It is.

11      Q    I want to refer you to the second full

12  paragraph that starts, "Pritt Investments."

13      A    Yes.

14      Q    I'm going to read from it.  "Pritt

15  Investments, as a large shareholder and board

16  member, has provided a proof of funds (see attached)

17  that far exceeds the $37,000,000.00 that is its

18  initial investment into SPG and its associated

19  companies."  Did I read that correctly?

20      A    You did.

21      Q    So first I want to ask, has Pritt

22  Investment ever been a shareholder of SPG?
```

Page 125

 1      A      No, they would be -- as of the investment

 2   that they make into the company, they would become a

 3   shareholder in the company.

 4      Q      Has Pritt Investment ever been a board

 5   member of SPG?

 6      A      No.

 7      Q      Is that a similar situation with regards

 8   to the shareholder?  It will become one once the

 9   fund are received?

10      A      That's correct.

11      Q      The letter also makes reference to in that

12   same sentence we looked at a proof of funds and it

13   refers to, "See attached."

14      A      Okay.  I don't recall what that was.  What

15   that may have -- I don't recall what that attachment

16   would be.  If you have it, I will be happy to look

17   at it.

18      Q      Okay.  No, I don't have it.  That was one

19   of the things that I was searching for, whether

20   there is actually a document that has been provided

21   as a proof of funds or whether there is a similar

22   document that was being referred to here when it

Page 126

1  says, "See attached."

2       A    Okay.  I see that this is a draft, but I

3  had signed it, so I assume that there would have

4  been something, you know, that would go along with

5  that.  And that should be available or should be

6  able to be made available to you, I would think.

7  Once again, this was something that was -- as I

8  remember, was put to me as a recommendation to send

9  to Mr. Schumacher, and I agreed that that's

10  reasonable to keep him informed of and it represents

11  our position in it.  I am not certain that it was

12  ever sent, so that would have to be -- I would have

13  to verify that.

14       Q    Okay.  Looking at the second sentence of

15  that paragraph, I'm going to read it.  "We have been

16  told by the bank that the funds will be cleared to

17  transfer to SPG no later than Monday, 11 January

18  2021, although the bank has stated they expect it to

19  be earlier."

20       A    That was correct at the time we wrote

21  this, yes.  It was the information that we had.

22       Q    The bank that's being referred to there,

1    do you know what bank that's referencing?

2         A    I believe that -- could I see the date of

3    the letter again?

4         Q    Absolutely.

5         A    That's the 5th.  Okay.  That would have

6    been, I believe, the overseas bank.

7         Q    Is that the one that we talked about in

8    India or a different bank?

9         A    This was in January.  This would have been

10   the Malaysia bank.

11        Q    Are there any other -- so we talked now

12   about a Malaysia bank and a bank in India.  Are

13   there any other foreign banks you're aware of that

14   were kind of involved in this process of SPG

15   potentially receiving the funds?

16        A    That would have been Malaysia and India,

17   and if there is a loan, it would be out of Dubai.

18   The loan proceeds, I should say.

19        Q    I want to direct you to that next

20   paragraph.  It starts with, Lastly.  "Lastly, we

21   have opened an account in Ohio and are transferring

22   control of SPGI's account to the leadership in the

Page 128

1    Dayton office to prevent problems arising in the

2    future."

3         A    Okay.

4         Q    What is that sentence making reference to

5    when it states, "to prevent problems arising in the

6    future"?

7         A    I believe at that time there was some

8    animosity that had grown between Ken's assistant and

9    Mr. Ehlert, and since, you know, they are dealing

10   with it out there, at that point I was more than

11   happy to turn administration over to the process to

12   the people closest to the customer.

13        Q    What is your understanding of the reason

14   for the animosity between Mr. Wall's assistant, I

15   believe you said, and Mr. Ehlert?

16        A    I just -- I think that there was, once

17   again -- and this is nothing that I know firsthand.

18   It's not anything that I have witnessed, but I was

19   told by Mr. Ehlert that they were getting very

20   frustrated with the amount of calls that were coming

21   in and that, you know, they were the first line of

22   defense on it and, you know, that they basically

1   were trying to say that any updates you need to call

2   back to Mr. Ehlert.  So, you know, we felt that if

3   they're getting dinged on a daily basis, then what

4   we would like to do is make that interface closer to

5   where, you know, the questions and so forth were

6   coming to wouldn't have been a difficult situation

7   to affect them in the least.  And Mr. Wall was more

8   comfortable with that.

9        Q    And when you say they were receiving

10  calls, those were calls from the subrecipients?

11       A    Yes.

12       Q    And the account that's referenced in that

13  sentence, is that a bank account or something else?

14       A    That would have been a bank account, and I

15  don't know if that got opened or not.  We had

16  instructed them to since we were expecting money

17  shortly and would have wired those amounts directly

18  to that account, but, you know, I can't say whether

19  that -- to be honest with you, I'm not sure this

20  draft letter ever got put out.  I am assuming that

21  it did, but I don't know that.

22       Q    And the purpose of that account would

Page 130

1   have been to have money in there to pay the

2   subrecipients?

3        A    That's correct.

4             MS. BAAKMAN:  I am just gathering a couple

5   more documents I may want to ask the witness about.

6   Does everyone want to take a brief break while I do

7   so?

8             THE WITNESS:  Okay.

9             (Brief pause.)

10            MS. BAAKMAN:  Mr. Burns, I am showing you

11  a document that my client produced with its initial

12  disclosures.  It is Bates labeled RBR 1, and I am

13  going to have this marked Burns 3 -- oh, I'm sorry.

14  Oh, yeah, Burns 3.

15            (Burns Deposition Exhibit Number 3

16            was marked for identification.)

17  BY MS. BAAKMAN:

18       Q    And I'm going to ask you some questions

19  about it.  Let me know when you are done reviewing

20  it and let me know if I need to scroll for you.

21       A    If you could scroll down just a little

22  bit, please.

Page 131

1      Q    Sure.

2      A    Okay.  Go ahead.

3      Q    So the first thing I want to direct your

4  attention to is the email that was sent from

5  Mr. Harte to Ms. Gross.  It is dated January 25,

6  2021.  You are also included on the Cc line right

7  here, Thomas.Burns@SPGlobalInc.com.  Is that right?

8      A    It's true.

9      Q    Do you recall having seen this email

10 before?

11     A    I don't.

12     Q    Do you currently have an SPGI email

13 address?

14     A    I don't -- I may have, but I don't -- if I

15 do, it does not come to my Inbox.  But it doesn't

16 look like this is an SPGI.  This is an SP Global,

17 Inc.

18     Q    Okay.

19     A    But typically if I get something like

20 this, I forward it on to Dan Ehlert or whatever

21 because I have no action to take on it.

22     Q    Yeah, so I do see here that the email

Page 132

1    address that is used that was sent to you is an SP

2    Global, Incorporated, email address.  I was just

3    trying to understand whether you also have an SPGI

4    email address.

5         A    I don't think I do.  If they set one up

6    for me, I never got it put into my email.  I've

7    never seen anything from SPGI.

8         Q    I next want to direct your attention to

9    the chart that's on the email.  Do you have an

10   understanding of what the chart depicts?

11        A    Yes.

12        Q    And what is that?

13        A    Those would be outstanding invoices to

14   RBR.

15        Q    And what is the total that's reflected

16   there?

17        A    1,467,486.59.

18        Q    Do you contest that the figure that's

19   reflected there is due and owing to RBR?

20        A    According to the email and according to

21   the invoice numbers that they've put through, I've

22   got no reason to assume that it is not correct.  So

Page 133

 1   I would -- I would say in all likelihood it is
 2   correct.
 3        Q    Are you aware of there being any -- are
 4   you aware of SPGI or SPG contesting the amounts owed
 5   by -- that RBR claims are owed to it from any
 6   invoice that it has previously submitted?
 7        A    Some of the invoices that we've had, and I
 8   don't know if they were with RBR or another
 9   subcontractor, had been submitted and they were
10   incorrect or, you know, incorrect math, or just
11   submitted incorrectly.  In general, I don't think
12   anyone has put anything through that was not, you
13   know, essentially correct.  But I don't know these
14   invoices specifically, but my guess is that if this
15   is what they've put through that, you know, this is
16   correct.  And so your answer was, am I aware of
17   anybody having mistakes?  Yes, I'm aware of mistakes
18   that have been made.  I don't know if those were by
19   RBR.  But, yes, someone in submissions along the
20   line I have heard had made mistakes repeatedly, and
21   I don't know -- as I said, I don't know if this
22   refers to RBR or to someone else.

Page 134

1      Q    If Mr. Wall approved the invoices for

2  payment, would there be any other steps that would

3  have to occur before payment was to be made to RBR?

4      A    No.

5      Q    Mr. Burns, earlier in your deposition I

6  was asking questions about the valuation of your

7  shares of SPG, and I believe you said that they're

8  currently valued at about a dollar a share.  You

9  anticipate once the funding comes in that they'll be

10  at about $5 a share.  How many shares do you

11  currently own of SPG?

12      A    I don't have the cap table right now and

13  there's been changes with our employee stock and so

14  forth.  I'm not certain exactly what that number is,

15  but originally it was around, I think, 3 million and

16  I think it's dropped from there.  I've given stock

17  to others and so forth.  So somewhere around

18  2 million shares, I would imagine.

19      Q    And when you estimated that the shares are

20  worth about a dollar, what was that based off of?

21      A    Just if you look at some of the IP that we

22  have and what would be sold off and what the value

 1    of that would be and then take that against the

 2    number of shares that we have.

 3         Q    And the figure that you're estimating,

 4    does that include any shares or any stocks that you

 5    may hold in the subcompanies, for example,

 6    GlobalFlyte or CoreSyte or Vyrtx?

 7         A    Yeah, they -- there's IP in each one of

 8    those companies, and obviously we have an interest

 9    in that.  And, once again, if the companies are not

10    using the IP, it's not worth anything.  If they get

11    to the point where they have a minimum viable

12    product and then move along into a percentage of

13    their addressable market, then it becomes quite

14    valuable.

15         Q    But none of the subcompanies that we

16    discussed today are kind of at that point in the

17    development process?

18         A    You know, when you look at the -- the

19    question you had asked before, are they at the point

20    of revenue.  Okay.  They are not at the point of

21    revenue, but they are -- most of the relative

22    software and other components that round out the IP

Page 136

 1    have been done.

 2             MS. BAAKMAN:  Mr. Burns, I am showing you

 3    documents that my client produced with his initial

 4    disclosures.  They are Bates labeled RBR 37 through

 5    RBR 41.  I'm going to have this marked Burns 4.

 6             (Burns Deposition Exhibit Number 4

 7             was marked for identification.)

 8    BY MS. BAAKMAN:

 9        Q    Mr. Burns, I'll give you the opportunity

10    to review this.  I'm going to ask you some

11    questions.  The email chain starts at the bottom of

12    the document that's produced, so I will direct the

13    screen to that point.

14        A    Okay.  Go ahead.  You can go ahead and go

15    up.

16        Q    Okay.

17        A    You can go up.

18             Okay.  You can go up.

19             Okay.  Go up.

20             Okay.

21             Okay.

22             Okay.

Page 137

1          Okay.

2          Okay.

3          Okay.

4          Okay.

5      Q    So the first email I want to direct you to

6   on this chain is one that was sent by Ms. Gross to

7   Mr. Harte dated October 27, 2020.  The substance of

8   the email says, "Bryan, I am going to let corporate

9   answer for an updated payment status.  Thanks,

10  Marcia."  Do you see that?

11     A    I do.

12     Q    Do you have an understanding of what

13  Ms. Gross means when she says "corporate" in this

14  email?

15     A    I don't know what she was referring to,

16  but corporate would be back to us, I assume.  You

17  know, I think -- I'm just looking at the time frame

18  on this.  This was the time frame that we had been

19  assured that things would be moving quickly on, and

20  I'm sure that had been -- you know, as far as

21  receiving our funding.  And I am assuming, once

22  again, I don't know this, that she was probably

Page 138

1   aware of the documents that had been signed in

2   September and were anticipating funds being moved

3   shortly.

4           But your question, you asked about

5   corporate.  Corporate would have been calling back

6   here to this office.

7       Q    And that's SPG's office?

8       A    That's SPG's office, yes.

9       Q    Scrolling up to the next email I kind of

10  want to direct your attention to in this chain, it

11  is an email from Mr. Harte.  Well, do you know who

12  Mr. Harte is when I make reference to that?

13      A    I know he's part of the RBR entity.  I do

14  not necessarily know what his position in the

15  company is.

16      Q    Okay.  So the email is from Mr. Harte to

17  Dr. Tolley dated November 12, 2020.  The substance

18  of the email reads as follows:  "Dr. Tolley, Good

19  morning.  I believe that you spoke with Chris Taylor

20  regarding RBR's outstanding invoices, he indicated

21  that you said payment would come this week.  As of

22  today we have not seen any payment on the below

Page 139

1    invoices.  Can you please provide an update on the

2    below invoices."  Do you see that?

3         A    I see that, yes.

4         Q    Do you recall having any conversations

5    with Dr. Tolley in and around this time regarding

6    payment being anticipated around this week of

7    November 9th, November 8th, right around that time

8    frame?

9         A    I do not remember any conversations around

10   this particular email.  We were having conversations

11   at that time with high anticipations of the funding

12   being able to get in before the -- certainly before

13   Thanksgiving.  You know, so that probably was within

14   that time frame.  And I assume that that's where

15   some of this anticipation was coming from.

16        Q    Was Dr. Tolley communicating directly with

17   Mr. Trip about the timeline for anticipated receipt

18   of the funds?

19        A    At that time frame, I am not -- I don't --

20   I don't know if Dan was communicating directly

21   through to Mr. Trip or receiving his information

22   from me.  I don't know.

Page 140

1      Q    Scrolling up to the next email on this

2  chain that I want to direct your attention to, it is

3  from Mr. Harte to Dr. Tolley dated November 18,

4  2020.  The substance reads as follows:  "Dr. Tolley,

5  Good morning.  Chris Taylor indicated that you said

6  a payment will be coming this week.  This is after a

7  previous conversation where you indicated that

8  payment would come the week of November 9th."

9      A    Yes.

10     Q    Do you have an understanding of what --

11 well, were you having any conversations with

12 Dr. Tolley in and around this time about funds being

13 received the week that Mr. Harte is indicating was

14 represented to him?

15     A    The direct conversations I don't remember

16 that we had around this.  To be honest with you, the

17 RBR is not one -- other than that I saw that they

18 were one of the ones that we had invoices that we

19 owed.  We were all at a high level of anticipation

20 in that time frame that funding would be coming, and

21 we did have several delays during that time, once

22 again.  That was a frustrating time certainly for us

Page 141

1    and everybody else.  But, you know, any information

2    I can tell you that -- in my opinion, that Dan would

3    provide anybody with the best information that we

4    had at that time.

5        Q    It would have been based off of either

6    your direct communications with Mr. Trip or

7    Dr. Tolley's communications with Mr. Trip?

8        A    During that time frame, I think most of

9    the communications would have come through me.

10       Q    And when you said that there was a high

11   level of anticipation that the funds would be

12   received, was there anything in and around this

13   particular time frame that made the anticipation

14   especially high that the funds would be received?

15       A    Just the fact that, you know, the

16   subscription agreement was done in September and had

17   went through then the FINRA things and so forth, and

18   after those things had been finished, our

19   anticipation was that funds would be forthcoming

20   shortly.  We started at this time to understand

21   after it was -- later than this date, then that --

22   you know, anyway, a number of delays continued to

Page 142

1   happen.  I can't specifically go back and interpret

2   from what Dan said, a direct comment that I would

3   have made to him or that Mr. Trip would have made,

4   but what I can assume is that that was in the time

5   frame when we had high anticipation of money being

6   in at that time and that that money would

7   immediately be pushed back out to the subs.

8         Q    I next want to direct your attention to an

9   email from Dr. Tolley to Mr. Harte dated November

10  19, 2020.  This one reads as follows:  "Bryan, First

11  let me say how much I appreciate you and your

12  company's willingness to give us the opportunity to

13  correct our mistakes.  I'll get to answering your

14  original question.  We plan to make the ARCNet

15  payment via wire this Friday.  I don't have a

16  specific time, but let me say no later than 3:30 pm.

17  I know we have made it difficult on you, so I wanted

18  to reconfirm that the commercial side of our

19  business is going to add an 18% APR bonus to your

20  payment.  It will come separate from the ARCNet

21  payment towards the end of the month as a way to

22  express our regret, and hopefully cover any costs

Page 143

1    you may have incurred by our mistake.  Thanks for

2    your kindness.  Dan."  Did I read that correctly?

3         A    You did.

4         Q    So I first want to direct your attention

5    to the second paragraph that starts with, "I'll get

6    to answering your original question."  That

7    paragraph makes reference to an ARCNet payment via

8    wire that was anticipated no later than 3:30 p.m.,

9    Friday of that week.

10        A    Yes.

11        Q    Was that wire payment ever made?

12        A    No.

13        Q    And the reason for that was the -- well,

14   what was the reason that the payment wasn't made?

15        A    We were anticipating payment to us, and

16   as soon as it came into our account -- we were

17   anticipating that it would be in that day and that

18   it was not.

19        Q    And, again, that was based off of

20   communications either you or Dr. Tolley were having

21   with Mr. Trip?

22        A    Mr. Trip or the bank.

1    Q    And that would have been the Malaysia bank

2    at that point?

3    A    Some of the communications that we were

4    having was done with our bank because we were

5    anticipating funds being wired at a time and that

6    they should arrive to us at that time, and if that

7    happened, would they then be able to get it out

8    before the weekend.  So that's what I think.  Once

9    again, remember, I'm going by memory on this.  I do

10   remember that at this time frame it was high

11   anticipation that we would be getting these out in

12   short term, and I assume that's why Dr. Tolley put

13   the email out.

14   Q    Understood.  And when you made reference

15   to your bank, is that United Bank or a different

16   bank?

17   A    Well, that would have been United Bank.

18   Q    Okay.  I want to direct you to the next

19   paragraph where Dr. Tolley makes reference to the

20   commercial side of our business right here.  I'm

21   kind of hovering over that.  What is your

22   understanding of what Dr. Tolley means be there?

Page 145

1      A    Once again, I think that he's stated it

2    fairly clearly that SPG, not SPGI, would offer an

3    18 percent bonus to the payment that would come

4    directly from SPG in addition to their outstanding

5    invoices.

6             MS. BAAKMAN:  I am going to make a request

7    for last known contact information for Mr. Ehlert,

8    if that could be provided to me.  I believe

9    Mr. Burns testified that he does have contact

10   information for Mr. Ehlert.

11             I'm just going to take a quick look

12   through my notes to see if there's anything else I

13   have.  I'll pass it along to Ms. Dickerson or

14   Ms. Leary in case they have any questions.

15             EXAMINATION BY COUNSEL FOR DEFENDANT

16   BY MS. DICKERSON:

17      Q    Mr. Burns, did you take any medication

18   today?

19      A    Well, quite a bit.  I've got -- I take two

20   separate shots.  One was about 2:15 and the other

21   about 4:15.  And then I take several pain

22   medications, yes.

Page 146

1      Q    What was your medication for?  For what

2   condition?

3      A    I have chronic leukemia, lymphatic

4   leukemia, and then I also have an issue with -- it's

5   a blood issue, but the pain medications are for my

6   neck.  I have -- I'm waiting to go in to have

7   several vertebrae fused, and I'm not willing to do

8   this until we get some of this stuff tended to.

9            MS. DICKERSON:  No other questions.

10            THE WITNESS:  Pardon me?

11            MS. DICKERSON:  I have no other questions.

12            THE WITNESS:  Oh.  Thank you.

13            MS. LEARY:  I don't have any questions.

14            THE WITNESS:  Thank you.

15         EXAMINATION BY COUNSEL FOR PLAINTIFFS

16   BY MS. BAAKMAN:

17      Q    Mr. Burns, the medication that you took

18   today, did that impact your ability to recall any of

19   the details that we were discussing?

20      A    I --

21      Q    I'm sorry.  I didn't hear your answer.

22      A    I don't think so.  You know, it's just

Page 147

1   that I'm a little less acute than I normally am.

2       Q    Did it negatively impact your ability to

3   testify truthfully today?

4       A    Oh, no.

5           MS. BAAKMAN:  Okay.  So at this time I

6   don't have any other questions.  We're going to

7   suspend Mr. Burns' deposition in accordance with the

8   Court's most recent order last week that permits my

9   client to take an additional up to four hours of

10  deposition testimony after the documents are

11  produced to my client in accordance with the court

12  order tomorrow.

13          MS. DICKERSON:  So Mr. Burns will review

14  the testimony.  However, we're going to wait until

15  such time as the deposition is complete so he's not

16  reviewing two small parts of a deposition.

17          MS. BAAKMAN:  For purposes of reading and

18  signing, is that what you're --

19          MS. DICKERSON:  Yes.

20          MS. BAAKMAN:  Okay.  I have no objection

21  to that.

22              (Signature not waived.)

Page 148

1           (Whereupon, at 4:54 p.m., the

2       deposition of THOMAS BURNS

3       was concluded.)

4                   *   *   *   *   *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 149

1        CERTIFICATE OF NOTARY PUBLIC

2            I, CHRISTY MCGEE, the officer before whom

3    the foregoing statement was taken, do hereby certify

4    that the statement was taken by me in stenotype and

5    thereafter reduced to typewriting under my

6    direction; that the said statement is a true record

7    of the proceedings; that I am neither counsel for,

8    related to, nor employed by any of the parties to

9    the action in which this statement was taken; and,

10   further, that I am not a relative or employee of any

11   counsel or attorney employed by the parties hereto,

12   nor financially or otherwise interested in the

13   outcome of this action.

14                              *Christy McGee*

15

16                          CHRISTY MCGEE

17                     Notary Public in and for the

18                       Commonwealth of Virginia

19

20   My commission expires:

21   September 30, 2024

22   Notary Registration No.: 7233765

Page 150

1    A C K N O W L E D G E M E N T   OF   D E P O N E N T

2

3    I, THOMAS BURNS, do hereby acknowledge I have read

4    and examined the foregoing pages of testimony, and

5    the same is a true, correct and complete

6    transcription of the testimony given by me, and any

7    changes or corrections, if any, appear in the

8    attached errata sheet signed by me.

9

10

11

12

13

14

15

16

17

18

19

20    _____              _____

21    Date                      THOMAS BURNS

22

Page 151

1   Thomas Burns

    14800 Conference Center Drive, Suite 300,

2   Chantilly, Virginia 20151

3

    IN RE:  RBR Tech. vs. SPG Institute, Inc., et al.

4

5   Dear Mr. Burns:

6        This letter is to advise you that the original

7   transcript of THOMAS BURNS, taken in the above

8   matter will be available for reading and signing in

9   our office, Veritext Legal Solutions, located at

10  1250 Eye Street, NW, Washington, D.C. 20005, Monday

11  through Friday, between the hours of 7:30 a.m. to

12  5:30 p.m.  Please call (202) 857-3376 in advance to

13  set up a mutually-agreeable time.

14       Pursuant to the rules, the transcript will be

15  available for 21 days beginning Thursday, August 19,

16  2021.

17       If you have any questions, please do not

18  hesitate to call.  Thank you.

19  Yours,

20  Christy McGee

21  Reporter/Notary

22

    cc:  Justine A. Baakman, Esq.

```
                                            Page 152

 1  Veritext Legal Solutions

 2  1250 Eye Street, NW

 3  Suite 350

 4  Washington, D.C. 20005

 5  (202) 857-3376

 6

 7              E R R A T A   S H E E T

 8  Case Name:  RBR Tech. vs. SPG Institute, et al.

 9  Witness Name:  THOMAS BURNS

10  Deposition Date:  Thursday, August 5, 2021

11  Page No.    Line No.    Change/Reason for Change

12

13

14

15

16

17

18

19

20  _____        _____

21  Signature                           Date

22
```

[00213 - able]                                                              Page 1

| **0** |
| --- |
| **00213**  1:7 |
| **1** |

**1**  3:9 119:19,20
   130:12
**1,467,486.59.**
   132:17
**1.6**  104:21
**10**  67:18 97:18
   108:2
**10505**  2:15
**11**  91:8,10 102:15
   126:17
**111**  3:9
**115**  3:10
**11th**  92:9
**12**  97:18,19 138:17
**122**  3:11
**1250**  151:10 152:2
**128**  3:12
**12:35**  1:20
**137**  3:5
**14700**  9:19
**14800**  23:17,21
   151:1
**15**  28:11 67:18
   92:6 97:6,9,15
   102:8
**15th**  93:16
**16**  13:1,7
**17**  13:8
**18**  17:15 140:3
   142:19 145:3
**18-21**  3:15
**1801**  2:4
**19**  142:10 151:15
**1900s**  94:21
**19103**  2:4
**1:21**  1:7

| **1st**  23:2 93:17 |
| --- |
| **2** |

**2**  3:10 116:6
   123:14,15 134:18
**20**  28:12 108:2
**2000**  94:17,19,20
**20005**  151:10
   152:4
**2015**  12:21 17:12
**20151**  23:22 151:2
**2018**  101:12
**202**  151:12 152:5
**2020**  10:3 12:13
   16:16 22:7 23:3
   24:4 65:19 66:1
   66:14 87:9,10
   90:21 92:2 94:19
   94:21 95:18,20
   96:2,22 98:15
   99:10 101:10
   103:7 111:15
   113:2,6 116:6,7
   137:7 138:17
   140:4 142:10
**2021**  1:12 3:10
   66:14 104:9
   106:18 126:18
   131:6 151:16
   152:10
**2024**  149:21
**203**  2:15
**21**  17:15 151:15
**22030**  2:15
**22182**  2:10
**23**  11:8 22:6 24:12
**2300**  2:4
**24**  11:8
**25**  92:4,4,5 97:21
   102:8,8,8 131:5
**267**  2:5

| **27**  137:7 |
| --- |
| **2:15**  145:20 |
| **2nd**  95:19 97:5 |
|   98:21 |
| **3** |

**3**  3:11 97:15,21
   130:13,14,15
   134:15
**3,000**  86:18
**30**  149:21
**300**  9:20 23:21
   151:1
**338-1300**  2:5
**35**  26:20 27:1
**350**  152:3
**359-7111**  2:16
**360,000**  63:4,6
**37**  136:4
**37,000,000.00**
   124:17
**38**  27:1
**3:30**  142:16 143:8

| **4** |
| --- |

**4**  3:12 99:10 116:7
   136:5,6
**4/138**  3:4
**4087**  123:12
**4088**  123:13 124:5
**41**  136:5
**46**  45:15
**46-51**  3:16
**4:15**  145:21
**4:54**  148:1
**4th**  94:9,17 96:22

| **5** |
| --- |

**5**  1:12 3:10 28:5,5
   104:9 108:2
   134:10 152:10
**50**  22:13

| **51**  45:15 |
| --- |
| **54**  22:13 |
| **540**  2:10 |
| **552-4113**  2:11 |
| **5:30**  151:12 |
| **5th**  127:5 |
| **7** |

**703**  2:11,16
**7233765**  149:22
**7:30**  151:11

| **8** |
| --- |

**8045**  2:10
**8112**  149:15
**855**  119:18
**856**  120:19 122:12
**857**  119:19 122:2
**857-3376**  151:12
   152:5
**8th**  139:7

| **9** |
| --- |

**90**  92:3 102:6,9,14
   107:8,16,21
   108:15
**95**  97:5 100:12
   101:6 102:1,5
**9th**  139:7 140:8

| **a** |
| --- |

**a.m.**  151:11
**abandoned**  15:22
**ability**  7:15 89:15
   101:5 110:17
   146:18 147:2
**able**  10:12 31:13
   37:19 38:2 40:8
   42:12,17 44:10,20
   56:17 59:2 87:15
   88:7 89:4,5,7,18
   93:21 94:2,6
   98:22 101:13

105:18 126:6
139:12 144:7
**absolutely** 38:12
120:6 127:4
**acceptable** 9:1
**access** 38:5,13
40:10,14,19 65:10
65:14,18,21 66:5
67:8 75:15,17,22
76:13
**accommodate**
5:19 9:3,7
**account** 64:13
65:10,22 67:5
83:15,18,20,22
84:4,5,12,15,16,19
85:1,3,4,6,8,11,12
85:15,16,19 86:3
87:13,15,18,20
89:1,11 90:12,15
91:3 123:6 127:21
127:22 129:12,13
129:14,18,22
143:16
**accounting** 34:21
35:20,22 37:9,11
55:9 60:8 77:21
77:22 89:22
113:11,14 114:4,9
**accounts** 36:8,16
64:8,11,12,14,22
65:14,18,22 67:5
83:21 84:1,2,3,7
84:10 85:19 87:20
88:2 91:3 113:17
**accredited** 100:17
**accumulator** 93:1
**accuracy** 66:11
**accurate** 9:1
**acknowledge**
150:3

**act** 31:7 123:1
**action** 131:21
149:9,13
**actively** 44:2
**actor** 96:13
**acute** 147:1
**add** 142:19
**addition** 145:4
**additional** 12:3
31:8 78:9 92:6
120:9 147:9
**address** 10:6
23:17,19 131:13
132:1,2,4
**addressable**
135:13
**administer** 16:11
**administration**
128:11
**administrative**
30:13 84:13
**advance** 121:20
151:12
**advice** 30:15
**advise** 151:6
**advisory** 92:11
**affect** 129:7
**afghanistan**
104:19
**afternoon** 4:8
**ago** 5:7 10:9 36:20
37:21 41:13,14
72:1 73:14 105:12
105:13 106:3
**agree** 68:21 94:7
**agreeable** 151:13
**agreed** 105:19
126:9
**agreement** 94:8,8
94:11 96:2 99:9
99:12,20 108:9

116:7 141:16
**agreements** 96:7,9
**ahead** 10:15 73:1
120:12 131:2
136:14,14
**air** 13:5,10,10,22
16:15 54:4,15
68:6,9 69:2 70:8
73:13,18 74:17
75:3 80:12 82:12
87:6 97:12
**al** 151:3 152:8
**alexandria** 1:2
**allow** 77:16 119:9
**allowed** 115:9
**american** 95:8
**amount** 44:8,9,21
90:5,16 91:1
103:11 107:18
108:19 121:15,15
121:16 128:20
**amounts** 92:2
129:17 133:4
**animosity** 128:8
128:14
**annually** 63:2,7
**answer** 5:16,21
7:13,14,16,19,22
8:15 9:5 32:17
39:8 42:1,4,7
57:16 62:13 70:2
72:18 74:14 81:2
82:14 111:6
133:16 137:9
146:21
**answered** 71:4
72:18 110:8
**answering** 8:5
15:15 56:14
142:13 143:6

**answers** 8:19 9:1
71:7,16
**anti** 95:5
**anticipate** 7:21 8:6
53:14 106:17
134:9
**anticipated** 97:11
105:6 139:6,17
143:8
**anticipating** 98:22
108:13 138:2
143:15,17 144:5
**anticipation** 60:3
139:15 140:19
141:11,13,19
142:5 144:11
**anticipations**
139:11
**anybody** 83:4
115:21,22 133:17
141:3
**anyway** 94:6
141:22
**apologize** 14:20
15:16 31:16 78:18
102:10 110:7
**appear** 120:17
150:7
**appetite** 103:21
**application** 52:18
**applicative** 43:19
**appreciate** 31:21
95:12 142:11
**approached** 13:21
**approved** 75:8
134:1
**approving** 121:6
**approximate** 8:17
8:19
**approximately**
10:9 24:12 86:18

**apr** 142:19
**april** 93:16 99:1
  110:15
**ar** 3:11
**arcnet** 83:18,22
  84:5,16 85:1,8,12
  85:15 87:13,15,17
  87:19 89:1,11
  90:11 91:3 142:14
  142:20 143:7
**area** 11:4 12:7
  29:15 39:15 74:18
  74:20 75:1,6,11,15
  75:17,22 76:13,18
  77:5,14,21 79:20
  80:2,5,14,16 81:7
  81:10 82:3 93:3
  93:12
**areas** 15:21 43:13
  52:10,14
**arising** 128:1,5
**arrival** 60:18
**arrive** 144:6
**aside** 12:11
**asked** 15:14,22
  16:5,8 22:5 25:13
  37:6 42:12 55:18
  56:18 58:10 72:16
  110:7 115:20
  116:14 117:21
  135:19 138:4
**asking** 8:14,16
  11:12 13:6 25:15
  56:15 70:15 79:5
  108:12 118:19
  134:6
**assets** 27:3
**assistance** 57:21
**assistant** 112:13
  128:8,14

**assisting** 59:14
**associated** 124:18
**assume** 8:15 65:7
  83:10 112:13
  113:14 121:8,15
  126:3 132:22
  137:16 139:14
  142:4 144:12
**assuming** 55:6
  58:15 59:17,19
  93:19 112:15
  117:4 121:11
  129:20 137:21
**assumption** 63:9
  77:18 117:12
**assured** 137:19
**athletic** 45:1
**attached** 3:22
  17:17 45:17
  124:16 125:13
  126:1 150:8
**attachment**
  125:15
**attempting** 107:6
**attention** 131:4
  132:8 138:10
  140:2 142:8 143:4
**attorney** 99:13
  149:11
**attorneys** 6:18
**august** 1:12 10:2
  12:13 16:16 22:7
  23:3 24:4 65:19
  66:1 87:8 103:7
  104:9 106:1,18,20
  107:5 113:6
  151:15 152:10
**authorization**
  123:4
**authorized** 89:10
  91:2 122:15

**authorizes** 122:16
**authorizing** 121:9
  122:20
**available** 58:9,11
  65:5 126:5,6
  151:8,15
**award** 85:10
**aware** 16:21 43:21
  43:21 53:3 54:18
  54:21 57:3 58:2
  58:19 60:1,5,13
  63:11,15 77:3
  80:1 82:10 84:18
  86:15,22 87:4,11
  87:21,22 112:22
  118:7 127:13
  133:3,4,16,17
  138:1
**awareness** 87:2
**awful** 104:2

**b**

**baakman** 2:3 4:7,9
  9:10,15 14:21
  15:3 22:1 38:10
  52:1 61:12 63:8
  67:13,21 68:4
  119:9,12,16,22
  123:10,17 130:4
  130:10,17 136:2,8
  145:6 146:16
  147:5,17,20
  151:22
**back** 10:2 12:6,9
  33:21 38:17 79:19
  92:19 95:13 97:4
  98:12 106:4
  114:10,11 118:16
  122:11 129:2
  137:16 138:5
  142:1,7

**bad** 96:12
**balance** 36:11
  108:3
**bank** 36:8 63:12
  64:1,7,9,22 65:3,4
  65:11,15 66:1,4
  67:6 73:6 83:15
  83:18,20,20 84:5,7
  84:10 85:6 90:15
  97:3 104:15
  105:14 106:5,5,7
  106:10,11,14
  107:22 123:6
  126:16,18,22
  127:1,6,8,10,12,12
  129:13,14 143:22
  144:1,4,15,15,16
  144:17
**banking** 63:16
  64:2,8 67:5 93:4
  95:9,9 105:1
  115:8
**banks** 100:6
  127:13
**base** 24:15
**based** 29:11 72:10
  73:21 74:1 81:9
  90:3 91:20 93:2
  134:20 141:5
  143:19
**basic** 30:11
**basically** 16:11
  22:16,18 35:19
  43:3,8 44:18 56:8
  96:16,21 113:13
  128:22
**basis** 70:12 74:2
  99:8 129:3
**bates** 119:18
  120:19 122:11
  123:12 124:4

**[bates - chain]** Page 4

130:12 136:4
**began**  113:7
**beginning**  1:20
23:10 29:3 151:15
**behalf**  1:21 2:2,7
2:13 4:14,21
54:17 61:9,14,17
61:19 63:12 70:16
98:5 119:3 123:2
**belief**  90:2
**believe**  11:7 13:1,7
13:14 14:4,8,9
17:4,10,12 22:5
24:6 29:3 32:12
33:3 34:9,11
35:15 38:15 40:15
40:17 53:2,9 54:9
55:4,9,9 60:8
62:11 63:6 68:14
75:4,19 79:22,22
83:14 86:2 89:20
94:21 97:5 104:12
104:14 105:4
114:5,15,16 127:2
127:6 128:7,15
134:7 138:19
145:8
**benchmark**  81:19
**benchmarks**  81:17
**benefits**  97:2
**best**  7:15 37:4,12
104:2 141:3
**better**  70:3 74:11
**beyond**  27:18
30:12 59:9 69:12
84:14 100:3
**billing**  82:1
**bills**  84:14 85:7,9
98:2 102:16,19
103:3 108:6

**bit**  13:15 70:3
130:22 145:19
**blood**  146:5
**board**  11:18,20
12:12 14:3,11
15:5,11 16:2,9,22
17:2,3,7,8 24:19
25:9,16,18,20,21
26:1 43:9 92:11
124:15 125:4
**bonus**  142:19
145:3
**books**  36:15 38:2
92:13
**botanicals**  27:8
28:18 53:3 88:11
**bottom**  120:22
124:9 136:11
**bounced**  86:18
**bouncing**  86:22
87:3
**branch**  27:8 28:17
53:3 88:11
**break**  9:3,6 67:17
67:22 130:6
**breakdown**  84:21
**breaks**  9:8
**brief**  5:3 68:3 79:2
130:6,9
**briefings**  74:1
**briefly**  71:3,6
72:19
**bring**  92:18
105:18 113:18
118:3
**bringing**  26:5 93:9
104:5
**brings**  4:11
**broker**  96:10
**brokers**  96:20

**brought**  94:12
**bryan**  2:19 137:8
142:10
**buildings**  27:21
115:8
**burns**  1:15 3:8 4:3
4:8 9:16 67:19
68:5 70:16 118:13
119:12,13,16,19
119:20 120:2
123:10,14,15,18
124:6 130:10,13
130:14,15 134:5
136:2,5,6,9 145:9
145:17 146:17
147:7,13 148:2
150:3,21 151:1,5,7
152:9
**business**  13:15,17
34:15 36:9 39:13
43:17 44:16 45:8
52:5,8 60:7 61:14
61:16 89:12
142:19 144:20
**busy**  43:16

**c**

**c**  2:1 3:1 4:1 17:14
25:7 31:7 150:1
**call**  31:4 43:20
93:11 112:2,2
129:1 151:12,18
**called**  1:16 4:4
31:2 36:2 85:4
92:7 109:17
**calling**  138:5
**calls**  128:20
129:10,10
**cap**  134:12
**capacity**  54:16
105:1

**capital**  93:12
**car**  45:1
**card**  36:8
**cards**  61:2
**care**  76:6
**carried**  93:13
**carry**  89:8
**case**  1:6 7:13
145:14 152:8
**catch**  10:13
**cc**  131:6 151:22
**cease**  10:7 32:10
**ceasing**  77:4 83:8
**cellphone**  32:16
42:3
**cellphones**  29:6
33:8 58:3
**center**  9:19,20
23:17,21 151:1
**central**  60:11
**ceo**  24:20 25:8
30:8 31:4 43:14
**certain**  14:9 26:16
30:19 36:4 39:19
40:18 43:6 44:8
52:14,15 55:16
58:16 66:7 72:20
89:19 107:15,16
126:11 134:14
**certainly**  42:15
43:2 63:18 98:21
117:6 139:12
140:22
**certificate**  149:1
**certification**  82:4
82:10 104:16
**certified**  106:2
**certifies**  122:15
**certify**  149:3
**chain**  3:12 136:11
137:6 138:10

[chain - concerns]                                                           Page 5

| | | | |
|---|---|---|---|
| 140:2 | cleared  126:16 | commercial  27:20 | 124:19 135:8,9 |
| **chairman**  24:19 | **clearer**  37:13 | 92:5 142:18 | **company**  16:12 |
| 25:20 26:1 | **clearing**  104:6 | 144:20 | 27:6 29:15 30:18 |
| **change**  76:4 | **clearly**  72:18 | **commission** | 31:12 33:14 36:3 |
| 152:11,11 | 145:2 | 149:20 | 42:18,22 43:4 |
| **changed**  116:13 | **client**  95:6 130:11 | **commitment** | 54:19 60:8,12 |
| **changes**  134:13 | 136:3 147:9,11 | 95:21 96:1 101:2 | 79:1,4 107:12 |
| 150:7 | **clock**  60:22 | 105:21 116:5,8,10 | 108:10 114:11 |
| **chantilly**  4:17,19 | **close**  31:18 42:13 | 116:16 117:22 | 124:7 125:2,3 |
| 9:18 23:16,18,22 | **closed**  10:11 | **commitments**  90:4 | 138:15 |
| 24:13 151:2 | **closer**  31:16,17 | 90:7 92:1 116:19 | **company's**  88:4 |
| **chart**  29:18 30:6 | 129:4 | **committed**  92:3,9 | 142:12 |
| 36:15 132:9,10 | **closest**  128:12 | 94:9,10 95:16 | **competent**  117:8 |
| **check**  80:12 86:18 | **closing**  103:12 | 97:4 99:22 100:13 | **compiling**  57:1 |
| **checking**  96:13 | **collect**  76:16 | 101:6 102:2,14 | **complaint**  71:13 |
| **checks**  86:22 87:3 | **collected**  61:5 | 103:13,13 | 71:14,17 |
| **chief**  25:2 43:1 | **collecting**  63:12 | **commonwealth** | **complete**  147:15 |
| **children**  59:9 | **combined**  30:21 | 1:20 149:18 | 150:5 |
| **chiochetti**  15:10 | **come**  22:17,17 | **communicate**  5:14 | **completed**  28:9 |
| 15:11,18,21 16:6 | 31:9 40:4 59:2,10 | 109:11 110:22 | **completely**  31:20 |
| 17:5 | 70:6 86:3 88:17 | 115:19 | **completion**  81:18 |
| **chris**  98:14 138:19 | 88:18 91:19,19 | **communicated** | **compliant**  33:4 |
| 140:5 | 92:12 95:3 96:4 | 110:18 111:19 | **components**  68:19 |
| **christie**  2:14 | 96:19 105:22 | 114:2,12 | 135:22 |
| **christie.leary**  2:16 | 107:18,19 111:1 | **communicating** | **composed**  124:6,8 |
| **christy**  1:18 6:11 | 115:6 117:17 | 69:6 98:8 111:2 | **comptroller**  30:12 |
| 7:10 8:3 14:22 | 118:16 131:15 | 111:13 112:5 | 34:4 35:18 66:12 |
| 32:1 119:9 149:2 | 138:21 140:8 | 115:12 139:16,20 | 66:16 |
| 149:16 151:20 | 141:9 142:20 | **communication** | **computer**  77:20 |
| **chronic**  146:3 | 145:3 | 74:17 109:13 | 118:16 |
| **circumstances** | **comes**  134:9 | 110:5 113:21,22 | **conceivably**  27:12 |
| 52:15 | **comfortable**  129:8 | 114:1 | **concept**  8:14 |
| **civil**  1:6 | **coming**  60:11 88:6 | **communications** | **concern**  89:14,17 |
| **claims**  133:5 | 92:14 96:14,14 | 44:1 78:4 79:13 | 110:17 111:14 |
| **clarify**  6:22 12:3 | 107:12,21 128:20 | 98:5 109:8 113:1 | **concerned**  56:15 |
| **clarifying**  11:14 | 129:6 139:15 | 113:19,20 118:1 | 79:2 80:9 83:11 |
| 11:22 63:10 | 140:6,20 | 141:6,7,9 143:20 | 98:10 100:22 |
| **clarity**  63:5 | **comment**  9:2 | 144:3 | 101:1 |
| **clear**  4:15 6:20 7:4 | 64:21 142:2 | **companies**  26:4 | **concerns**  101:5 |
| 8:2 11:10 31:15 | **commerce**  115:16 | 27:14 39:6,7 | 110:16 |
| 108:12 | | 88:17 97:17,20 | |

[concluded - dan]                                                                    Page 6

concluded  148:3
condition  146:2
conditioning
  45:10
conditions  92:10
conduct  61:14
conducted  61:15
  74:18
conducting  7:8
conduit  13:22
conference  1:18
  9:19,19 23:17,21
  151:1
confidential  3:14
  17:16 45:16
connect  94:3
connection  55:14
  60:4 63:13 72:5
  75:2,12 82:7
  86:18 87:1
consider  12:12
  26:5 27:13 62:12
consideration
  28:13
considered  15:20
consistently  17:1
consult  5:22
consulted  68:22
consultive  68:18
contact  35:1 42:14
  69:2,12 76:4 98:9
  99:8 112:18 145:7
  145:9
contest  109:2
  132:18
contesting  133:4
context  64:18
continue  16:8 88:7
  89:7,20 93:13
  101:2,8,13

continued  91:12
  93:15 95:3 103:8
  103:9 117:22
  141:22
continuing  54:14
  116:15
continuous  95:10
contract  13:5,9,10
  13:22 16:15 39:22
  54:4,15 68:6,8,12
  68:17 69:3,21
  70:1 73:12,18
  74:7,18 75:2,12
  80:7,9 81:20 82:2
  82:7,11 85:10
  86:3,19 87:1,3,6
  95:22 96:2 97:12
  99:11,14 118:21
  119:4
contractors  85:9
contracts  35:14
  39:16
contribute  104:18
control  60:12
  127:22
conversation  7:20
  110:2 140:7
conversations
  79:6 109:10 113:4
  118:4 139:4,9,10
  140:11,15
coordinate  44:1
copies  38:15,17
  117:16
core  30:15
corepro  36:2,6,12
  36:18 37:2,2,6,15
  38:7,7,7,14 60:21
  61:4 62:2,5 66:19
  78:1,3

coresyte  27:7
  28:17 44:16,17
  45:4 52:7,17 53:2
  135:6
corey  69:14
corp  17:14
corporate  17:13
  25:3,4 70:17
  137:8,13,16 138:5
  138:5
corporation  26:3
  29:4
correct  4:22 55:17
  55:18 62:7 67:10
  69:15 81:4 88:15
  88:22 89:13 90:9
  102:18,21 123:9
  125:10 126:20
  130:3 132:22
  133:2,13,16
  142:13 150:5
corrections  150:7
correctly  124:19
  143:2
correlation  81:22
correspondence
  73:15
costs  26:8 93:5
  123:6 142:22
counsel  1:16 3:4,5
  4:6 5:15 79:7,7
  109:6 117:1,10,11
  145:15 146:15
  149:7,11
counting  11:19
countries  104:20
country  92:21
  115:7
couple  36:20
  37:21 105:12
  106:3,22 122:12

130:4
course  39:13 60:7
court  1:1 6:6
  14:14 147:11
court's  147:8
cover  3:14 17:17
  45:17 91:4,15
  123:6 142:22
covering  90:13
covid  24:17 92:19
  93:14 95:4 98:18
credit  36:8
csr  1:18
cto  25:8 30:9
current  24:12
  25:18 28:1 54:8
  58:3 75:21 83:1
  116:20
currently  10:22
  11:5,7 12:11 14:2
  16:14 22:2,4,20
  26:20 27:3 34:2
  34:19 36:22 41:4
  54:13 55:2 61:5
  62:17,19 64:2
  131:12 134:8,11
curve  93:4
customer  128:12
cut  119:14
cv  1:7

d

d  4:1 150:1,1
d.c.  151:10 152:4
daily  79:17 99:8
  113:15 129:3
dan  1:9 2:13 4:11
  25:1 30:8,11 36:7
  37:4 38:17 56:9
  56:12,15 58:17
  64:16 65:12 72:17
  86:14 98:7,14

109:22 131:20
139:20 141:2
142:2 143:2
**dan's** 59:9
**date** 12:19 13:5,6
15:14 23:7 35:1
43:7 90:14 99:21
102:1,3 105:7,10
113:18 118:9
127:2 141:21
150:21 152:10,21
**dated** 116:6,7
131:5 137:7
138:17 140:3
142:9
**dates** 36:21 116:10
**day** 70:12,12
79:11 98:13 99:6
113:17 115:11
143:17
**days** 92:17 105:12
107:1 151:15
**dayton** 10:5,7,18
10:20 11:2 24:8
53:12 112:8,10
121:3 128:1
**deal** 27:17 44:10
114:22
**dealing** 44:22 52:9
52:16 100:17
104:21 114:19
128:9
**dealt** 113:14
**dear** 151:5
**deaths** 104:22
**debt** 104:6
**debts** 108:10
**decide** 16:12 32:19
**decided** 10:14
88:1 96:17

**decisions** 30:16
**dedicated** 104:4
**dedicating** 62:4
**defendant** 2:13
3:5 145:15
**defendants** 1:10
2:7
**defense** 128:22
**delay** 111:12,16
112:3
**delayed** 110:22
111:3 112:1
114:14
**delaying** 104:10
**delays** 95:3,11
140:21 141:22
**demasi** 25:4 30:10
32:6 39:17 42:9
**demasi's** 42:20
**demonstrate** 28:7
**denied** 92:20
**departure** 60:18
**depending** 42:19
**depicts** 132:10
**deposed** 86:16
**deposition** 1:14
3:8 4:12,20 5:2,6
5:9 7:8 68:7 70:21
71:1,22 73:4,7
78:6,10 79:8,15
119:20 121:21
123:15 130:15
134:5 136:6 147:7
147:10,15,16
148:2 152:10
**depression** 52:9
52:10
**describe** 40:13
**described** 36:14
**description** 61:21

**designated** 31:3,4
**designee** 4:21
**detail** 12:3
**details** 146:19
**develop** 30:17
**developed** 44:13
**developing** 52:12
**development** 45:4
45:7,12 52:19
101:14 135:17
**dickerson** 2:9 5:17
6:1 7:11 9:10,13
61:10 63:5 68:2
145:13,16 146:9
146:11 147:13,19
**difference** 22:14
**different** 7:16 8:6
52:18 83:21 88:2
88:9,13 92:1
94:15 103:18
127:8 144:15
**difficult** 110:12
129:6 142:17
**dinged** 129:3
**direct** 60:12 81:22
89:10 90:11 97:22
107:13 113:1
118:4 127:19
131:3 132:8
136:12 137:5
138:10 140:2,15
141:6 142:2,8
143:4 144:18
**directed** 56:4 89:3
91:2
**direction** 26:2
149:6
**directive** 58:14
**directly** 30:6
85:18 92:4 96:15
96:19 97:22 110:6

115:19 129:17
139:16,20 145:4
**directors** 12:12
14:3,12 15:6,12
16:3,10,22 17:2,3
17:7,9 25:9,16,19
26:1
**disclosure** 30:20
**disclosures** 130:12
136:4
**discovery** 55:21
56:7 71:9,11
**discuss** 103:9
**discussed** 57:13
71:18,19 84:1
88:12 135:16
**discussing** 24:10
67:1 146:19
**discussion** 12:7
**dispersed** 81:13
82:6 83:13
**district** 1:1,1
**division** 1:2
**document** 38:20
39:1,7,9 40:22
55:14 60:3 120:18
122:1,11,14 124:4
125:20,22 130:11
136:12
**documentation**
38:13 40:20 74:16
75:10 79:21 80:2
80:20 81:11 82:17
**documents** 38:6
39:12,19 40:3,11
40:19 55:13,22
56:1,4,15 57:4,8
57:13 58:6,21,22
59:10,11,15 60:2
72:4,8,13 76:16
77:5,10 119:13,17

120:2,16 121:20
123:11 130:5
136:3 138:1
147:10
**doing** 6:9 8:20
15:20 37:12 42:14
59:18 78:21 81:16
97:19 101:13
121:14
**dollar** 28:11 134:8
134:20
**dollars** 90:5,5
110:13
**domestic** 95:9
**doubt** 117:14
**downstream**
29:22
**dr** 1:9 2:13 4:11
14:6,7,13,17 15:4
17:1,8 25:1,21
26:3,11,18,21
29:19 30:7 34:9
42:8 56:4 57:11
57:18,20 58:19
59:15 62:8 63:11
64:16,17,21 65:12
65:16 66:4 67:9
68:16 76:21 78:21
83:2,5 87:22
112:22 113:4
117:8,9 119:17
123:12 138:17,18
139:5,16 140:3,4
140:12 141:7
142:9 143:20
144:12,19,22
**draft** 3:10 124:5,7
126:2 129:20
**drawer** 90:1,1
**drive** 2:15 9:19,20
23:18,21 40:10,17

57:13 67:2 117:13
151:1
**drivers** 45:2
**dropped** 134:16
**dubai** 93:3 106:22
127:17
**due** 24:17 87:16
108:20 132:19
**duly** 4:4
**duties** 76:10

### e

**e** 2:1,1 3:1 4:1,1
150:1,1,1,1,1
152:7,7,7
**earlier** 9:2 12:4
24:10 53:1 57:13
68:7 83:19 84:16
102:16 109:5
121:19 126:19
134:5
**early** 15:13,13
16:4 69:4 104:1
**easier** 63:2
**eastern** 1:1
**economy** 103:22
**educated** 111:8
**effect** 82:11 107:1
**efficiently** 44:2
**effort** 103:2
**ehlert** 30:12 32:8
32:10,13,15 34:3
34:18 35:2 37:5
59:4 64:16 65:12
65:16 66:12,13
67:9 74:8,10
75:19,20 76:14
77:3,9,19 82:15,16
83:7 88:1 112:21
128:9,15,19 129:2
131:20 145:7,10

**ehlert's** 35:17 83:6
**eight** 81:20 116:18
**either** 5:13,19 6:1
9:14 10:11 33:6
34:19 37:6,10
38:6 58:3,11 61:5
63:11 72:5 74:10
78:8 94:1 100:6
101:9,20 117:9
141:5 143:20
**electronic** 39:13
40:11 65:8 94:2
**electronically** 61:1
65:5 66:10 67:1
77:10
**element** 13:18
**elements** 36:9,10
**elliott** 41:10 59:14
**elliott's** 41:11
59:20
**email** 3:9,10,11,12
73:15 109:9
117:17,18 131:4,9
131:12,22 132:2,4
132:6,9,20 136:11
137:5,8,14 138:9
138:11,16,18
139:10 140:1
142:9 144:13
**emails** 56:19 57:6
98:11 116:2
**emergency** 43:22
**employ** 11:6 12:11
22:3 35:7 53:4,18
55:2
**employed** 11:12
11:13 22:15 34:19
34:20 35:10,12,21
41:15 149:8,11
**employee** 32:4,6,8
33:9 36:22 42:9

53:7,21 54:8 55:5
55:6 83:1 134:13
149:10
**employees** 11:11
11:15,19,21 12:13
12:14,16 22:20
23:1,4,5 24:12
26:16 28:20 29:2
29:5,7,8,10 31:3
32:18 33:6 40:10
40:14 43:9 58:4
60:18 61:8,13,15
61:19 73:16 75:21
**employing** 22:9,12
36:17
**employment** 32:10
32:19,22 33:7,7
41:11 66:15 77:4
77:12 83:8
**endeavoring** 44:14
**ended** 37:8
**endgame** 103:14
**ends** 32:22 33:7
**engaged** 44:2
**enter** 13:4 96:2
**entered** 13:3 94:7
**entire** 69:22
**entities** 70:17
**entity** 16:13
138:13
**entry** 92:21
**equipment** 32:20
33:8,22
**equity** 97:20
**errata** 150:8
**especially** 141:14
**esq** 151:22
**esquire** 2:3,9,14
**essentially** 133:13
**estate** 93:5,6,10

[estimate - formerly]                                                    Page 9

| | | | |
|---|---|---|---|
| **estimate** 8:19 11:8 12:20 22:6 91:6 | **exist** 10:8 | **far** 6:10 53:22 56:14 60:10 79:1 80:8 83:10 98:10 100:5 101:1 109:12 124:17 137:20 | 143:4 |
| **estimated** 134:19 | **existing** 29:13 | | **firsthand** 128:17 |
| **estimating** 135:3 | **expect** 126:18 | | **five** 31:10 92:17 97:17,20 |
| **et** 151:3 152:8 | **expected** 91:21 105:6 | | **flash** 15:2 |
| **eventually** 88:18 105:22 113:4 | **expecting** 129:16 | **fashion** 58:1 89:19 | **flow** 82:21 90:5,6 101:13 |
| **everybody** 60:12 113:18 141:1 | **expenses** 88:19 90:13 91:4 | **fast** 14:18,20,21 15:2 | **focus** 52:8 120:18 |
| **everyday** 7:20 | **experience** 82:3 | **february** 92:2,9 95:17,17,19 96:1 97:5 98:15,21 101:10 111:15 116:6 | **focused** 103:11,12 |
| **exact** 12:19 13:6 23:6 36:20 90:14 | **experiences** 43:13 81:7,10 | | **folder** 40:9 |
| **exactly** 7:15 55:22 70:20 88:15 109:10 134:14 | **expertise** 15:21 29:15 31:12 | | **folks** 11:2 33:11 74:4 |
| | **expires** 149:20 | **feedback** 52:15 74:4 | **follow** 38:5 92:7 122:12 |
| **examination** 1:16 3:3 4:6 145:15 146:15 | **explain** 29:16,20 69:19 73:16 88:22 | **feel** 33:18 123:21 | **follows** 4:5 138:18 140:4 142:10 |
| **examined** 4:5 150:4 | **exploring** 103:2 | **felt** 105:14 129:2 | **force** 13:5,10,11 13:22 16:15 54:4 54:15 68:6,9 69:3 70:8 73:13,18 74:17 75:3 80:12 82:12 87:6 97:12 |
| **example** 12:20 27:20 34:13 40:11 57:5 90:20 91:14 115:7 135:5 | **express** 142:22 | **figure** 91:5 132:18 135:3 | |
| | **extent** 26:14 59:13 64:20 72:7 | **file** 33:16 | |
| | **external** 41:18 | **filed** 71:16,20 72:1 | |
| | **eye** 151:10 152:2 | **files** 60:6,9,10 | **forego** 23:11,11 |
| **exceeds** 124:17 | **f** | **finally** 96:21 | **foregoing** 149:3 150:4 |
| **excel** 61:7 | **face** 31:18 | **financial** 68:20 | **foreign** 95:7,9 127:13 |
| **excerpts** 3:14 | **facilities** 10:15 | **financially** 149:12 | |
| **exchanged** 80:2 | **fact** 12:10 66:13 83:19 87:5,11 108:9 141:15 | **fine** 120:8 | **forget** 43:20 |
| **excuse** 104:15 | | **fingers** 14:18 | **forgot** 62:18 |
| **executed** 100:8 | **fair** 101:4 | **finish** 7:19 | **form** 39:13,14,14 66:10 |
| **executive** 30:9 43:11 | **fairfax** 2:15 | **finished** 141:18 | |
| | **fairly** 91:22 145:2 | **finra** 96:11 100:18 141:17 | **formal** 38:20 39:4 39:4 40:6,22 95:22 |
| **executive's** 40:7 | **falls** 27:1 | **firm** 28:14 | |
| **executives** 24:22 25:4,14 | **familiar** 56:10 69:18,22 73:19 74:19,20 77:14 81:6 | **first** 4:4 5:11 11:16 12:18 13:3 23:3 29:1 38:3 72:1 87:4 90:10 91:17 95:16 110:8 111:13 124:21 128:21 131:3 137:5 142:10 | **formation** 31:11 42:21 |
| **exercise** 45:1 | | | **formed** 12:18 17:11 |
| **exhibit** 119:20 123:15 130:15 136:6 | **familiarization** 80:5 | | **former** 58:3 |
| | **family** 26:12,21,22 93:2 | | **formerly** 34:19 67:9 |
| **exhibits** 3:8,22 | | | |

**forth** 28:10 30:11
56:15,19 59:11
65:1 88:5 90:6
92:19 98:12 100:3
101:14 103:10,20
129:5 134:14,17
141:17
**forthcoming**
141:19
**forward** 89:4,6
100:9 131:20
**four** 10:9 116:18
147:9
**frame** 17:6 87:8
90:19 100:7 111:4
111:7,11,17,18
113:3 137:17,18
139:8,14,19
140:20 141:8,13
142:5 144:10
**frankly** 54:2 58:16
58:18 114:8
**frasier** 103:17
**free** 123:21
**freed** 113:17
**friday** 142:15
143:9 151:11
**friends** 26:12
**front** 6:7 26:21
**fruition** 91:19,20
104:6 105:18
**frustrated** 128:20
**frustrating** 140:22
**full** 37:21 97:14
103:11 107:7,16
124:11
**fully** 7:22 30:2
33:4
**functions** 54:20
89:8

**fund** 92:5,6 96:8,8
96:9 125:9
**funding** 10:19
11:1 26:6 28:6,8
85:20,22 86:2
92:1 93:12 94:10
104:6 134:9
137:21 139:11
140:20
**funds** 69:20 70:8
81:12 82:6 83:13
88:13 90:3,11
92:11,16 94:11,13
95:21 96:1 99:22
100:11,15 103:3
104:10,17 105:7
116:5,8,11 124:16
125:12,21 126:16
127:15 138:2
139:18 140:12
141:11,14,19
144:5
**furniture** 27:16
**further** 149:10
**fused** 146:7
**future** 23:12 80:18
128:2,6

| g |
| --- |

**g** 4:1 150:1
**gain** 31:13
**gather** 57:3 59:3,4
76:15 78:8
**gathered** 77:1,11
**gathering** 55:12
58:20 59:15 76:21
130:4
**general** 30:5,13
38:1 71:2 78:9,13
133:11
**generally** 30:14
34:14 39:16 72:9

75:7 81:11 89:17
116:12
**getting** 23:4 31:16
33:13 74:4 87:12
106:9 113:12
117:10 128:19
129:3 144:11
**give** 5:11 6:21 7:10
7:11,12,21 9:12
12:1,3,20 28:15
99:14 117:11
136:9 142:12
**given** 103:21
112:13 113:9
117:10 134:16
150:6
**giving** 7:16 118:11
**glaringly** 72:21,21
**global** 1:8 2:7 4:18
122:17,20,22
123:1 131:16
132:2
**globalflyte** 27:7
28:17 43:15,18,19
53:3,12 54:17
76:10 88:11 97:16
103:20 135:6
**go** 5:2,5,22 10:15
12:6,9 29:21
32:14 40:17 62:2
70:9,19 76:3
79:19 84:13 85:5
94:1 95:13 96:20
97:15 98:3 104:18
107:19 115:16
120:12 122:11
126:4 131:2
136:14,14,14,17
136:18,19 142:1
146:6

**god** 103:14
**goes** 44:19,19
**going** 5:2,16 7:1
7:14,18,21 8:1,9
8:15 9:5 10:13
11:9 14:19 30:6,7
30:16 38:4 42:10
67:17 72:9 74:3
81:9 89:19 93:16
93:16,17,20,22
95:13 98:19 99:2
99:3 100:21 104:1
104:17,18,18
106:4 110:6,12,22
112:3 113:14
114:13,18 115:10
116:17 119:19
120:1 122:13
123:6,13 124:14
126:15 130:13,18
136:5,10 137:8
142:19 144:9
145:6,11 147:6,14
**good** 4:8 14:22
39:3 44:10 110:1
138:18 140:5
**goodness** 29:17
**gopher** 43:1,3
**gotten** 38:1
**government** 39:22
69:7,9,20 73:18
74:7 76:3 81:1
82:18 83:13 95:7
95:7,8 104:15,16
105:1 115:8 118:2
118:5,6
**governments**
100:7
**grading** 37:18
**graduated** 23:9

**grant** 44:9
**great** 5:1 6:4,9 7:7
   9:16 114:22
**gross** 55:3,6,11
   112:17,17 131:5
   137:6,13
**group** 31:2 72:17
**grown** 128:8
**guarantees** 85:6
**guess** 8:17,18,21
   33:15 34:1 40:21
   57:19 58:15 62:13
   70:10 77:15,19
   78:11 81:5 86:10
   86:12 87:19 91:8
   111:8,8,8 121:10
   123:8 133:14
**guesses** 81:3

**h**

**h** 152:7
**handed** 117:18
**handle** 76:12
**handled** 35:19
   96:10 98:9
**handling** 98:4
**happen** 85:1
   114:21 142:1
**happened** 41:8
   77:19 144:7
**happy** 5:19 8:12
   9:3,7 12:6 14:22
   125:16 128:11
**harte** 2:19 131:5
   137:7 138:11,12
   138:16 140:3,13
   142:9
**head** 6:15 7:1 30:7
**health** 45:1 52:11
**healthcare** 52:8
**hear** 5:12 7:9,10
   7:12 16:19 31:17

31:19,22 63:19
   111:5 118:16
   146:21
**heard** 109:16
   110:3 133:20
**heavy** 16:7
**held** 33:2 104:14
**help** 13:18 59:3,7
   59:10
**helpful** 82:21
**hereto** 149:11
**hesitate** 151:18
**hierarchy** 112:12
**high** 139:11
   140:19 141:10,14
   142:5 144:10
**hold** 24:18 28:2,9
   105:4 135:5
**holdups** 110:13
**home** 24:15
   115:10
**homes** 5:13
**honest** 29:14 80:4
   129:19 140:16
**honestly** 112:11
**hope** 31:14,14
   38:18 53:17
**hopefully** 142:22
**hours** 61:22 147:9
   151:11
**house** 62:6
**hovering** 144:21
**hr** 34:16 43:8
**huh** 6:15,16
**hydration** 44:18
   44:21 45:3

**i**

**identification**
   119:21 123:16
   130:16 136:7

**imagine** 112:18
   134:18
**immediately**
   108:18 142:7
**impact** 146:18
   147:2
**impacted** 105:2
**implication** 97:13
**impression** 121:21
**inbox** 131:15
**incentive** 26:15
**inception** 17:2,9
**include** 99:21
   102:19 108:11
   135:4
**included** 131:6
**incorporated** 4:10
   4:16,18 132:2
**incorrect** 133:10
   133:10
**incorrectly** 102:11
   133:11
**increase** 120:4
**incurred** 143:1
**india** 104:14,21
   106:6,7,10,11
   127:8,12,16
**indian** 104:14,16
**indicated** 79:20
   81:6 138:20 140:5
   140:7
**indicating** 116:20
   123:5 140:13
**individual** 35:7
   42:2,18 44:21
   53:4,18 55:2
   69:13,16 78:16,22
   82:16 93:7 94:11
   96:9 98:4,11
   121:1 122:9

**individuals** 11:5
   11:13 14:2,5,11
   15:5,9 22:2,8,11
   22:15 31:11 32:15
   41:15 60:9 65:17
   67:8 69:6 78:5
   86:16 114:17
   123:1
**industry** 52:9
**inform** 112:2
**informal** 6:5 39:1
**information** 34:10
   35:2,4 36:13 37:5
   38:6 55:13,18,21
   56:5,13,17 58:1,20
   59:3,5,8 61:4 62:6
   64:15,18 76:22,22
   78:9,12,20 86:13
   126:21 139:21
   141:1,3 145:7,10
**informed** 112:4
   126:10
**initial** 26:8 107:18
   112:18 124:18
   130:11 136:3
**initiated** 4:10
**input** 43:13
**inside** 40:18 123:2
**inspect** 92:12
**inspecting** 93:7
**inspection** 93:7
**institute** 1:7 2:7
   4:16 151:3 152:8
**institution** 63:16
   63:21 64:3,6
**institutions** 63:22
**instructed** 129:16
**instruction** 5:11
   12:1
**instructions** 5:3
   9:11

**insurance** 91:16
**insurances** 43:6
**intending** 10:22
**intends** 63:6
**intention** 102:4,13
  102:18 108:5,8,16
**interchangeably**
  88:13
**interest** 100:9
  135:8
**interested** 149:12
**interesting** 103:15
**interests** 15:22
**interface** 43:8
  129:4
**interfaced** 35:20
**internal** 41:2,4,16
  70:1
**interpret** 142:1
**interrogatories**
  55:17,19 56:3
**interrupt** 94:18
**interrupted** 93:14
**interrupting** 78:17
**invested** 101:16,17
**investment** 22:17
  28:4 44:7 79:17
  88:6 90:4,7 92:3,7
  93:6 94:13 97:16
  97:22 98:6,10
  100:10,14 101:10
  101:17 102:22
  103:5,10,21 104:5
  104:13,13 105:5
  107:11,13 110:13
  113:12 124:18,22
  125:1,4
**investments** 26:4
  91:18 92:12 93:10
  101:7 104:1,11
  124:12,15

**investor** 97:17
  100:15,17,20
  118:12
**investors** 79:14,14
  92:22 93:5 96:4
  103:1,1,10,18
**invoice** 81:18
  121:15 122:16
  132:21 133:6
**invoices** 3:9,12
  36:7 70:6 73:2
  75:8 80:1,3,11,15
  80:21,22 81:12
  82:5 85:12 86:6
  88:5 108:21
  120:17 121:7,22
  122:1,4,8,9 132:13
  133:7,14 134:1
  138:20 139:1,2
  140:18 145:5
**involved** 15:20
  34:15,17 39:6
  68:15 83:5,9
  97:15 127:14
**involving** 94:16
**ip** 28:9 30:17
  134:21 135:7,10
  135:22
**issue** 13:11 82:8
  98:18,19 110:9
  113:11,14 114:3,4
  114:9 122:17,21
  146:4,5
**issues** 52:9 104:3
  104:20 118:2,7
**items** 32:20 37:13

**j**

**january** 3:10
  126:17 127:9
  131:5

**jim** 35:8
**job** 6:9 8:11 22:19
  59:6 61:21
**jobs** 60:10
**john** 15:10 41:10
**joined** 17:6
**judge** 6:7
**judicial** 2:15
**july** 105:15,17
  106:17
**justine** 2:3 4:9
  151:22
**justine.baakman**
  2:5

**k**

**k** 150:1
**kathryn** 2:9 30:19
**keep** 23:4 33:20
  37:9 39:18 60:6
  61:18 62:8 77:17
  126:10
**keeping** 38:8
  60:18
**keeps** 39:12
**ken** 54:6 112:19
  121:1,1
**ken's** 128:8
**kept** 38:17 39:19
  60:9 61:1
**key** 23:10
**kind** 5:1,5 7:20 8:2
  9:2 12:9 25:5
  29:16,20,21,22
  37:1 38:4,8 39:10
  43:7 55:20 63:17
  68:6 70:19 81:12
  88:12 91:18 101:5
  111:14 115:13
  127:14 135:16
  138:9 144:21

**kindness** 143:2
**kndickerson** 2:11
**knew** 100:5
  116:21
**know** 5:18 8:10,12
  8:20,22 9:4,7 12:2
  12:6,19,22 13:6
  14:8 15:2,2,14
  16:11 23:6,11,11
  23:16 25:5,6 26:2
  26:9,19 27:16
  28:8,10,11,11,12
  29:9,10,12 31:22
  32:17 33:10,19,21
  34:5,8,9,9,11,12
  35:16 36:4,20
  38:2,17,19 39:5,16
  39:20 40:5,5,20,22
  41:7 42:1,4,6,10
  42:10,12,13,15
  43:7 44:8 52:12
  52:14,15 53:22
  54:2,3,11,14,18
  55:8,8 56:14,18,20
  57:5,10,10,11,16
  57:17,20,21 58:7,9
  58:18,18 59:2,4,6
  59:9,9,10,13,14
  60:13,15 62:1,2,11
  64:10,21,22 65:2,6
  65:7,9 66:2,3,6,13
  66:16,18 67:3,12
  68:14,19 69:8,12
  70:6,18 71:22
  72:10 74:4 76:4,5
  76:9,19,20 77:17
  78:11 80:19 81:2
  81:3,17 82:13,14
  82:20,21 83:1,2
  84:11,14,20,20
  85:4,18 86:8,8,9

86:10,13 88:10,15
89:22 90:14,20
91:7,12,16 93:15
93:17,19,22 94:1,3
94:3,4 95:4,6,6
96:5,16,18,22 97:1
98:3,7 99:3,5,7
100:2,14,18 103:8
103:19 104:21
105:2,12 106:9
107:17,19,20,22
108:1,1,22,22
109:15,16,19
110:1,11,12,13,14
110:21 111:1
112:1,2,11,11,12
112:16,17,20
113:3,16 114:9,10
115:5,13,15,17
116:15,16 117:16
118:9 119:3,3,5,7
120:10 121:13
123:18 126:4
127:1 128:9,17,21
128:22 129:2,5,15
129:18,21 130:19
130:20 133:8,10
133:13,13,15,18
133:21,21 135:18
137:15,17,20,22
138:11,13,14
139:13,20,22
141:1,15,22
142:17 146:22
**knowing**   34:12
74:5 98:18
**knowledge**   70:4,5
70:10,18 73:21
77:8 80:14 86:19
86:21

**known**   145:7
**knows**   103:14
**kurman**   2:3
**kyung**   2:9

**l**

**l**   150:1
**lab**   24:6
**labeled**   119:18
122:11 123:12
124:5 130:12
136:4
**lack**   57:21 110:16
110:17
**lag**   7:9
**laid**   22:5 33:12
**laptop**   34:3 41:22
**laptops**   28:21 29:2
33:9
**large**   85:5 93:2
120:6 124:15
**largely**   44:12
**larger**   114:3
**lastly**   127:20,20
**late**   110:15 111:10
**laundering**   95:5
**law**   2:14
**law.com**   2:16
**layoff**   33:12,15
42:13
**leadership**   29:21
127:22
**leary**   2:14,14,16
5:17 6:1 7:11 9:11
9:14 145:14
146:13
**lease**   10:11
**leave**   32:18 41:7
115:9
**leesburg**   2:10
**left**   33:3 87:14
88:7 90:1

**legal**   1:19 151:9
152:1
**lend**   105:19
**length**   95:12
**lent**   106:16,20
**letter**   3:10 33:12
33:14,15 42:13
105:15 106:2,3
124:5,7 125:11
127:3 129:20
151:6
**leukemia**   146:3,4
**level**   25:7 26:13
31:12 34:17 105:1
105:2 140:19
141:11
**levels**   40:19
**life**   94:1
**light**   61:3 78:13
**likelihood**   133:1
**likes**   42:22
**limited**   33:17 70:5
70:10 72:7 104:1
**line**   93:15 128:21
131:6 133:20
152:11
**litigation**   4:10
13:11 55:15 60:4
63:14 72:6
**little**   13:14 33:10
70:3 111:5 130:21
147:1
**loan**   106:21 107:1
107:2,7,9,10
127:17,18
**located**   151:9
**location**   9:17
10:21 23:13,18
24:14
**locations**   9:22
10:4 24:2,5

**long**   5:22 23:5
42:11 73:14 99:14
**longer**   22:18 30:5
32:14 61:3
**look**   30:14 37:13
59:6 71:5 78:12
78:13,19 79:2
92:13 99:2 107:16
125:16 131:16
134:21 135:18
145:11
**looked**   11:2 56:9
62:18 71:2,3
72:19,22 78:14
108:21 118:21
119:1,2 125:12
**looking**   26:8 44:7
44:12 103:19
120:10 124:4
126:14 137:17
**lot**   52:11 104:2
**lymphatic**   146:3

**m**

**m**   150:1
**maintain**   40:7
**maintained**   40:1
60:10
**maintaining**   36:12
40:2
**major**   52:8
**majority**   24:16
38:16 109:18
**making**   55:13 60:3
122:3 128:4
**malaysia**   92:15
93:3 115:6,13,16
127:10,12,16
144:1
**malaysia's**   115:7
**man**   43:9 117:8

**management**
30:21,22 31:1,2
39:9 40:8 43:22
45:9 123:2
**manager** 25:6
35:14 53:12,15
81:19,20
**managers** 81:21
**manassas** 24:6
**mann** 15:10 16:2
17:4 30:9 32:4
68:15 103:19
**mann's** 43:10
**manner** 83:12
**march** 92:20
93:16 98:21
110:15 111:15
**marcia** 55:3
137:10
**marina** 69:17
**mark** 53:19
119:19 123:13
**marked** 17:16
45:16 119:21
123:16 130:13,16
136:5,7
**market** 2:4 45:1
135:13
**math** 133:10
**matter** 99:2 108:9
109:15 114:10
151:8
**mcgee** 1:18 149:2
149:16 151:20
**mean** 31:18 63:6
89:6
**means** 6:15,16
137:13 144:22
**meant** 6:19
**measure** 44:20

**medical** 92:6 96:8
**medication** 145:17
146:1,17
**medications** 52:13
145:22 146:5
**meet** 31:6 55:11
79:7
**meeting** 79:10
98:13
**member** 25:21
124:16 125:5
**members** 11:18,20
12:11 17:1 25:18
**memory** 144:9
**mentioned** 27:9
28:16 53:1
**merkle** 35:8,10,12
39:20,21 42:2
75:20
**merkle's** 41:21
**messages** 56:22
58:4,8,10,12 59:5
116:3
**met** 69:8 78:16
**methodology** 40:2
**meticulous** 56:13
**mid** 23:8
**middle** 28:4
**middleman**
103:13
**million** 28:12 91:8
91:10 92:3,4,4,5,6
97:5,6,9,15,15,21
97:21 100:12
101:6 102:1,5,6,9
102:14,15 104:21
107:8,16,21 108:2
108:2,2,15 134:15
134:18
**mind** 8:15,21

**mine** 101:19
**minimal** 44:9
**minimum** 107:18
135:11
**minor** 56:8
**minutes** 67:18,20
67:22
**missed** 52:22
111:21 113:10
**mistake** 143:1
**mistakes** 133:17
133:17,20 142:13
**moment** 94:19
**monday** 126:17
151:10
**money** 33:20 44:9
73:17 74:6 80:22
83:15 84:12,22
85:2,5,11 87:14,17
88:6,9,10,16 89:1
89:3,11,15 91:1,11
93:9 94:5,5,6 95:5
95:16 96:6 97:4,9
97:10 98:1 99:16
103:14,20 105:19
105:20,21 106:15
106:16,19,20
107:2,6,12 108:4,5
108:13,20 113:12
113:16 114:10
115:6,11 123:5
129:16 130:1
142:5,6
**monies** 31:8 88:4
107:11
**monitoring** 44:17
44:18 52:13
**month** 32:12
108:14,17 142:21
**monthly** 63:2,7
66:9,22

**months** 10:9 36:20
37:21
**morning** 138:19
140:5
**move** 10:15,22
11:4 36:11 37:8
60:13 81:17 89:4
89:5 100:9 135:12
**moved** 42:15 89:4
90:12 91:2 118:15
138:2
**movement** 45:10
**moving** 110:14
114:11 137:19
**mud** 31:15
**multiple** 90:17
**mutually** 151:13

**n**

**n** 2:1 3:1,1 4:1
150:1,1,1,1
**name** 4:8 15:8,8
29:11 35:8,22
36:3 41:9 53:5,19
55:3 63:21 64:5
69:16,18 120:20
121:1,11 122:13
152:8,9
**names** 15:9 64:5
69:9 84:9,11
**nature** 91:15
**near** 114:18
**necessarily** 33:2
81:8 138:14
**neck** 146:6
**need** 5:17,22 6:10
6:19 8:19 9:4 26:6
33:16 40:16,21
43:14 54:19,21
67:15,18 129:1
130:20

**needed** 9:8 40:8
58:16 61:16
**needs** 43:5 103:11
**negatively** 147:2
**negotiate** 93:21
**negotiations** 98:10
**neighboring**
104:19
**neither** 149:7
**never** 13:2,2 69:8
93:18 99:6 110:1
114:16 119:1
132:6,7
**new** 31:13
**nightmare** 95:10
**non** 93:11
**noninvasive** 44:20
**nonpayment**
36:21
**nonprofit** 13:1,18
27:13
**nontraditional**
93:12
**nonverbal** 6:21
**nonvoting** 26:15
**normal** 27:16 75:7
**normally** 147:1
**notarized** 105:11
106:4 109:4
**notary** 1:19 149:1
149:17,22 151:21
**notes** 145:12
**notice** 1:17 111:3
111:7
**notices** 113:15
**november** 17:12
138:17 139:7,7
140:3,8 142:9
**number** 22:8,15
23:9 28:14 37:16
59:12 105:3 109:1

119:20 123:15
130:15 134:14
135:2 136:6
141:22
**numbers** 26:21
29:13 132:21
**numerous** 98:11
116:19
**nw** 151:10 152:2

**o**

**o** 3:1 4:1 150:1,1
**oath** 6:5
**objection** 147:20
**obstacles** 103:16
**obvious** 110:11
**obviously** 24:7
40:3 57:20 65:8
68:19 112:1 135:8
**occur** 134:3
**occurred** 60:14
90:20
**october** 23:8,8
37:17 137:7
**offer** 26:8 99:9,20
116:6 145:2
**offered** 30:21
**offering** 68:14
94:8
**office** 4:17,18 9:17
9:21 10:3,7,10,17
10:20,21 23:13
24:1,5,7,8,9,14
25:5 27:16,21
53:13,15 56:2
93:1,2 98:13
109:14 110:4
112:8,10 121:3
128:1 138:6,7,8
151:9
**officer** 25:2 149:2

**offices** 5:13
**official** 96:20
**officially** 96:22
**offit** 2:3
**offitkurman.com**
2:5
**offset** 33:20
**oh** 29:17 41:13
79:11 102:7
130:13,14 146:12
147:4
**ohio** 10:5,7,18,20
24:8 53:15 121:3
127:21
**okay** 5:9 6:4,9
9:16 11:18,22
14:10 15:17 25:10
25:12 27:20 30:3
31:2 38:4 53:7,10
58:14 60:1 61:13
67:16,21 68:1
70:2,11,14 73:21
80:9 81:5 84:4,18
85:4 88:2 91:1
92:2 93:18 94:15
94:17 95:2,21
96:3,6,11 97:9
99:12 101:20
102:4,7,10,12
105:10 106:4,9
107:9,14,15,17
109:2 110:2
111:19 114:2
119:2 120:9,12,13
120:14,14,14
121:19 122:6,10
122:20,22 123:22
124:1,2,3 125:14
125:18 126:2,14
127:5 128:3 130:8
131:2,18 135:20

136:14,16,18,19
136:20,21,22
137:1,2,3,4 138:16
144:18 147:5,20
**old** 94:20
**omitted** 72:22
**once** 13:19 28:12
30:5 33:21 36:19
39:8 40:5,15
42:11 44:10 53:15
54:18 57:19 60:21
66:20 77:13 80:7
84:22 86:10 88:16
89:21 91:12 92:14
92:15 98:2 100:2
100:21 102:13
106:8 107:1,20
109:19 112:15
115:15 117:19
122:22 125:8
126:7 128:16
134:9 135:9
137:21 140:21
144:8 145:1
**ones** 87:21 140:18
**ongoing** 99:8
**online** 67:4 115:16
**open** 10:17
**opened** 12:22
53:16 93:18
127:21 129:15
**operated** 31:1
**operates** 43:14
93:1
**operating** 53:11
**operation** 56:10
**operational** 30:2
**operations** 30:11
91:12
**opinion** 114:8
141:2

**opportunity**
103:12 136:9
142:12
**opposed**  63:7
**oral**  1:16
**order**  26:7 80:22
82:18 105:18
107:1 147:8,12
**org**  30:6
**organization**  26:6
29:18 31:6 43:2
43:15 89:9 91:13
**organizations**
43:22
**organs**  45:11
**original**  15:19
142:14 143:6
151:6
**originally**  15:20
134:15
**originate**  29:17
**origination**  29:17
**outcome**  149:13
**outside**  96:18
**outstanding**  3:12
91:8 102:15,17,20
103:3 108:6,10,20
132:13 138:20
145:4
**overall**  26:5
**overcome**  103:17
104:3
**overhead**  62:12
84:12,15
**oversea**  99:1
**overseas**  127:6
**oversight**  30:15
**owe**  33:20 91:7
**owed**  133:4,5
140:19

**owing**  108:20
132:19
**ownership**  27:6
94:13,14

**p**

**p**  2:1,1 4:1 150:1
**p&l**  38:1
**p.c.**  2:3,14
**p.m.**  1:20 143:8
148:1 151:12
**package**  22:17
97:14
**page**  3:3,8 5:4
123:19 152:11
**pages**  3:15,16
17:15 45:15 120:9
150:4
**paid**  11:20 23:4
75:9 81:22 85:7,8
85:13,17,18 87:12
87:16 108:18
118:10 121:16
**pain**  145:21 146:5
**pakistan**  104:19
**panel**  96:4
**paper**  39:13 60:2,6
60:9,10 65:6,8
66:10
**paperwork**  82:22
92:19
**paragraph**  124:12
126:15 127:20
143:5,7 144:19
**pardon**  146:10
**parochial**  37:9
**part**  23:3 30:18,20
33:13 34:15,16
60:20 61:21 68:20
70:14,15 76:9
83:3 92:10 93:8,9
94:12 95:4 97:14

111:6 138:13
**partial**  94:13,14
**participate**  101:2
**particular**  5:10
12:7 30:17 43:16
52:16 81:8 114:6
139:10 141:13
**parties**  1:22 149:8
149:11
**partners**  92:12
105:17 106:11
**parts**  147:16
**pass**  110:3 145:13
**pause**  68:3 130:9
**pay**  31:8 70:7,8
84:13 86:1 88:4,5
88:18,19 89:15,18
97:11 98:2 102:14
103:3 108:6,8,10
110:17 130:1
**payables**  35:20
36:8,10
**paying**  22:20 23:1
110:9
**payment**  23:11,12
32:14 80:13 82:1
82:19 85:21 86:7
87:5 89:2 111:20
113:8,9 141:13
118:7 121:7
122:17,21 134:2,3
137:9 138:21,22
139:6 140:6,8
142:15,20,21
143:7,11,14,15
145:3
**payments**  87:16
87:18 88:7 89:19
91:14,14 111:16
111:22 113:7
114:11

**payroll**  23:5
**pending**  5:21 9:6
**pennsylvania**  2:4
**people**  11:19 22:5
22:18 23:10 25:3
25:7 30:4,13,15
31:8 33:2,22
39:18 40:18,20
43:8 54:20 59:2
59:12 65:21 69:8
76:11 92:18 93:22
94:3 103:17 112:2
112:14 115:9,20
128:12
**people's**  91:15
**percent**  26:20 27:2
97:18,18,19 145:3
**percentage**  26:17
98:1 99:14 135:12
**perfectly**  8:22
**perform**  54:20
**performed**  80:17
80:18
**performing**  61:9
61:19
**period**  13:20
37:20 109:20
**permissions**  40:18
**permits**  147:8
**permitted**  5:14
**person**  42:6 56:13
59:20,22 66:17
76:4 109:13 112:5
117:20
**person's**  41:9
44:19
**personal**  70:17
**personally**  117:4
**personnel**  34:16
41:2,5,16

pertained  60:9
philadelphia  2:4
phone  56:22 58:9
phones  29:12,14
physical  9:21 10:3
   10:21 23:13 24:1
   24:5 27:19
physically  93:7
piece  30:17
pike  2:10
place  34:12 94:6
placement  93:1
   96:10,16,17,20
placing  94:5
   107:11
plaintiff  1:5 2:2
plaintiffs  1:17 3:4
   4:6 146:15
plan  142:14
planning  41:7
plans  10:17
play  55:12 68:8,16
played  34:20 56:6
   56:8
please  5:18 8:12
   8:20 23:20 31:22
   78:18 106:8
   119:10 123:21
   130:22 139:1
   151:12,17
pleased  16:1
pleasure  55:10
plevy  2:9
pm  142:16
poehl  53:19,21
poehl's  54:1
point  5:18 10:18
   11:15 12:2 22:22
   22:22 24:16 25:4
   25:6,7 26:7,14
   27:5 37:5 41:16

44:4,6,7,13,15
45:4,12 52:19
53:4 57:2 59:6
61:7 62:20 69:2
69:11 74:4 86:14
86:17 87:13,14
89:20 90:10,11
91:7,17 96:3,5
97:1 98:9,16,20
99:5 104:5 106:14
110:16 112:16,18
113:11 114:2,12
114:16 115:14
116:17 118:6
128:10 135:11,16
135:19,20 136:13
144:2
policy  38:21 39:2
   39:5,7 40:6,7
pool  88:3,7,9,10
portals  103:10
portfolio  79:17
portion  105:20,20
   122:14
posed  71:8
position  24:18
   27:12 126:11
   138:14
positions  27:6
possession  34:2
   41:21
possibility  55:1
possible  116:1
   119:5 120:4
possibly  13:8
   39:20 58:17 59:4
   66:4 68:15,18
   69:10 70:10 75:19
   77:20,21 79:11
   82:15

postpartum  52:10
potential  79:14
   103:1
potentially  33:19
   112:14 127:15
practice  39:3 88:3
   88:8,10
preapproved
   106:21
preferred  11:4
premise  13:20
preparation  72:14
   73:3,7,10,13 74:12
   75:12 78:6 79:15
prepare  70:20,22
   78:9 79:7
preparing  56:6
prescribe  36:9
present  1:21 2:18
president  24:21
   25:2,8 30:8,10
   31:4 43:1 53:11
presidents  30:10
presumably  117:9
presume  5:9 83:2
   85:14 117:2,3
pretty  115:5
prevent  128:1,5
previous  80:6
   140:7
previously  25:10
   71:14 72:3 73:11
   81:14 123:11
   133:6
primarily  26:2
   31:1 43:6,14,22
   93:5
primary  44:22
   93:4 98:9
prior  13:15 66:14
   72:13,15 77:3,11

81:7,9,12 82:3
83:6,7,10 101:10
101:17
pritt  92:11,22 93:9
98:5 101:6,10,17
102:22 104:10
116:14 124:12,14
124:21 125:4
private  96:15,17
97:16
probably  5:11,13
14:18 28:9,10
41:13 74:9 76:8
77:1 81:22 95:13
98:17 110:14
111:10 112:16,17
112:19,20 115:10
137:22 139:13
problem  28:6
61:13
problems  128:1,5
procedural  65:2
procedure  86:9
89:22
procedures  37:11
proceedings  149:7
proceeds  127:18
process  30:18 45:9
54:15 55:21 56:21
57:1 65:2 69:19
70:1 73:16,19
74:6,12 76:3
79:18 80:8 82:1
82:22 83:5,10
86:5,9 89:7 92:22
93:9,13,20 94:2,12
100:5 101:14
103:9,15 114:17
115:2 127:14
128:11 135:17

**processes** 123:2
**produce** 6:13
  101:5
**produced** 56:2
  72:5,16 119:13,17
  123:11 130:11
  136:3,12 147:11
**producing** 63:13
**product** 36:2
  43:21 44:18
  135:12
**production** 55:14
  55:22 56:3 57:5,7
  57:15 58:5,21
  60:3 72:14,16
  76:17 77:7
**profit** 27:10,11,14
  53:1
**profitability** 26:9
**profitable** 44:5,6
  44:13,15 45:5,6,13
  52:20
**program** 116:16
**project** 43:16 44:3
  44:4 62:3 81:8,19
  83:3 93:8 101:3
  104:3
**projects** 13:19
  16:12,14,18 31:10
  88:9,12,14 101:17
  103:18
**promise** 23:12
**proof** 100:11,15
  100:22 101:1
  124:16 125:12,21
**properties** 27:19
  33:14
**property** 27:15
  32:21
**proposed** 71:4

**proprietary** 17:16
  45:16
**provide** 28:20
  29:5 30:15 31:12
  33:12 36:7 37:7
  37:19 40:8,20
  56:12,17 57:22
  58:11 59:8 61:8
  105:22 117:7
  118:12 139:1
  141:3
**provided** 7:15
  11:3 26:15 30:22
  32:16 36:15 42:3
  56:2 58:14 72:10
  78:14 106:2,3
  109:6 123:1
  124:16 125:20
  145:8
**provides** 43:13
  45:2 99:15 104:15
**providing** 29:1
  36:6 37:2 38:8
  71:19
**public** 1:19 149:1
  149:17
**pull** 37:4 44:14
  59:10
**punch** 60:22
**purchase** 99:16
**purchasing** 99:15
**purpose** 13:16,17
  16:9 43:17 44:16
  45:8 52:5 55:13
  60:17 61:9 66:10
  129:22
**purposes** 63:13
  90:12 147:17
**pursuant** 1:17
  151:14

**pushed** 142:7
**pushing** 31:18
**put** 27:12 59:16
  61:22 62:3 126:8
  129:20 132:6,21
  133:12,15 144:12

### q

**question** 5:16,21
  7:19,21,22 8:5,7
  8:15 9:5 11:17
  15:15 38:5,11
  56:11 61:11 70:3
  110:7 135:19
  138:4 142:14
  143:6
**questions** 8:10,11
  25:12,14 31:19,22
  42:7 55:19 56:14
  70:19 71:2,3,8
  72:10,17 79:19
  120:1 122:12
  123:20 129:5
  130:18 134:6
  136:11 145:14
  146:9,11,13 147:6
  151:17
**quick** 145:11
**quickbooks** 37:10
**quickly** 137:19
**quite** 54:2 135:13
  145:19

### r

**r** 2:1 4:1 152:7,7
**race** 45:1
**raise** 10:13
**range** 11:7 26:19
  27:1,2 31:9 91:9
**rates** 107:20
**rbr** 1:4 4:9 73:2,9
  78:5 85:16,21

86:1,5 102:20
  108:11,17,20
  115:19,21,22
  116:3 118:14,18
  120:21 121:22
  122:4 130:12
  132:14,19 133:5,8
  133:19,22 134:3
  136:4,5 138:13
  140:17 151:3
  152:8
**rbr's** 57:4,7,14
  58:5,21 76:16
  77:6 138:20
**read** 122:13,17
  124:14,19 126:15
  143:2 150:3
**reading** 6:17,18
  147:17 151:8
**reads** 138:18
  140:4 142:10
**ready** 117:10
  123:18
**real** 93:5,6,10
**reality** 88:16
  98:12
**realize** 91:17
**realized** 110:9
**really** 12:22 13:17
  80:6 81:2 100:20
  121:12
**realm** 55:1
**reason** 10:10
  15:17 16:6 22:14
  32:13 59:21 66:6
  70:15 111:12
  113:8 114:6
  128:13 132:22
  143:13,14 152:11
**reasonable** 72:22
  78:14 126:10

**reasons**  8:2 110:4
  114:21
**recall**  69:1 90:16
  90:19,22 116:1,2
  125:14,15 131:9
  139:4 146:18
**receipt**  104:10
  139:17
**receivables**  35:19
  36:10
**receive**  62:14,19
  65:3,6,9 69:20
  70:8 74:6 80:22
  82:19 86:6 94:13
  94:14 97:18 99:21
  100:4 102:5,13
  105:7 106:19
  107:17 108:4,5,17
**received**  11:1 34:7
  34:8 66:9 73:17
  83:14 84:22 85:13
  100:11 102:1,3
  105:11 106:17
  116:8,11,13 125:9
  140:13 141:12,14
**receiving**  62:17,20
  87:5 92:10 97:2
  106:18 108:14
  113:8,15 127:15
  129:9 137:21
  139:21
**receptive**  94:4
**receptors**  44:19,20
**recipients**  85:13
**recitation**  88:21
**recognize**  120:19
**recollection**  56:11
**recommendation**
  126:8
**recommitted**
  100:8

**reconciliation**
  66:21
**reconfirm**  142:18
**record**  4:15 5:20
  5:22 6:21 7:3 8:3
  119:11,15 149:6
**records**  36:8 40:7
  77:16 90:15
**reduced**  149:5
**refer**  4:15 124:11
**reference**  13:9
  78:1 83:22 86:17
  95:17 106:15
  122:3 125:11
  128:4 138:12
  143:7 144:14,19
**referenced**  102:15
  106:5 129:12
**referencing**  4:16
  127:1
**referred**  14:1
  84:16 122:7
  125:22 126:22
**referring**  54:6
  68:7 69:13 71:9
  78:15 79:3 85:16
  99:17 102:11
  109:5 137:15
**refers**  4:17 125:13
  133:22
**reflected**  123:7
  132:15,19
**regard**  40:1 68:21
  86:9 111:20
**regarding**  138:20
  139:5
**regards**  25:12,15
  52:2 89:15 100:12
  108:13 118:2
  125:7

**registration**
  149:22
**regret**  142:22
**regular**  61:16
  100:4
**regulations**  95:6,7
  95:8
**regulators**  100:6
**reiterated**  106:12
**related**  41:19
  101:21 149:8
**relation**  81:16
**relations**  95:9
**relative**  56:22
  135:21 149:10
**released**  98:22
**relevant**  56:19
**relying**  91:18
**remain**  108:6
**remember**  5:7
  8:22 10:6 23:17
  90:22 115:22
  116:4 126:8 139:9
  140:15 144:9,10
**remote**  96:3
**remotely**  24:16
  42:17
**renewed**  10:11
**rent**  10:12,13
  91:14,16
**reopen**  10:19
**repeat**  7:13,14,17
  11:9 32:1,1 38:11
  78:18
**repeatedly**  114:20
  133:20
**rephrase**  8:13
**reporter**  14:14
  151:21
**repository**  60:11

**represent**  4:9
**representative**
  122:15
**represented**
  140:14
**representing**  69:9
**represents**  126:10
**request**  55:21 56:3
  57:4,7,14 58:5,8
  58:21 76:17 77:6
  145:6
**requesting**  74:2
**requests**  56:1 71:9
  71:12
**require**  100:21
**required**  80:21
  82:5,11,18
**requirement**  33:1
  33:4,13 108:9
**requirements**
  96:12,12 99:4
  100:19
**research**  13:2,3,18
  81:16
**resign**  16:1
**resignation**  83:6,7
**resources**  89:18
**respective**  1:21
  5:13 67:5
**responded**  68:13
**responding**  7:4
**response**  6:21 7:10
  7:11,12 13:15
  14:10 16:19 95:13
  106:13
**responses**  6:10,20
  44:1 56:6
**responsibilities**
  25:22 35:17 37:1
  42:20 43:4,10
  54:3,12 55:7

**responsible** 32:19
66:8 68:11 74:5
82:17 121:6,8
**responsive** 57:4,7
57:14 58:5,21
76:16 77:6
**rest** 23:19
**restrictions** 95:5
**resume** 53:15
**retention** 38:21
39:1,7
**retrieval** 40:22
**retrieve** 40:21
77:5
**return** 33:14
**revenue** 44:14
135:20,21
**review** 66:17
71:13,21 72:4,8
73:2,6,9,12,15
75:10 78:4 79:13
80:12 120:3 122:1
123:20 136:10
147:13
**reviewed** 71:14,22
72:2,3,13 73:11,14
75:8 79:16 118:13
118:17 121:20,22
122:3,16
**reviewing** 66:8
130:19 147:16
**right** 9:10 28:3,15
30:4 33:7 44:22
68:2 90:1 95:12
103:5,10 104:12
104:20 115:18
117:15 122:13
131:6,7 134:12
139:7 144:20
**rips** 101:14

**roger** 15:10 30:9
**role** 34:3,20 42:20
44:22 53:15 55:12
56:5,8 59:20,22
66:16 68:8,16
**roles** 29:11
**roughly** 28:5,5
91:10 97:5 102:15
**round** 26:12 28:8
135:22
**rude** 7:3
**rules** 151:14

**s**

**s** 2:1 3:1 4:1 152:7
**s.a.** 27:7 28:19
52:4,5,6,7 53:2
**salaries** 33:21
91:15,16
**salary** 23:11 62:14
62:17,18,19,20
63:1
**sas** 43:20
**satisfy** 99:4
**saved** 117:13
**saw** 16:20 108:22
122:8 140:17
**saying** 6:12,14
57:19 88:10
**says** 52:2 122:14
126:1 137:8,13
**scale** 37:18
**scanned** 117:19
**scc** 96:12 100:19
**scheduled** 96:3
**schemmel** 69:17
**schumacher** 69:10
69:10,14,14 126:9
**scott** 58:12
**screen** 31:17
119:10 136:13

**scroll** 120:2,3,11
123:19 124:1
130:20,21
**scrolling** 138:9
140:1
**search** 57:5,6,12
58:3 60:1
**searching** 125:19
**second** 123:19
124:11 126:14
143:5
**secure** 103:2 107:7
**securing** 68:8,11
68:16
**securities** 94:8,11
**security** 94:8 99:9
99:20 107:10
116:6
**see** 115:16 119:1
121:13,13,17
122:17 124:16
125:13 126:1,2
127:2 131:22
137:10 139:2,3
145:12
**seek** 55:20
**seeking** 56:5
**seen** 44:2 59:17
69:9 121:12,18
131:9 132:7
138:22
**segment** 62:11
**send** 80:13 107:21
115:10 126:8
**sending** 116:2
**sensing** 52:17
**sent** 38:16,17,18
73:16 109:5
117:18 126:12
131:4 132:1 137:6

**sentence** 125:12
126:14 128:4
129:13
**separate** 3:14
17:17 45:17 84:1
84:15 142:20
145:20
**separated** 64:11
**september** 23:2,3
37:17 87:8,8 94:9
94:17 96:21 99:10
111:10,10,18
113:2,6 116:7
138:2 141:16
149:21
**serve** 14:2
**served** 14:11 15:5
17:1
**service** 32:18
35:20 36:1,21
43:19 44:11 60:17
**services** 36:6,17
37:3,8,15,17,18,20
37:21 38:9 61:4
61:19
**session** 5:16
**set** 5:12 26:2 132:5
151:13
**setting** 6:5 12:11
**seven** 31:10
**severely** 105:2
**shake** 6:15,22
**share** 28:5,6,11
40:11 119:10
134:8,10
**shared** 40:9,17
57:13 64:19 67:2
117:13
**shareholder**
124:15,22 125:3,8

**shareholders** 26:10,22

**shares** 134:7,10,18 134:19 135:2,4

**shaw** 53:5,7,14 54:5 68:15 69:4 74:9,11 76:6,7,9

**shaw's** 53:10

**sheet** 36:11 150:8

**shoemaker** 69:10

**short** 144:12

**shortly** 33:6 67:18 113:15 129:17 138:3 141:20

**shot** 67:15

**shots** 145:20

**showing** 90:15 119:12,16 122:2 123:10 130:10 136:2

**shut** 115:7,8,9,17

**shutdown** 92:20

**sic** 9:19

**side** 142:18 144:20

**sidecar** 92:7 97:16

**sign** 81:21 94:10 96:5 119:8

**signature** 122:14 124:9 147:22 149:15 152:21

**signed** 97:1 99:10 116:19 117:18 119:4,5,8 120:22 126:3 138:1 150:8

**significant** 114:17

**significantly** 10:14 114:14

**signing** 147:18 151:8

**similar** 16:6 52:7 52:16,17 125:7,21

**simple** 115:5

**simply** 61:6

**simultaneous** 17:6

**singapore** 93:2

**sit** 35:4 85:11 104:9 105:7

**site** 40:18

**situation** 13:2 24:17 68:18 94:16 109:21,22 125:7 129:6

**situations** 27:17

**six** 31:10

**size** 94:1 120:5

**skin** 44:19

**slow** 14:19 37:16

**small** 39:7 147:16

**smolen** 2:9

**smolenplevy.com** 2:11

**software** 44:11,11 44:12 135:22

**sold** 134:22

**solely** 58:12 82:7

**solutions** 1:19 151:9 152:1

**somebody** 40:16 100:16,21 117:5

**somewhat** 73:19

**soon** 98:17 143:16

**sorry** 8:18 10:5 14:14 15:15 16:19 38:10 41:1 42:4 61:10 63:19 67:15 71:8 72:2 74:14 78:17 82:20 102:12 111:5 118:15 130:13 146:21

**sort** 36:13 59:11

**soucie** 98:8 110:1

**sound** 56:1

**sounding** 43:9

**sounds** 69:15

**sources** 85:22 105:3

**sp** 1:8 2:7 4:17 82:1 122:16,20,22 123:1 131:16 132:1

**space** 11:3

**speak** 5:17 74:10 78:8

**speaking** 5:19 8:3 30:8 115:22

**specific** 40:19 91:22 99:21 142:16

**specifically** 11:11 69:1 71:21 84:11 86:11 87:22 117:7 133:14 142:1

**speed** 15:1

**spending** 103:6

**spent** 114:21

**spg** 1:7 2:7 4:11,14 4:16,17,21 11:13 13:19 17:11,13 22:2,7,11,15,20 23:1,13 24:1,4,13 24:18,19,21 25:9 25:11,15,15 26:1,9 26:10 27:3,15 28:2,20 29:1,5,18 30:7 32:4,6,8,11 32:16,18,21 33:5,8 34:2,4,19,20 35:1 35:7,10,12,18 36:6 36:17,22 37:3,14 38:5,8,12,20 39:9 39:12 40:10,14

41:2,4,11,15,18,21 42:3,9 53:4,8,18 53:21 54:8 55:2,7 56:4 60:6,17 61:3 61:8,13,15,18 62:10,14,21 63:12 63:16 64:8,10,13 65:3 67:4 71:17 72:5 75:17,22 77:4,12 78:5 83:1 83:8,20 86:12 88:11,17,18 89:4,7 89:12 90:8,13 91:3,4,11 92:3,4,8 94:14,16 96:15,19 97:15,22 98:1 99:21 100:9 102:1 102:14 103:2 123:5 124:18,22 125:5 126:17 127:14 133:4 134:7,11 145:2,4 151:3 152:8

**spg's** 25:18 34:21 65:10 67:2 97:7 101:20 104:10 138:7,8

**spgi** 4:14,15,21 9:17,21 10:3,22 11:5,12,15,16,21 12:10,13,16,18,22 13:4,16,22 14:3 15:6,12 16:3,10,14 17:2,9 23:18 24:10 25:11 27:12 54:5,15 56:4,10 61:9,14,15,20 62:2 64:2,10,13 67:4 69:20 71:16 72:5 73:3,16,17 74:5,6 75:1,11,17,21 78:5

80:22 82:2,18
83:13,21 84:7,10
84:13 85:1 86:6
88:11,14 89:8
111:21 118:14,18
118:19,22 119:3
122:16,20,22
123:2 131:12,16
132:3,7 133:4
145:2
**spgi's** 61:16 65:14
65:22,22 68:8
69:2 73:12 74:17
82:11 87:6 89:15
97:11 127:22
**spglobalinc.com.**
131:7
**spi** 4:11
**spoke** 24:9 115:20
138:19
**spoken** 105:17
**spreadsheet** 36:12
122:7
**spring** 90:21
**staff** 123:1
**staffed** 61:15
**stage** 104:1
**stages** 15:13,13
16:4
**stake** 97:19
**stamped** 120:19
**standard** 37:11
**start** 7:20 29:1
68:5
**started** 37:16
92:20 98:18 111:9
111:18 112:1
141:20
**starts** 124:12
127:20 136:11
143:5

**state** 42:15
**stated** 126:18
145:1
**statement** 105:11
106:5 109:4 149:3
149:4,6,9
**statements** 55:20
63:12 65:3 66:9
66:11,20,22 73:6
**states** 1:1 128:5
**status** 33:22 42:20
45:3 115:13
116:14,17,20
137:9
**stay** 42:11 100:20
110:5
**stayed** 31:9
**stenotype** 149:4
**step** 15:14,18 16:5
16:8
**steps** 33:5 134:2
**stock** 26:15,16,17
27:5 28:1 99:15
134:13,16
**stockholders**
26:13
**stocks** 135:4
**stop** 23:1
**stopped** 23:4
37:20,22
**store** 40:11
**stored** 61:5,6 67:1
76:17 77:10,20
117:15
**street** 2:4 100:16
151:10 152:2
**strike** 109:2
**strong** 41:1
**structure** 17:13
**stuff** 42:16 117:20
146:8

**stumbles** 100:16
**sub** 64:11
**subaward** 73:9
118:14,17 119:7
121:13
**subcompanies**
26:6 27:7,9 28:14
28:16 30:22 31:5
43:12 52:3,22
92:8 97:7,10
101:21 135:5,15
**subcontractor**
120:20 133:9
**subject** 94:11 97:1
97:1
**submissions**
133:19
**submit** 70:6,7
80:11 81:15,18
86:6
**submitted** 38:7,14
72:17 73:1,3
74:18 75:8,11
78:12 79:22 80:15
80:21 81:11 82:5
122:8 133:6,9,11
**submitting** 82:17
**subprojects** 62:9
**subrecipient** 121:7
**subrecipients** 87:5
87:12 89:2,16
97:11 102:16
103:4 108:7
110:10,18,18,20
111:13 112:6
113:2,5,7,9 114:3
114:13 118:8
129:10 130:2
**subs** 142:7
**subscribed** 35:21

**subscription** 96:6
96:9 99:12 141:16
**subsequently**
15:22
**substance** 5:2
70:19 79:5 137:7
138:17 140:4
**sudden** 107:21
**sufficient** 90:3
113:18
**suggest** 67:17
**suit** 41:1
**suite** 2:4,10,15
9:20 23:21 31:7
151:1 152:3
**sum** 85:5
**summary** 3:11
37:7 38:2
**supervisors** 61:22
62:1
**support** 41:19
76:11
**supposed** 115:6
**sure** 7:3 8:5 11:10
25:6 33:3,6 34:6
35:3,3 40:1 88:20
95:14 109:1
129:19 131:1
137:20
**suspend** 147:7
**sweat** 44:17 52:16
**swift** 85:4,6
**sworn** 4:5 106:2
**system** 37:9 39:9
44:17 45:9 52:13
60:21 62:5 77:21
77:22
**systems** 77:18

**[t - times]**                                                                 Page 23

| t | technical  68:19 | thanksgiving | thomas.burns |
|---|---|---|---|

**t**  3:1,1 150:1,1
  152:7,7
**table**  134:12
**tables**  97:20
**tact**  38:9
**tail**  57:22
**tailored**  52:14
**take**  8:3 9:6 16:13
  22:19 26:4 30:16
  33:5 43:3,4 67:15
  67:17,21 71:4
  79:2 130:6 131:21
  135:1 145:11,17
  145:19,21 147:9
**taken**  5:6,10 37:1
  76:6 149:3,4,9
  151:7
**talk**  14:19 68:5
  103:9 104:12
**talked**  83:19
  109:17 115:21
  127:7,11
**talking**  12:2 14:21
  25:7,10,11 72:2
  82:12 91:11 121:2
  121:19
**tangential**  74:2
**tangentially**  83:9
**tasked**  57:18
**tasks**  37:2
**taylor**  138:19
  140:5
**tcf**  30:18 31:2 92:4
  92:5 96:8,8
  101:14
**team**  30:21 31:1
  68:14
**teams**  45:1
**tech**  151:3 152:8

**technical**  68:19
**technically**  62:15
  62:16
**technologies**  1:4
  4:9
**technology**  25:2
  73:3
**tell**  22:11 30:1
  54:11 55:4 63:3
  105:10 116:18
  141:2
**ten**  67:20,22
  105:12
**tend**  109:9,10
**tended**  146:8
**tense**  109:20
**term**  42:22 44:11
  55:17 144:12
**terminated**  36:19
  36:21 37:3
**termination**  33:13
**terms**  29:21 55:16
  57:6
**testified**  4:5 12:4
  97:6 145:9
**testify**  4:14 147:3
**testifying**  6:6
  70:16
**testimony**  12:10
  68:7 147:10,14
  150:4,6
**text**  56:22 58:4,8
  58:10,12 109:9
  113:22 116:2
**texts**  98:12
**thank**  9:9 11:14,22
  31:21 32:3 63:9
  94:21 95:1 146:12
  146:14 151:18
**thanks**  137:9
  143:1

**thanksgiving**
  139:13
**thing**  7:7 13:4 16:4
  34:16 45:2 56:20
  58:7 92:13 100:22
  103:6 109:18
  111:2 131:3
**things**  15:19 36:16
  37:10 38:16 39:16
  39:17 52:11 54:19
  56:2 68:20 72:9
  74:3 91:15 95:14
  96:13 100:2
  103:22 110:22
  111:2 115:1,1,3
  116:13 118:10
  125:19 137:19
  141:17,18
**think**  11:2 12:4
  23:6 25:3 26:22
  27:17,18,19 30:20
  33:18 35:14 36:2
  39:4,15,20 43:20
  56:18 59:1,7,16
  60:15 61:6 62:12
  66:5 69:4,11 74:8
  75:20 76:2,13
  77:13 86:14 92:16
  95:19 109:7
  110:21 111:16,17
  112:17 113:13
  114:8 126:6
  128:16 132:5
  133:11 134:15,16
  137:17 141:8
  144:8 145:1
  146:22
**third**  84:19
**thomas**  1:15 4:3
  148:2 150:3,21
  151:1,7 152:9

**thomas.burns**
  131:7
**thought**  12:5
  14:10 64:12 79:2
**three**  41:13 64:13
  65:14,22 83:21
  84:6 87:20 88:2
  99:7 109:12
**thrift**  92:8
**thursday**  1:12
  151:15 152:10
**tied**  59:7
**time**  5:12 7:9 10:1
  10:14 13:21 17:4
  17:6 22:12 24:3
  31:10 37:14 43:5
  52:16 60:18,19,21
  61:2,18 62:4,9,12
  71:20 73:14 76:1
  80:6 86:17 87:8
  88:14 90:19 92:19
  95:2 100:7 103:6
  103:11 104:2,5
  109:20 110:9,15
  110:15 111:4,7,10
  111:17,18 113:3
  114:22 116:12
  126:20 128:7
  137:17,18 139:5,7
  139:11,14,19
  140:12,20,21,22
  141:4,8,13,20
  142:4,6,16 144:5,6
  144:10 147:5,15
  151:13
**timeline**  91:20
  139:17
**timely**  58:1 89:18
  113:8
**times**  99:7 107:3

[timothy - updated]                                                          Page 24

timothy  53:5
tissue  45:11
title  25:13 35:13
  53:10 54:1,10
  96:15
titles  29:11
today  4:12,20 6:5
  6:12,14 12:2 35:5
  70:17,20,21 71:1
  71:22 72:14 73:4
  73:7,10,13 74:12
  75:13 78:6,10
  79:8,15 82:12
  93:14 103:21
  104:9 105:5,8
  106:22 118:3
  121:19 135:16
  138:22 145:18
  146:18 147:3
told  34:5 58:15,17
  64:12,15,16,17
  80:7 100:6,8
  105:2,13 106:10
  106:12,13,13
  114:17 126:16
  128:19
tolley  1:9 2:13
  4:11 14:6,7,13,17
  15:4 17:1,8 25:1
  25:21 26:3,11,18
  29:19 30:7 34:9
  42:8 56:4 57:11
  57:18,20 58:19
  59:15 62:8 63:11
  64:16,17,21 65:12
  65:16 66:4 67:9
  68:16 76:21 78:21
  83:2,5 112:22
  113:4 117:8,9
  119:17,18,18
  120:19 122:2,11

123:12,12,13
  124:5 138:17,18
  139:5,16 140:3,4
  140:12 142:9
  143:20 144:12,19
  144:22
tolley's  26:21
  141:7
tomorrow  147:12
tony  25:4 30:10
  42:21
top  29:20 30:7
total  91:1 108:14
  121:14,15,16
  132:15
touch  112:15
touched  13:14
track  37:9 60:18
  61:1,18 62:8
tracking  45:10
train  31:8
transactions  94:15
transcript  3:22
  6:13,17,18 151:7
  151:14
transcription
  150:6
transfer  87:15
  90:15,16 107:19
  126:17
transferred  100:3
  107:3
transferring
  114:10 127:21
transfers  90:17,18
  90:20
transformative
  31:5
transitioned  69:5
transplant  45:11

travel  99:1
tried  23:4 37:4,6
  42:11 72:18
  109:19,21
trip  57:1 58:12
  93:21 98:5 99:18
  99:19 100:4,12
  101:9 102:22
  105:12 106:16
  107:6 109:5,8
  113:16,19 139:17
  139:21 141:6,7
  142:3 143:21,22
trip's  101:5
true  96:8 98:15
  103:7 115:1 131:8
  149:6 150:5
truthfully  147:3
try  37:9,12 59:10
  104:3 107:19
  110:3
trying  8:7 27:18
  29:18 59:4 95:5
  103:16 114:22
  129:1 132:3
turn  33:8 128:11
turned  116:22
turning  32:20
two  8:1 14:4,11
  41:13 64:12,22
  84:9 85:19 96:14
  96:17,19 109:10
  145:19 147:16
type  26:5 39:4
  40:9 45:2 52:11
  52:12 62:6 82:4
  92:13 94:2 96:13
  109:17 111:1
types  36:16 39:16
  115:3

typewriting  149:5
typically  131:19

                u

uh  6:15,16
ultimately  6:12
  62:6 85:13 86:6
uncertainty
  103:22
underneath  85:9
understand  6:7,14
  6:19 7:5,6 8:10,11
  8:13 29:19 38:11
  61:11 70:2,14,18
  72:12 80:10 88:20
  95:15 97:13
  101:12 106:8
  132:3 141:20
understanding
  4:13,19 36:5 41:6
  74:11,16,22 75:1,5
  76:2 99:13 104:8
  108:19 120:15
  121:5 128:13
  132:10 137:12
  140:10 144:22
understood  6:2,3
  8:16 115:18
  122:10 144:14
unemployment
  33:16
unfortunately
  71:5
united  1:1 64:1,7,9
  64:22 65:4,10,15
  66:1,4 67:6 83:17
  83:20 84:5,7,10
  144:15,17
update  116:14
  117:21 139:1
updated  137:9

**updates** 100:4
118:11 129:1
**use** 15:1 41:18
42:22 60:17 63:16
64:2 88:12 108:5
**user** 67:4

**v**

**vaccine** 104:22
**valuable** 43:2
135:14
**valuation** 97:18
134:6
**value** 28:1,7,13
33:15 134:22
**valued** 42:17
134:8
**various** 56:1 62:9
84:13 85:12 88:12
88:13 97:7 102:16
110:20 121:6
**vast** 109:18
**vehicle** 27:18
**vendors** 41:18
85:9
**venture** 93:12
**verbal** 6:11,20
109:9,18 113:20
113:21
**verified** 105:3
**verify** 114:22
115:2,4 126:13
**verifying** 66:11
**veritext** 1:18
151:9 152:1
**vertebrae** 146:7
**viable** 135:11
**vice** 30:10,10 43:1
**video** 1:17 119:14
**vienna** 2:10
**virginia** 1:1,20
2:10,15 4:17,19

9:18 23:16,22
24:14 149:18
151:2
**virtual** 1:14
**virtually** 98:13
104:4 109:14
**visas** 92:18
**visit** 92:12 96:4
**vp** 26:7 43:11
**vs** 1:6 151:3 152:8
**vyrtx** 27:8 28:17
45:8,9,12 53:3
135:6

**w**

**w** 150:1
**wait** 22:18 147:14
**waiting** 22:16
146:6
**waived** 147:22
**walked** 109:17
**wall** 54:5,6,6,8,13
54:16 55:10 69:5
76:8,11 112:9,13
112:19 118:10,11
121:1,2,6 123:3
129:7 134:1
**wall's** 122:13
128:14
**want** 7:3 8:4,17,18
8:21 9:3 11:10
12:3,9 29:13
30:19 31:19 68:5
70:2,18 79:19
81:5 86:12 88:20
93:19 94:18
100:20 117:7
120:18 121:10
122:10 124:11,21
127:19 130:5,6
131:3 132:8 137:5
138:10 140:2

142:8 143:4
144:18
**wanted** 78:11,19
142:17
**washington**
151:10 152:4
**way** 5:3 6:20
59:16 80:11 94:15
103:16 104:18
142:21
**we've** 22:16 66:22
68:6 80:10 84:1
99:5 121:2 133:7
**week** 99:7 109:14
114:20,20 138:21
139:6 140:6,8,13
143:9 147:8
**weekend** 144:8
**weeks** 99:6 105:12
106:3
**went** 60:22 72:22
85:20 96:11
100:18,19 105:16
112:16,20 141:17
**whatsoever** 70:4
**wide** 74:18,20
75:1,5,11,15,17,22
76:13,17 77:5,14
77:20 79:20 80:2
80:5,14,16 81:7,10
82:3
**willing** 146:7
**willingness** 101:1
142:12
**wire** 83:14 97:2
142:15 143:8,11
**wired** 83:16,17
92:16 96:6 104:17
129:17 144:5
**withdrawing**
89:14

**withdrawn** 89:11
**witness** 4:4 9:12
14:16 15:1 63:6
68:1 130:5,8
146:10,12,14
152:9
**witnessed** 128:18
**women's** 52:11
**wonderful** 43:9
**work** 24:13 29:5
31:11 32:16 37:19
42:17 43:12 44:9
54:14,16 60:19
61:9 62:9 80:16
80:17 81:15 98:19
121:14
**workday** 60:19
**worked** 57:22
101:9,11 117:21
121:2
**workflow** 74:19
74:20 75:2,6,7,11
75:15,18,22 76:13
76:18 77:5,15,21
79:20 80:3,5,14,16
81:7,10 82:4
**working** 16:14
24:16 39:18 54:4
56:16 58:20 59:12
62:3 79:17 80:8
83:3 88:14 92:18
101:11 103:18
106:11
**workload** 16:7
**works** 43:21
**world** 100:14
**worth** 134:20
135:10
**wound** 105:14
107:5

**[writing - zoom]**

| |
|---|
| **writing**   116:8 |
| **written**   6:13 55:19 |
| 55:20 56:1,7 71:9 |
| 71:11 113:22 |
| **wrong**   35:15 |
| **wrote**   126:20 |
| **wyze**   27:7 28:19 |
| 52:4,5,6,7 53:2 |

| x |
|---|
| **x**   1:3,11 |

| y |
|---|
| **yeah**   38:12 53:17 |
| 70:9 117:19 119:5 |
| 121:9 123:8 |
| 130:14 131:22 |
| 135:7 |
| **year**   37:22 38:3 |
| 87:9 96:16 |
| **years**   5:7 41:13,14 |
| **yesterday**   79:11 |
| 79:12 |
| **younger**   23:5 |

| z |
|---|
| **zero**   11:15,21 |
| **zoom**   1:17 5:10 |
| 7:8 |

Rules of Supreme Court of Virginia

Part Four - Pretrial Procedures

Depositions and Production at Trial

Rule 4.5


(e) Submission to Witness; Changes; Signing.
When the testimony is fully transcribed, the
deposition shall be submitted to the witness for
examination and shall be read to or by him, unless
such examination and reading are waived by the
witness and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within 21 days of its
submission to him, the officer shall sign it and
state on the record the fact of the waiver or of
the illness or absence of the witness or the fact
of the refusal to sign together with the reason, if
any, given therefor; and the deposition may then be
used as fully as though signed unless on a motion

to suppress under Rule 4:7(d)(4) the court holds
that the reasons given for the refusal to sign
require rejection of the deposition in whole or in
part.


DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

| | |
|---|---|
| **From:** | Ken Wall |
| **Sent:** | Wednesday, August 5, 2020 9:33 AM |
| **To:** | Marcia Gross |
| **Subject:** | RBR Invoice 07.12.20 SPGI Approve.pdf |
| **Attachments:** | RBR Invoice 07.12.20 SPGI Approve.pdf |

CONFIDENTIALITY NOTICE: This transmission is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521 and is intended to be delivered only to the named addressee(s) and may contain information that is confidential and proprietary or subject to the attorney client privilege and/or the attorney work-product doctrine. If this information is received by anyone other than the named addresse(s), the recipient should immediately notify the sender by E-mail and by telephone and obtain instructions as to the disposal of the transmitted material. In no event shall this material be read, used, copied, reproduced, stored or retained by anyone other than the named addressee(s), except with the express consent of the sender or the named addressee(s).

1

TOLLEY - 000855

**EXHIBIT**
Burns 1



| | |
|---|---|
| **Invoice No.** | RBR-071220 |
| **Date SPGI Rec'd** | 08/04/20 |

| | |
|---|---|
| Subcontractor Name: | **RBR - Technologies** |
| Address 1: | 2288 Blue Water Blvd. |
| Address 2: | Suite 322 |
| City, State, Zip | Odenton, MD  21113 |

## SPGI Invoice Checklist

| | |
|---|---|
| Subaward Number: | 19001 |
| Project Name: | ACT3 - Air Force Cognitive Engine |
| Period of Performance: | 06/15/20 to 07/12/20 |
| Total Amount Due: | $213,867.21 |

**Checklist:**

| | |
|---|---|
| Invoice reflects cost by each cost element? | Yes |
| Invoice contains written certification? | Yes |
| Invoice is signed by a duly authorized agent? | Yes |

| | |
|---|---|
| Amt of Inception-to-Date Charges: | $2,183,483.95 |
| Invoice aligns w/Mos Spend Plan: | Yes |
| Area of Concern to Note: | |

Signature below certifies that an authorized representative of SPGI has reviewed the invoice and authorizes SP Global to issue payment

**Ken Wall**  Digitally signed by Ken Wall
Date: 2020.08.05 09:32:26 -04'00'

SPGI Authorized Representative


**RBR-Technologies**

| | |
|---|---|
| Bill Date: | August, 03, 2020 |
| Bill #: | RBR-071220 |
| Billing Pd: | 06/15/2020- 07/12/2020 |

To:  SPG Institute, Inc.
5100 Springfield St., Suite 500
Dayton, OH 45431

From:  RBR - Technologies
2288 Blue Water Blvd, Suite 322
Odenton, MD 21113

| | | | | |
|---|---|---|---|---|
| Prime Contract #: | CA FA8650-19-2-6983 | **Total Funded:  $** | **4,799,435.00** | **% Spent** |
| Subcontract #: | 19001 | Labor Funded:  $ | 4,203,168.00 | |
| Internal Account #: | | Labor Used:  $ | 2,080,022.58 | 49.49% |
| Contract Name: | SPG ACT3 | Labor Balance:  $ | 2,123,145.42 | |
| POP: | 8/1/19 - 7/31/21 | Travel / ODC Funded:  $ | 596,267.00 | |
| | Mark.Miller@SPGInstitute.com | Travel / ODC Used:  $ | 103,461.54 | 17.35% |
| | Andrea.Seitz@SPGInstitute.com | Travel / ODC Balance:  $ | 492,805.46 | |
| | | Total Balance:  $ | 2,615,905.88 | |

| Employee Name | | | Current Period | | Inception-To-Date | |
|---|---|---|---|---|---|---|
| | | | Hours | Amount | Hours | Amount |
| Program Manager | | | 0.00 | $0.00 | 448.00 | $85,127.94 |
| Project Engineer | | | 1,073.5 | $ 163,946.75 | 7,743.90 | $1,079,872.25 |
| Software Developer | | | 148 | $ 24,284.69 | 3,577.45 | $494,916.97 |
| Jr. Software Developer | | | 140 | $6,728.23 | 2,707.50 | $141,881.10 |
| System Integrator | | | 152.00 | $15,914.23 | 2.799 | $278,224.31 |
| | | | | | | |
| Labor Total: | | | 1,513.5 | $210,873.90 | 17,275.85 | $2,080,022.58 |
| | | | | | | |
| | | | | Amount | | Amount |
| Travel / ODC Total: | Amazon Web and Microsoft Hosting Services | | | $2,993.31 | | $70,988.82 |
| | Travel | | | | | $32,472.72 |
| **Invoice Total** | | | | **$ 213,867.21** | | **$2,183,484.12** |

I hereby certify that the above invoice is true and correct, that any costs included herein have been incurred, and that payment therefore has not been received; that it is in accordance with the terms and conditions of the Sub award; and that all services, supplies shown in the invoice have been performed, delivered, or incorporated into an item to be delivered. It is presented with the knowledge that the amount paid hereto will become the basis for a claim against the United States Government.

*Bryan M Harte*

Bryan Harte                    08/03/2020

TOLLEY - 000857

| | |
|---|---|
| **From:** | Ken Wall |
| **Sent:** | Tuesday, January 5, 2021 10:46 AM |
| **To:** | SCHUMACHER, COREY J DR-04 USAF AFMC 711 HPW/RH; SCHEMMEL, MARINA R CIV USAF AFMC AFRL/RQKHA; FINK, ELIZABETH A CIV USAF AFMC AFRL/RAKHC; SOUTHERS, SUSAN L DO-03 USAF AFMC AFRL/RAKHA |
| **Subject:** | DRAFT Letter - Tom Dan Scott to Corey.1-5-21.pdf |
| **Attachments:** | DRAFT Letter - Tom Dan Scott to Corey.1-5-21.pdf |

Corey/Marina et al- Here is a draft letter that will be coming your way along with a proof of funds once all signatures are obtained – we'll discuss this at 11 - Ken

1

TOLLEY - 004087

EXHIBIT

Burns 2



DRAFT

January 5, 2021

Dr. Corey Schumacher
ARCNET Chief Technology Officer

Dear Corey,

First, we, as the three largest shareholders of SP Global, Inc. ("SPG"), apologize for the delay in payments to the vendors. We have been working diligently to resolve all outstanding payments.

PRITT Investments, as a large shareholder and board member, has provided a proof of funds (see attached) that far exceeds the Thirty-Seven Million Dollars ($37,000,000.00) that is its initial investment into SPG and its associated companies. We have been told by the bank that the funds will be cleared to transfer to SPG no later than Monday, 11 January 2021, although the bank has stated they expect it to be earlier. The wiring instructions have already been provided and the money will be transferred immediately when the bank has approved. Upon our receipt of funds, we will immediately wire transfer (for those vendors who provided wiring instructions) or send checks to all vendors.

Lastly, we have opened an account in Ohio and are transferring control of SPGI's account to the leadership in the Dayton office to prevent problems arising in the future.

We sincerely apologize for these delays and appreciate everyone's patience.

DRAFT

Thomas D. Burns, Sr.
Chairman & CEO
SP Global, Inc.

Dr. Dan B. Tolley
President
SP Global, Inc.

Pritt Investment Partners, LLC
By: Scott Tripp, Manager

14800 Conference Center Drive, Suite 300, Chantilly, VA 20151

TOLLEY - 004088

**From:** Marcia Gross
**To:** Bryan H rte
**Subject:** RE: [EXTERNAL]RBR-Technologies, Inc. Invoice RBR-SPG_012421 Contract: CA FA8650-19-2-6983
**Date:** Tuesday, January 26, 2021 10:49:56 AM
**Attachments:** image001.png

**CAUTION: This email was sent from outside RBR-Technologies. Please exercise caution when clicking links or opening attachments within this email.**

Thanks Bryan!

**From:** Bryan Harte <bryan.harte@rbr-technologies.com>
**Sent:** Monday  January 25  2021 8 18 PM
**To:** Marcia Gross <Marcia.Gross@spginstitute.com>
**Cc:** Kevin Reynolds <kevin.reynolds@rbr-technologies.com>; Christopher Taylor (E) <ctaylor@rbr-tech.com>; Andrea Seitz <Andrea.Seitz@spginstitute.com>; Katelyn Kennedy <kkennedy@rbr-tech.com>; Dan Tolley (E) <dan.tolley@spglobalinc.com>; Thomas.Burns@SPGlobalInc.com; Ken Wall <ken.wall@spglobalinc.com>
**Subject:** [EXTERNAL]RBR-Technologies  Inc. Invoice RBR-SPG_012421 Contract  CA FA8650-19-2-6983

Marcia

Good Evening. Attached you will find RBR invoice# RBR012421 for contract CA FA8650-19-2-6983 . Below is a summary of our current AR  please Let me know if you need anything else to process this invoice for payment.

| Invoice Number | Contract | Dated Submitted | Period Covered | Amount | Notes |
|---|---|---|---|---|---|
| RBR-SPG_071220 | AFRL ACT3 | 8/4/2020 | 6/15/2020-7/12/2020 | $213,867.21 | Past Due |
| RBR-SPG_080920 | AFRL ACT3 | 8/25/2020 | 7/13/2020-8/9/2020 | $237,450.14 | Past Due |
| RBR-SPG_090620 | AFRL ACT3 | 10/5/2020 | 08/10/2020- 09/06/2020 | $249,689.53 | Past Due |
| RBR-SPG_100420 | AFRL ACT3 | 10/23/2020 | 09/7/2020-10/4/2020 | $187,744.22 | Past Due |
| RBR-SPG_110120 | AFRL ACT3 | 11/5/2020 | 10/5/2020-11/1/2020 | $210,435.69 | Past Due |
| RBR-SPG_112920 | AFRL ACT3 | 12/1/2020 | 11/2/2020-11/29/2020 | $142,816.01 | Past Due |
| RBR-SPG_122720 | AFRL ACT3 | 12/30/2020 | 11/30/2020-12/27/2020 | $139,469.97 | Past Due |
| RBR-SPG_012421 | AFRL ACT3 | 1/25/2021 | 12/28/2020-01/24/2021 | $86,013.82 | Just Submitted |
| | | | Total | **$1,467,486.59** | |

V/R,
Bryan

Bryan Harte
MBA, PMP, CISSP
RBR-Technologies, Inc.
Chief Operating Officer
443.306.9250
bryan.harte@rbr-technologies.com

This message (including any attachments) is intended only for the use of the individual or entity to which it is addressed and may contain information that is non-public, proprietary, privileged, company confidential, and exempt from disclosure under applicable law or may constitute attorney work product. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, notify us immediately by telephone and (i) destroy this message if a facsimile or (ii) delete this message immediately if this is an electronic communication.

CONFIDENTIALITY NOTICE: This transmission is protected by the Electronic Communications Privacy Act, 18 U S C  Sections 2510-2521 and is intended to be delivered only to the named addressee(s) and may contain information that is confidential and proprietary or subject to the attorney client privilege and/or the attorney work-product doctrine  If this information is received by anyone other than the named addressee(s), the recipient should immediately notify the sender by E-mail and by telephone and obtain instructions as to the disposal of the transmitted material  In no event shall this material be read, used, copied, reproduced, stored or retained by anyone other than the named addressee(s), except with the express consent of the sender or the named addressee(s)

EXHIBIT

Burns 3

**From:** Dan Tolley
**To:** Bryan Harte
**Subject:** RE: [EXTERNAL] RE: [EXTERNAL]RE: [EXTERNAL]RE: Outstanding Invoices
**Date:** Tuesday, November 24, 2020 11:02:14 AM

CAUTION: This email was sent from outside RBR-Technologies. Please exercise caution when clicking links or opening attachments within this email.

Understood.  Meeting with my CEO on it today and will have an update for you tomorrow.

Dan.

Dr. Dan B. Tolley
President  SP Global  Inc.
1400 Conference Center Dr.  Suite 300
Chantilly  VA 20151
703-346-5291

**From:** Bryan Harte <bryan.harte@rbr-technologies.com>
**Sent:** Monday  November 23  2020 3 58 PM
**To:** Dan Tolley <dan.tolley@spglobalinc.com>
**Subject:** RE [EXTERNAL] RE [EXTERNAL]RE [EXTERNAL]RE Outstanding Invoices

Dan

I wanted to follow-up on our phone call. You had initially indicated that your accounting issue would need to be moved back to 12/1/2020 that is 8 days from today. You also indicated that you were going to try to accelerate that to sometime this week.

Is there a way to do a partial payment this week and the balance next week? I know that you don t feel well about the situation and acknowledge the issue is within accounting on your end. I trust that you are trying to do the right thing  and I am trying to find ways to reduce the current impact the delayed payment is having on my company.

V/R,
Bryan

Bryan Harte
MBA, PMP, CISSP
RBR-Technologies, Inc.
Chief Operating Officer
443.306.9250
bryan.harte@rbr-technologies.com

This message (including any attachments) is intended only for the use of the individual or entity to which it is addressed and may contain information that is non-publ ic, proprietary, privileged, company confidential, and exempt from disclosure under applicable law or may const tute attorney work product. If you are not the intended recipient, you are hereby not fied that any use, dissemination, distribution, or copying of this communication is strictly prohi bited. If you have received this communication in error, notify us immediately by telephone and ( ) destroy this message ? a facsim le or (ii) delete this message immediately if this is an electronic communication.

**From:** Dan Tolley <dan.tolley@spglobalinc.com>
**Sent:** Wednesday  November 18  2020 3 39 PM
**To:** Bryan Harte <bryan.harte@rbr-technologies.com>
**Cc:** Management <mgmt@rbr-technologies.com>
**Subject:** RE [EXTERNAL] RE [EXTERNAL]RE [EXTERNAL]RE Outstanding Invoices

CAUTION: This email was sent from outside RBR-Technologies. Please exercise caution when clicking links or opening attachments within this email.

Bryan

First let me say how much I appreciate you and your company s willingness to give us the opportunity to correct our mistakes.

I ll get to answering your original question – We plan to make the ArcNet payment via wire this Friday.  I don t have a specific time  but let me say no later than 3 30pm.

I know we have made it difficult on you  so I wanted to reconfirm that the commercial side of our business is going to add an 18%APR bonus to your payment.  It will come separate from the ArcNet payment towards the end of the month as a way to express our regret  and hopefully cover any costs you may have incurred by our mistake.

Thanks for your kindness.

Dan.

Dr. Dan B. Tolley
President  SP Global  Inc.
1400 Conference Center Dr.  Suite 300
Chantilly  VA 20151
703-346-5291

**From:** Bryan Harte <bryan.harte@rbr-technologies.com>
**Sent:** Wednesday  November 18  2020 11 07 AM
**To:** Dan Tolley <dan.tolley@spglobalinc.com>
**Cc:** Management <mgmt@rbr-technologies.com>
**Subject:** RE [EXTERNAL] RE [EXTERNAL]RE [EXTERNAL]RE Outstanding Invoices

Dr. Tolley

Good morning. Chris Taylor indicated that you said a payment will be coming this week. This is after a previous conversation where you indicated that payment would come the week of Nov 9th.  Today we had a meeting with AFRL senior leaders to talk about future activities on this contract. We did not bring up the payment issue in the meeting. However  after the meeting we discussed internally that we probably do need to bring up the risk of continued support given the current situation. As of today SPGi is past due on 4 invoices and RBR has

EXHIBIT

Burns 4

incurred over $1 2M in costs on this Cost Plus No Fee contract  Please let me know what time/day the EFT will be processed  We need a response today

V/R,
Bryan

Bryan Harte
MBA, PMP, CISSP
RBR-Technologies, Inc.
Chief Operating Officer
443 306 9250
bryan_harte@rbr-technologies.com

This message (including any attachments) is intended only for the use of the individual or entity to which it is addressed and may contain information that is non-public, proprietary, privileged, company confidential, and exempt from disclosure under applicable law or may constitute attorney work product. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, notify us immediately by telephone and (i) destroy this message if a facsimile or (ii) delete this message immediately if this is an electronic communication.

---

**From:** Bryan Harte
**Sent:** Thursday, November 12, 2020 11:59 AM
**To:** Dan Tolley <dan_tolley@spglobalinc.com>
**Cc:** Management <mgmt@rbr-technologies.com>
**Subject:** RE: [EXTERNAL] RE: [EXTERNAL]RE: [EXTERNAL]RE: Outstanding Invoices
**Importance:** High

Dr  Tolley,

Good morning  I believe that you spoke with Chris Taylor regarding RBR s outstanding invoices, he indicated that you said payment would come this week  As of today we have not seen any payment on the below invoices  Can you please provide an update on the below invoices

| Invoice Number | Contract | Dated Submitted | Period Covered | Amount | Notes |
|---|---|---|---|---|---|
| RBR-SPG_071220 | AFRL ACT3 | 8/4/2020 | 6/15/2020-7/12/2020 | $213,867 21 | |
| RBR-SPG_080920 | AFRL ACT3 | 8/25/2020 | 7/13/2020-8/9/2020 | $237,450 14 | |
| RBR-SPG_090620 | AFRL ACT3 | 10/6/2020 | 08/10/2020- 09/06/2020 | $249,689 53 | |
| RBR-SPG_100420 | AFRL ACT3 | 10/23/2020 | 09/7/2020-10/4/2020 | $187,744 22 | |
| RBR-SPG_110120 | AFRL ACT3 | 11/5/2020 | 10/5/2020-11/1/2020 | $210,435 69 | Just submitted today |
| | | | | $   1,099,186 79 | |

V/R,
Bryan


Bryan Harte
MBA, PMP, CISSP
RBR-Technologies, Inc
Chief Operating Officer
443 306 9250
bryan harte@rbr-technologies.com


This message (including any attachments) is intended only for the use of the individual or entity to which it is addressed and may contain information that is non-public, proprietary, privileged, company confidential, and exempt from disclosure under applicable law or may constitute attorney work product  If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited  If you have received this communication in error, notify us immediately by telephone and (i) destroy this message if a facsimile or (ii) delete this message immediately if this is an electronic communication

---

**From:** Dan Tolley <dan_tolley@spglobalinc.com>
**Sent:** Tuesday, October 27, 2020 12:52 PM
**To:** Bryan Harte <bryan_harte@rbr-technologies.com>
**Subject:** RE: [EXTERNAL] RE: [EXTERNAL]RE: [EXTERNAL]RE: Outstanding Invoices

**CAUTION: This email was sent from outside RBR-Technologies. Please exercise caution when clicking links or opening attachments within this email.**

Bryan,

I would like to come see you tomorrow or Thursday and have a discussion and a chance to get to know each other   Would you be available?

Thanks

Dan

Dr  Dan B  Tolley
President, SP Global, Inc
1400 Conference Center Dr , Suite 300
Chantilly, VA 20151
703-346-5291

**From:** Marcia Gross <Marcia.Gross@spginstitute.com>
**Sent:** Tuesday, October 27, 2020 12:06 PM
**To:** Bryan Harte <bryan.harte@rbr-technologies.com>
**Cc:** Dan Tolley <dan.tolley@spglobalinc.com>; Daniel Ehlert <daniel.ehlert@spglobalinc.com>; Ken Wall <ken.wall@spglobalinc.com>; Mark Pohl <mark.pohl@spglobalinc.com>; Timothy Shaw <timothy.shaw@spglobalinc.com>
**Subject:** [EXTERNAL] RE: [EXTERNAL]RE: [EXTERNAL]RE: Outstanding Invoices

Bryan,

I am going to let corporate answer for an updated payment status

Thanks,

Marcia

---

**From:** Bryan Harte <bryan.harte@rbr-technologies.com>
**Sent:** Tuesday, October 27, 2020 11:31 AM
**To:** Marcia Gross <Marcia.Gross@spginstitute.com>
**Cc:** Dan Tolley (E) <dan.tolley@spglobalinc.com>; Daniel Ehlert <daniel.ehlert@spglobalinc.com>; Ken Wall <ken.wall@spglobalinc.com>; Mark Pohl <mark.pohl@spglobalinc.com>; Timothy Shaw <timothy.shaw@spglobalinc.com>
**Subject:** [EXTERNAL]RE: [EXTERNAL]RE: Outstanding Invoices

Marcia,

Thanks for the heads up  We checked with the bank this morning and have not seen deposit yet

We are ok with a paper check if easier  Any update on payment would be greatly appreciated

V/R,
Bryan

Bryan Harte
MBA, PMP, CISSP
RBR-Technologies, Inc
Chief Operating Officer
443 306 9250
bryan.harte@rbr-technologies.com

This message (including any attachments) is intended only for the use of the individual or entity to which it is addressed and may contain information that is non-public, proprietary, privileged, company confidential, and exempt from disclosure under applicable law or may constitute attorney work product  If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited  If you have received this communication in error, notify us immediately by telephone and (i) destroy this message if a facsimile or (ii) delete this message immediately if this is an electronic communication

**From:** Marcia Gross <Marcia.Gross@spginstitute.com>
**Sent:** Monday, October 26, 2020 9:33 AM
**To:** Bryan Harte <bryan.harte@rbr-technologies.com>
**Cc:** Dan Tolley (E) <dan.tolley@spglobalinc.com>; Daniel Ehlert <daniel.ehlert@spglobalinc.com>; Ken Wall <ken.wall@spglobalinc.com>; Mark Pohl <mark.pohl@spglobalinc.com>; Timothy Shaw <timothy.shaw@spglobalinc.com>
**Subject:** RE: [EXTERNAL]RE: Outstanding Invoices

**CAUTION: This email was sent from outside RBR-Technologies. Please exercise caution when clicking links or opening attachments within this email.**

Bryan,

My understanding is corporate is wiring the funds today,  I have forwarded your email to them for a response,

My apologies,

Marcia

---

**From:** Bryan Harte <bryan.harte@rbr-technologies.com>
**Sent:** Friday, October 23, 2020 11:40 AM
**To:** Marcia Gross <Marcia.Gross@spginstitute.com>
**Cc:** Ken Wall <ken.wall@spglobalinc.com>; Mark Pohl <mark.pohl@spglobalinc.com>; Timothy Shaw <timothy.shaw@spglobalinc.com>; Dan Tolley (E) <dan.tolley@spglobalinc.com>; Katelyn Kennedy <kkennedy@rbr-tech.com>
**Subject:** [EXTERNAL]RE: Outstanding Invoices

Marcia,

I just wanted to follow up regarding recent invoices  Can you look into payment status for the below invoices

| Invoice Number | Contract | Dated Submitted | Period Covered | Amount | Notes |
|---|---|---|---|---|---|
| RBR-SPG_071220 | AFRL ACT3 | 8/4/2020 | 6/15/2020-7/12/2020 | $     213,867 21 | |
| RBR-SPG_080920 | AFRL ACT3 | 8/25/2020 | 7/13/2020-8/9/2020 | $     237,450 14 | |
| RBR-SPG_090620 | AFRL ACT3 | 10/6/2020 | 08/10/2020- 09/06/2020 | $     249,689 53 | |
| RBR-SPG_100420 | AFRL ACT3 | 10/23/2020 | 09/7/2020-10/4/2020 | $     187,744 22 | Just submitted today |
| | | | Total Outstanding | $     888,751 10 | |

V/R,
Bryan


Bryan Harte
MBA, PMP, CISSP
RBR-Technologies, Inc
Chief Operating Officer
443 306 9250
bryan.harte@rbr-technologies.com


This message (including any attachments) is intended only for the use of the individual or entity to which it is addressed and may contain information that is non-public, proprietary, privileged, company confidential, and exempt from disclosure under applicable law or may constitute attorney work product  If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited  If you have received this communication in error, notify us immediately by telephone and (i) destroy this message if a facsimile or (ii) delete this message immediately if this is an electronic communication

**From:** Bryan Harte
**Sent:** Saturday, October 10, 2020 9:02 AM
**To:** Marcia Gross <Marcia.Gross@spginstitute.com>
**Cc:** Ken Wall <ken.wall@spglobalinc.com>; Mark Pohl <mark.pohl@spglobalinc.com>; Timothy Shaw <timothy.shaw@spglobalinc.com>; Dan Tolley (E) <dan.tolley@spglobalinc.com>
**Subject:** RE: Outstanding Invoices

V/R,
Bryan

Bryan Harte
MBA, PMP, CISSP, Inc.
RBR-Technologies, Inc.
Chief Operating Officer
443.306.9250
bryan.harte@rbr-technologies.com


This message (including any attachments) is intended only for the use of the individual or entity to which it is addressed and may contain information that is non-public, proprietary, privileged, company confidential, and exempt from disclosure under applicable law or may constitute attorney work product. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, notify us immediately by telephone and (i) destroy this message if a facsimile or (ii) delete this message immediately if this is an electronic communication.

**From:** Marcia Gross <Marcia.Gross@spginstitute.com>
**Sent:** Friday, October 9, 2020 10:55 AM
**To:** Marcia Gross <Marcia.Gross@spginstitute.com>
**Cc:** Ken Wall <ken.wall@spglobalinc.com>; Mark Pohl <mark.pohl@spglobalinc.com>; Timothy Shaw <timothy.shaw@spglobalinc.com>; Dan Tolley (E) <dan.tolley@spglobalinc.com>
**Subject:** Outstanding Invoices

**CAUTION: This email was sent from outside RBR-Technologies. Please exercise caution when clicking links or opening attachments within this email.**

I wanted to both apologize and thank you for your patience while we work to correct any outstanding invoices   We are working to implement a more efficient method of payment moving forward

At this time, we are requesting your ACH wire transfer information so we can quickly pay your outstanding invoice  Please forward your Financial Account and Routing numbers at your earliest convenience

Although corporate has not yet determined if all future payments will be made via ACH, I am hopeful that will be the end result and will keep you updated


Sincerely,

Marcia Gross

CONFIDENTIALITY NOTICE: This transmission is protected by the Electronic Communications Privacy Act, 18 U S C  Sections 2510-2521 and is intended to be delivered only to the named addressee(s) and may contain information that is confidential and proprietary or subject to the attorney client privilege and/or the attorney work-product doctrine  If this information is received by anyone other than the named addressee(s), the recipient should immediately notify the sender by E-mail and by telephone and obtain instructions as to the disposal of the transmitted material  In no event shall this material be read, used, copied, reproduced, stored or retained by anyone other than the named addressee(s), except with the express consent of the sender or the named addressee(s)

CONFIDENTIALITY NOTICE: This transmission is protected by the Electronic Communications Privacy Act, 18 U S C  Sections 2510-2521 and is intended to be delivered only to the named addressee(s) and may contain information that is confidential and proprietary or subject to the attorney client privilege and/or the attorney work-product doctrine  If this information is received by anyone other than the named addressee(s), the recipient should immediately notify the sender by E-mail and by telephone and obtain instructions as to the disposal of the transmitted material  In no event shall this material be read, used, copied, reproduced, stored or retained by anyone other than the named addressee(s), except with the express consent of the sender or the named addressee(s)

CONFIDENTIALITY NOTICE: This transmission is protected by the Electronic Communications Privacy Act, 18 U S C  Sections 2510-2521 and is intended to be delivered only to the named

addressee(s) and may contain information that is confidential and proprietary or subject to the attorney client privilege and/or the attorney work-product doctrine  If this information is received by anyone other than the named address(s), the recipient should immediately notify the sender by E-mail and by telephone and obtain instructions as to the disposal of the transmitted material  In no event shall this material be read, used, copied, reproduced, stored or retained by anyone other than the named address(s), except with the express consent of the sender or the named addressee(s)